**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

HAROLD HARRIS; PASTOR ROBERT
TIPTON, JR.; DELTA SIGMA THETA
SORORITY, INC.; DESOTO COUNTY
MS NAACP UNIT 5574

                      *Plaintiffs*,

v.

DESOTO COUNTY, MISSISSIPPI;
DESOTO COUNTY BOARD OF
SUPERVISORS; DESOTO COUNTY
ELECTION COMMISSION; and DALE
THOMPSON in her official capacity as
DeSoto County Circuit Clerk.

                      *Defendants*.

3:24-cv-289-DMB-RP

No. 24-cv-_____

**COMPLAINT FOR
DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF**

## <u>COMPLAINT</u>

     HAROLD HARRIS, PASTOR ROBERT TIPTON, JR., DELTA SIGMA THETA

SORORITY, INC., and DESOTO COUNTY MS NAACP UNIT 5574, (together, "Plaintiffs")

bring this action against DESOTO COUNTY, MISSISSIPPI, the DESOTO COUNTY BOARD

OF SUPERVISORS, the DESOTO COUNTY ELECTION COMMISSION, and DALE

THOMPSON in her official capacity as DeSoto County Circuit Clerk (together, "Defendants"),

and allege the following:

## **INTRODUCTION**

1.     Nearly a third of DeSoto County's residents are Black,[1] but they have been deprived of fair political representation under the 2022 redistricting plan ("the 2022 Plan") passed by the DeSoto County Board of Supervisors. The 2022 Plan governs elections for the following public offices in DeSoto County: the five members of the County's Board of Supervisors, the five members of the County's Board of Education, the five members of the County's Election Commission, the five Judges of the County's Justice Court, and the County's five Constables (collectively, "County Offices").

2.     Despite DeSoto County's significant Black population, no Black person has been elected to a County Office in at least the last two decades, and candidates of choice of the Black community have rarely been elected. The 2022 Plan, in combination with high levels of racially polarized voting and other factors, perpetuates this inequality. Like prior plans, the 2022 Plan splinters the Black community and dilutes its voting power. As a result, the 2022 Plan denies Black voters an equal opportunity to participate in the political process, and allows officials to ignore the Black community's discrete needs, desires, and concerns without fear of electoral consequences.

3.     Black citizens were 31.7% of the population of DeSoto County in the 2020 Census—a 9.2 percentage point increase in the County's share of Black residents since 2010 and an almost three-fold increase since 2000.

4.     Nevertheless, none of the five districts from which the County Offices are elected is drawn in a way that gives Black voters the opportunity to elect their preferred candidates.

---

[1] As used herein, the word "Black" includes people who identify as any part Black, *i.e.*, anyone who self-identified in the Census as either Black alone *or* as Black and any another race or ethnicity. *See Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1 (2003) (explaining that, in cases "involv[ing] an examination of only one minority group's effective exercise of the electoral franchise, . . . it is proper to look at all individuals who identify themselves as [B]lack").

5.  Not one of the 25 current officeholders elected from the districts established by the 2022 Plan is Black or was the Black-preferred candidate for the office.

6.  Black and Black-preferred candidates have been largely unsuccessful in other County elections as well.

7.  Voting in DeSoto County is racially polarized, *i.e.*, Black and white voters tend to support opposing candidates.

8.  In recent elections, large majorities of Black voters in DeSoto County have supported one candidate, while large majorities of the County's white voters supported the opposing candidate. White voters' preferred candidates regularly defeat Black-preferred candidates in these elections. This pattern is present in the County's election results in elections at the local, countywide, statewide, and federal levels.

9.  In 2022, following the 2020 Census, instead of providing DeSoto County's Black residents with fair representation, the Board of Supervisors enacted the 2022 Plan that continues to split the Black community among election districts, diluting Black residents' voting strength and political power.

10.  The Board of Supervisors enacted the 2022 Plan over the objections of Black residents, who advocated for a district in which Black voters could elect their preferred candidates.

11.  It is possible to draw a redistricting map that conforms to traditional redistricting principles and that includes a reasonably configured district in which Black residents are a majority of the population.

12.  Such a map would afford Black voters an opportunity to elect their preferred candidate as one of the five officeholders in each of the five County Offices currently governed by the 2022 Plan.

13. The actions taken by representatives holding each of these five offices affect many fundamental issues for DeSoto County residents. Elections of the public officials to the County Offices directly impact the daily wellbeing of DeSoto County's Black residents.

14. The Board of Supervisors is responsible for setting countywide policies, overseeing budgets and finances, and ensuring access to services.

15. The Board of Education is responsible for managing and setting the policy of the DeSoto County School District.

16. The Justice Court hears misdemeanor criminal actions and civil matters in which the principal of the debt, amount of the demand, or the value of the property sought is less than $3,500.

17. Constables assist the Justice Court in executing its judgments.

18. The Election Commission is responsible for conducting general and special elections, certifying election results, and maintaining voting rolls.

19. Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 (the "VRA" or "Section 2"), prohibits electoral mechanisms that prevent Black citizens from having an equal opportunity to participate in the political process and to elect their candidates of choice.

20. The 2022 Plan violates the VRA because Black voters in DeSoto County do not have the opportunity in any of the County's five districts to elect their preferred candidate to any of the County Offices.

21. The 2022 Plan interacts with DeSoto County's historic and ongoing racial discrimination to deprive Black residents of an equal opportunity to participate in the political process.

22.    There is deep and pervasive racial inequality in DeSoto County, which is reflected in disparities between Black and white residents in income and wealth, housing, education, and criminal justice, among other areas.

23.    DeSoto County's governing bodies have been unresponsive to the particularized needs of the Black community.

24.    For example, the Black community's efforts to ensure accountability in law enforcement and to achieve more equitable education outcomes have been ignored.

25.    The most basic requests, such as placing more polling locations in Black churches to provide equitable access to Black voters, have gone unfulfilled.

26.    The 2022 Plan exacerbates the County government's unresponsiveness to the Black community and negatively affects the Black community's participation and involvement in DeSoto County government.

27.    Accordingly, Plaintiffs seek:

    a.    A Declaration that the 2022 Plan violates the VRA because it dilutes the voting strength of the County's Black population;

    b.    A Permanent Injunction prohibiting Defendants from administering, implementing, or conducting any future elections under the 2022 Plan; and

    c.    An Order directing Defendants to hold special elections under a valid redistricting plan to remedy the ongoing vote dilution caused by the 2022 Plan.

## JURISDICTION AND VENUE

28. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1357 and 42 U.S.C. § 1983 because it arises under the laws and Constitution of the United States.

29. This Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1343(a)(4) and 1357 because this is a civil action to secure equitable relief under Section 2 of the VRA, an Act of Congress that protects the right to vote.

30. Plaintiffs' action for declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202 and 52 U.S.C. §§ 10302 and 10308(f).

31. This Court has personal jurisdiction over Defendants, a County of the State of Mississippi and its officers who are citizens of the State of Mississippi.

32. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims has occurred and is occurring in the Northern District of Mississippi. The entire challenged district map lies within the Northern District of Mississippi, and its effects are acutely experienced in this District.

## PARTIES

33. Plaintiff HAROLD HARRIS is a Black resident of DeSoto County. Mr. Harris resides in Walls, Mississippi and is lawfully registered to vote there.

34. Mr. Harris is a member of the DeSoto NAACP.

35. Mr. Harris resides in an area which could form part of a reasonably configured majority-Black district.

36. Under a reasonably configured alternative map, Mr. Harris would reside in a remedial district in which Black voters would have the opportunity to elect their preferred candidates (a "Black-opportunity district").

37. Plaintiff Pastor ROBERT TIPTON, JR. is a Black resident of DeSoto County. Pastor Tipton resides in Nesbit, Mississippi and is lawfully registered to vote there.

38. Pastor Tipton is President of the DeSoto NAACP.

39. Pastor Tipton resides in an area which could form part of a reasonably configured majority-Black district.

40. Under a reasonably configured alternative map, Pastor Tipton would reside in a remedial Black-opportunity district.

41. Plaintiff DELTA SIGMA THETA SORORITY, INC. ("Delta Sigma Theta" or "the Deltas") is a national, nonpartisan, not-for-profit membership service organization, comprised predominately of Black women.

42. Delta Sigma Theta was founded in 1913 on the campus of Howard University and incorporated under the laws of the District of Columbia. Six weeks after the organization was formed in 1913, several of its founding members marched in the historic Suffragist March under the Delta Sigma Theta Sorority, Inc. banner—the Deltas' first public act. The members participating in the march took on personal risk and indignity, as they were not welcomed by some white suffragists, who insisted that the Black women march at the end of the procession.

43. Civic engagement has remained a core tenet of the Deltas' mission since the Sorority was founded, as democracy and justice can only be achieved through voting. Accordingly, ensuring fair district lines that do not dilute the voting strength of Black communities is among the organization's top social action priorities. The DeSoto County chapter of Delta Sigma Theta coordinates with other civic-minded organizations in DeSoto County to provide voter education and information, and to encourage voter registration and turnout in elections.

44.　In Mississippi, Delta Sigma Theta has 75 alumnae and college chapters and over 1,000 members, including 138 members in DeSoto County. Delta Sigma Theta has several members who are Black registered voters of DeSoto County who live and vote in Horn Lake, Walls, Nesbit, and the surrounding areas where a reasonably configured majority-Black district can be drawn consistent with traditional redistricting principles. These members have not had and, if the 2022 Plan is not enjoined, will continue not to have a meaningful opportunity to elect candidates of their choice in DeSoto County because of bloc voting by the white majority that consistently defeats Black-preferred candidates. As such, these members' votes are diluted in violation of Section 2.

45.　Under a reasonably configured alternative map, Black voters in DeSoto County who are members of Delta Sigma Theta would reside in a remedial Black-opportunity district.

46.　Plaintiff DESOTO COUNTY MS NAACP UNIT 5574 (the "DeSoto NAACP") is a unit of the National Association for the Advancement of Colored People, Inc. ("NAACP"), a national non-profit, non-partisan organization founded in 1909 with more than 2,200 chapters, branches, and units across the United States.

47.　The DeSoto NAACP is a tireless advocate for political, educational, social, and economic equality for all, and works to dismantle racism and racial discrimination by using our nation's democratic process. The DeSoto NAACP has worked for decades to expand voting rights and fair representation for the County's Black residents.

48.　The DeSoto NAACP holds voter registration drives throughout the County, including at many traditionally Black churches. It also facilitates voter engagement through publicizing election information and promoting turnout.

49.　The DeSoto NAACP is a membership organization with members throughout DeSoto County. The DeSoto NAACP's membership includes Black residents of Horn Lake, Walls, Nesbit,

and the surrounding areas, where a reasonably configured majority-Black district can be drawn consistent with traditional redistricting principles. These DeSoto NAACP members, including Plaintiffs Harold Harris and Pastor Robert Tipton, Jr., have not had and, if the 2022 Plan is not enjoined, will continue not to have a meaningful opportunity to elect candidates of their choice in DeSoto County because of bloc voting by the white majority that consistently defeats Black-preferred candidates. As such, the votes of these members, including Plaintiffs Pastor Robert Tipton, Jr. and Harold Harris, are diluted in violation of Section 2.

50.     Under a reasonably configured alternative map, Black voters who are members of the DeSoto NAACP would reside in a remedial Black-opportunity district.

51.     Defendant DESOTO COUNTY, MISSISSIPPI ("DeSoto County" or the "County") is a political subdivision of the State of Mississippi that can sue and be sued in its own name.

52.     Defendant DESOTO COUNTY BOARD OF SUPERVISORS is the elected county body responsible for, among other things, adopting an annual county budget, establishing the annual property tax rate, and enacting policies and ordinances to direct the county's development and general welfare, including in the areas of public safety, construction and maintenance of roads and bridges, public health, land use, and economic development.

53.     Defendant DESOTO COUNTY ELECTION COMMISSION is the elected county body responsible for conducting general and special elections, certifying election results, and maintaining voter rolls.

54.     Defendant DALE THOMPSON is the Circuit Clerk of DeSoto County and is responsible for supporting the DeSoto County Election Commission, administering and supervising voter registration, preparing and holding elections, archiving election results, and performing other election functions. She is sued in her official capacity.

**LEGAL BACKGROUND**

55.    The VRA was first passed by Congress in 1965. Congress reauthorized and amended the VRA in 1982 to provide, *inter alia*, that a Section 2 claim may be predicated on the discriminatory *effects* of challenged electoral mechanisms. Following the 1982 amendments, the Supreme Court established in *Thornburg v. Gingles* a framework for assessing whether a redistricting plan dilutes minority voting strength. 478 U.S. 30, 50–51 (1986).

56.    In June 2023, the Supreme Court reaffirmed the *Gingles* framework, holding that Section 2 prohibits redistricting schemes in which members of a racial minority group "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Allen v. Milligan*, 599 U.S. 1, 25 (2023) (quoting 52 U.S.C. § 10301(b)).

57.    The *Gingles* framework requires a plaintiff to satisfy three preconditions when challenging a redistricting scheme as dilutive of a racial minority group's voting power: (1) the racial minority group must be sufficiently large and geographically compact to constitute a majority in a single member district; (2) the minority group must be politically cohesive; and (3) the white majority must vote as a bloc to usually defeat the minority group's preferred candidate. 478 U.S. at 50–51; *see also Milligan*, 599 U.S. at 18.

58.    After establishing the *Gingles* preconditions, a plaintiff must prove that "based on the totality of circumstances, . . . the political processes leading to nomination or election" are "not equally open to participation by members of a class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b); *see also Robinson v. Ardoin*, 86 F. 4th 574, 589 (5th Cir. 2023).

59.    This "totality of circumstances" analysis is guided by a non-exhaustive set of factors enumerated in a Senate Report that accompanied the 1982 VRA amendments. *See* S. Rep. No. 97-417, 97th Cong., 2d Sess. (1982) at 28–29. The totality of circumstances inquiry requires courts to conduct a "searching practical evaluation of the past and present reality." *Milligan*, 599 U.S. at 19.

## FACTUAL BACKGROUND

### *Overview of the 2022 DeSoto County Redistricting Process*

60.    After each decennial census, the DeSoto County Board of Supervisors is responsible for redrawing its own district boundaries, which also constitute the districts from which the Judges of the County Justice Court, the members of Board of Education and Election Commission, and the Constables are elected.

61.    When the Board of Supervisors began the redistricting process in September of 2021, Black residents in DeSoto County appealed to the Board of Supervisors to have a voice in the 2022 redistricting process.

62.    For example, at the September 20, 2021, Board of Supervisors meeting, Black citizens of DeSoto County criticized the clandestine nature of previous redistricting processes and laid out their objectives for the 2022 redistricting process, including the creation of "Citizens' Redistricting Committee."

63.    But in December 2021, the Board of Supervisors voted to contract with Chris Watson from the firm Bridge & Watson to prepare the County's redistricting plan, without providing a meaningful opportunity for public input by DeSoto County's residents.

64.    Meanwhile, a group of interested Black residents of DeSoto County, led by members of Plaintiffs Delta Sigma Theta and the DeSoto NAACP, established the Citizens' Redistricting Committee. The Citizens' Redistricting Committee hosted public meetings, provided classes on redistricting at the local library, and, ultimately, drafted alternative redistricting plans.

65.    State Representative Hester Jackson-McCray, a Black state legislator who represents District 40 encompassing part of Horn Lake, led a second citizen group, the DeSoto Community Redistricting Committee, that worked with another advocacy group with mapping expertise to create an alternative redistricting plan.

66.    On several occasions, Mr. Watson stated his intention to meet with every Supervisor and every Election Commissioner to ensure the 2022 Plan would protect their seats.

67.    Mr. Watson also met with community members and informed them that the Board of Supervisors had rejected a proposed map with a Black-plurality district.

68.    Mr. Watson presented county officials with draft maps in March 2022.

69.    On May 16, 2022, the Board of Supervisors scheduled a "public hearing on the matter of County redistricting" to be held on Monday, June 6, at the unusual time of 8:00 A.M.

70.    Community members asked the Board of Supervisors to change the time of the hearing to accommodate greater public involvement in the redistricting process, and to allow the public to view and comment on the proposed maps.

71.    The Board of Supervisors refused.

72.    The Citizens' Redistricting Committee asked for its alternative draft plans to be included in the agenda.

73.    The Board of Supervisors refused.

74.    At the June 6, 2022, meeting, Mr. Watson presented his findings and four redistricting plans, none of which included a Black-opportunity district.

75.    Mr. Watson stated he was not able to draw a map with a Black-opportunity district based on feedback from holders of the County Offices.

12

76.   Holders of the County Offices were the only ones who had a material opportunity to review the maps before the hearing.

77.   The Citizens' Redistricting Committee and the DeSoto County Redistricting Committee presented their proposed maps at the June 6, 2022, hearing.

78.   Each of the proposed maps included a Black-opportunity district.

79.   The Board of Supervisors refused to consider the proposed maps.

80.   The Board of Supervisors unanimously voted to adopt the 2022 plan.



*Figure 1: Enacted 2022 Plan*

### Gingles Prong I:
### The Black Community of DeSoto County is Sufficiently Large and Geographically Compact

81.   The 2022 Plan cracks the Black community and dilutes Black voting power in DeSoto County in a manner that denies Black voters an equal opportunity to elect a candidate of choice to any County Office in any of the five districts.

82.    The 2022 Plan splits the majority-Black City of Horn Lake between its Districts 3 and 4. The 2022 Plan places approximately half of Horn Lake's Black population in District 3 and the other half in District 4.

83.    Black communities in Horn Lake and the surrounding area, including the nearby Town of Walls and the nearby unincorporated community of Nesbit, share a community of interest with important socioeconomic and cultural ties.

84.    For example, people in Walls and Nesbit rely on access to doctors and dentists in Horn Lake. People in Walls and Nesbit do much of their shopping at stores in Horn Lake. For many people in Walls and Nesbit, Latimer Lakes Park in Horn Lake is the closest park for recreational activity. Residents of Walls and Nesbit who participate in Little League baseball or youth football will often travel to Latimer Lakes Park in Horn Lake. Children from Nesbit attend high school in Horn Lake.

85.    Like the County as a whole, Horn Lake, Walls, and Nesbit have experienced an influx of new residents in recent years. For example, the Black population of Horn Lake increased from approximately 12% of the City's population in the 2000 U.S. Census to nearly 52% in the 2020 U.S. Census. Relative to other parts of the County, the area in and around Horn Lake, Walls, and Nesbit has seen a disproportionate amount of in-migration from elsewhere in Mississippi. Many residents of Horn Lake, Walls, and Nesbit have moved from the Mississippi Delta, particularly Tunica County, Coahoma County, and Bolivar County. These residents maintain strong cultural and economic ties to one another.

86.    Households in Horn Lake tend to be worse off socioeconomically than those in the rest of DeSoto County. Median household income is approximately $23,000 less in Horn Lake than in the County as a whole. The percentage of Horn Lake residents living in poverty is nearly double

14

that of the County as a whole. Horn Lake residents are less likely to own a home. The median home value in Horn Lake is about $80,000 lower than values in DeSoto County as a whole. The percentage of residents with a college education is significantly lower in Horn Lake than in the rest of DeSoto County.

87.    Walls is a majority-Black town. Households in Walls tend to be worse off socioeconomically than those in the rest of DeSoto County. The median household income in Walls is approximately half of the median household income in the County as a whole. The percentage of Walls residents living in poverty is more than two-and-a-half times the percentage in the County as a whole. The percentage of Walls residents who own their home is less than half that of the County as a whole. The percentage of residents with a college education is significantly lower in Walls than in the rest of DeSoto County.

88.    In a recent decision, a three-judge district court found that the majority-black community in and around Horn Lake formed a community of interest that the Mississippi legislature unlawfully cracked in the state's post-2020 redistricting plan by splitting the community across several state senate districts. *Miss. State Conf. of NAACP v. State Bd. of Election Comm'rs,* No. 3:22-CV-00734, 2024 WL 3275965, at *19 (S.D. Miss. July 2, 2024). The court credited testimony that the splitting of this community in the state legislative plan "effectively took away the power of the [B]lack communities to seek representation[.]" *Id.*

89.    The 2022 Plan violates the VRA because it does not provide an equal opportunity for Black residents to participate in the political process and to elect candidates of their choice.

90.    DeSoto County's Black population is sufficiently numerous and geographically compact to constitute a majority of the voting-age population in one of the five DeSoto County election districts.

91. A majority-Black district would include large portions of the Black community in Horn Lake and the surrounding areas, including portions of Walls and Nesbit. The total population of Horn Lake according to the 2020 Census was approximately 27,000, more than two-thirds of the ideal population for each district in the county.

92. A majority-Black district would be reasonably configured. It would be contiguous, would split around the same or fewer municipalities as the 2022 Plan, and would have compactness scores on par with or better than the 2022 Plan based on commonly used quantitative measures of compactness.

93. A plan including a majority-Black district would have less than 10% population deviation.

94. Black voters in a majority-Black district would have an equal opportunity to elect their candidates of choice, notwithstanding the existence of racially polarized voting.

95. Consistent with traditional redistricting principles, there were many ways the Board of Supervisors could have drawn a reasonably configured majority-Black district in DeSoto County that would provide the opportunity for Black voters in DeSoto County to elect a candidate of choice in each of the elections for which the districts are used.

### Gingles Prongs II & III:
### The Black Community of DeSoto County is Politically Cohesive, and the White Majority in the County Votes as a Bloc to Defeat the Black Community's Preferred Candidates

96. Plaintiffs also satisfy the second and third *Gingles* preconditions because voting in DeSoto County is racially polarized.

97. Black voters in the County are cohesive in supporting their preferred candidates, but white voters consistently vote as a bloc to support other candidates.

98.   As a result, candidates preferred by white voters typically defeat the Black-preferred candidates in DeSoto County elections.

99.   In recent elections on the local, countywide, statewide, and federal levels, large majorities of Black voters supported the same candidates, who were defeated by candidates preferred by large majorities of white voters.

100.  Since 2018, at least twelve Black candidates have run against white candidates for the County Offices.

101.  In each of these elections, Black voters voted cohesively for the Black candidate, who was decisively defeated by the white candidate preferred by white people voting as a bloc, reflecting the consistently racially polarized voting in DeSoto County.

102.  Similarly, Black congressional and statewide candidates have received the lion's share of Black voter support, but very little white voter support, in DeSoto County.

103.  In the 2020 U.S. Senate race, nearly 100% of Black voters in DeSoto County supported Mike Espy, while nearly 90% of white voters in the county supported his opponent, Cindy Hyde-Smith. The same voting pattern existed in the 2019 statewide races for Treasurer and Attorney General, both of which were biracial.

104.  In a recent ruling finding that Mississippi's state legislative districts unlawfully dilute Black voting strength under Section 2, the court stated, "[w]e find racial polarization among voters in Mississippi is quite high. Black-preferred candidates are consistently unable to win elections unless running in a majority-minority district. White voters are also cohesive in voting for candidates that usually defeat the black-preferred candidates." *Miss. State Conf. NAACP,* 2024 WL 3275965, at *32.

17

***The "Totality of Circumstances" Confirms that Black Voters in Desoto County Have Less Opportunity than White Voters to Participate in the Political Process and Elect Representatives of Their Choice***

105. The 2022 Plan was enacted against the backdrop of historical and ongoing racial discrimination.

106. The Black population of DeSoto County is subject to the disparate effects of that discrimination in areas such as income and wealth, housing, education, and criminal justice.

***Lack of Black or Black-Preferred Candidates in Local Offices***

107. The harms of the 2022 Plan, in combination with other features of DeSoto County's electoral system, result in stark underrepresentation of the Black community in County government.

108. Since at least 2012, no Black or Black-preferred candidate has won election to any of the five County Offices that were elected under the County's districting plan.

109. From at least 2012 to 2022, no Black candidate or Black-preferred candidate prevailed in any election for countywide office in DeSoto County.

110. In 2023, a Black candidate prevailed in the Republican primary election for Sheriff and won an uncontested general election. Black voters did not participate in this primary to a meaningful degree, and had no opportunity to oppose or support this candidate in the general election.

111. Many DeSoto County elections are uncontested.

112. Black residents have often declined to run because there is little chance of winning election to the County Offices.

113. The Board of Supervisors, which lacks Black representation, is responsible for appointing many positions within DeSoto County government. Black residents are underrepresented in appointed positions within County government.

114.  The 2022 Plan perpetuates this situation by diluting the Black community's voting strength and preventing its voters from electing a candidate of their choice.

### *Historical and Ongoing Discrimination in Voting*

115.  The 2022 Plan interacts with the County's and state's long and continuing history of racial discrimination to produce racial disparities in political participation and representation.

116.  Courts have repeatedly recognized Mississippi's history of racial discrimination as a factor that supports plaintiffs in Section 2 cases. *See, e.g.*, *Miss. State Conf. NAACP*, 2024 WL 3275965, at *35 (S.D. Miss. July 2, 2024) (three-judge court); *see also Clark v. Calhoun Cnty.*, 88 F.3d 1393, 1399 (5th Cir. 1996).

117.  The State of Mississippi recently stipulated to its history of racial discrimination in *Thomas v. Bryant.* 366 F. Supp. 3d 786, 807 (S.D. Miss. 2019). Mississippi has repeatedly been found to have employed redistricting and election rules that discriminated against Black voters in DeSoto County and across the state. *See, e.g., Miss. State Conf. NAACP,* 2024 WL 3275965, at *35; *Operation Push v. Mabus*, 932 F.2d 400 (5th Cir. 1991); *Jordan v. Winter*, 604 F.Supp. 807 (N.D. Miss. 1984) (three-judge court) *aff'd. sub nom. Miss. Republican Exec. Comm. v. Brooks*, 469 U.S. 1002 (1984).

118.  DeSoto County has a long and well-documented history of discrimination that has burdened the ability of Black residents to participate in the political process.

119.  In 1890, Mississippi ratified a new constitution that disenfranchised nearly every Black person in Mississippi and established a poll tax and literacy test.

120. From 1890 forward, DeSoto County enforced laws passed by the Mississippi legislature that denied or diminished Black participation by such devices as poll taxes and immaterial qualifications for voting such as educational, property, or "character" requirements.

121.   According to a 1965 report accompanying the enactment of the VRA, 4,030 of 5,338 eligible white voters in DeSoto County were registered to vote on June 1, 1962, while 11 of 6,246 eligible Black voters were registered on that date.

122.   Mississippi is one of only three states to impose lifelong voting bans on people convicted of felonies. Miss. Const. art. XII, § 241 (1935).

123.   Section 241 was enshrined in Mississippi's 1890 Constitution with the express purpose of denying Black men the right to vote.

124.   During the 1890 Mississippi Constitutional Convention, the presiding officer stated, "We came here to exclude the negro. Nothing short of this will answer." *See Ratliff v. Beale*, 20 So. 865, 868 (Miss. 1896) ("Within the field of permissible action under the limitations imposed by the federal constitution, the convention swept the circle of expedients to obstruct the exercise of the franchise by the negro race.").

125.   Although only 36% of the state's voting age population of citizens are Black, 59% of individuals convicted of disenfranchising offenses between 1994 and 2017 were Black.

126.   In recent decades, Black voting-age Mississippians have been disenfranchised at over twice the rate of white voting-age Mississippians.

127.   A recent decision by a three-judge district court found that Section 241 disproportionately affects Black Mississippians. *Miss. State Conf. NAACP*, 2024 WL 3275965, at *78–79.

128.   An individual who has been disenfranchised by virtue of a felony conviction cannot have their rights restored without a pardon from the Governor, an Executive Order Restoring Civil Rights by the Governor, or a Bill of Suffrage passed by a two-thirds majority of the Mississippi State Legislature.

129.   From 2000 to 2015, only 335 of the 166,494 people who completed their sentences in Mississippi had their rights restored after a felony conviction. *See Felony Disenfranchisement in Mississippi*, The Sentencing Project, One Voice, & Mississippi NAACP (Feb. 28, 2018).

130.   Until 2020, Mississippi maintained another state constitutional provision originating in the 1890 Constitution, which required candidates for statewide office to win both the popular vote and a majority of Mississippi's 122 House districts to win election.

131.   Black voters sued Mississippi to enjoin enforcement of the state constitutional requirement, which posed a significant hurdle for Black candidates to overcome given the composition of the state's house districts, as well as persistent racial polarization in voting.

132.   In the face of active litigation, the State placed a constitutional amendment on the ballot that passed in 2020 and became effective immediately.

133.   In a recent lawsuit, a three-judge district court found that Mississippi's 2022 statewide legislative redistricting plan unlawfully dilutes Black voting strength in violation of Section 2, including in DeSoto County. *See Miss. State Conf. NAACP*, 2024 WL 3275965.

134.   A second ongoing lawsuit alleges that the districts used for electing justices to the Mississippi Supreme Court dilute Black voting strength in violation of Section 2, including in District 3 which encompasses DeSoto County. *See White v. State Bd. of Election Comm'rs*, No. 4:22-CV-00062 (N.D. Miss. Apr. 25, 2022).

135.   Based on their histories of racial discrimination, Mississippi and DeSoto County were designated subject to the preclearance requirement of Section 5 of the Voting Rights Act ("Section 5") when it was enacted in 1965.

136. Under Section 5, covered jurisdictions were required to obtain preclearance from the United States Attorney General or from a three-judge court of the United States District Court for the District of Columbia prior to implementing any voting change.

137. Mississippi and DeSoto County remained subject to Section 5 until the Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013).

138. While the State of Mississippi and its political subdivisions were subject to the requirements of Section 5, the United States Attorney General interposed objections under Section 5 to approximately 170 submissions of their voting changes, meaning those proposed changes were found to have the purpose or effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. *See* 52 U.S.C. §§ 10304(a), 10303(f)(2). Of those objections, 104 related to redistricting. The United States Attorney General objected to State Senate and House maps in 1975, 1978, 1991, and 1992. State congressional maps were redrawn by a court in 2002 and 2012.

139. Several objections applied specifically to DeSoto County. In 1969, the United States Attorney General objected to changing the method of selecting county superintendents of education in DeSoto County from election to appointment. Also in 1969, the Attorney General objected to DeSoto County's practice of holding at-large elections for its Board of Supervisors. In 1977, the Attorney General objected to the at-large method of electing the DeSoto County Board of Education. In 1986, the Attorney General objected to the conversion of single-judge districts to multi-judge districts and the establishment of at-large elections with single-shot voting in several judicial districts, including one in DeSoto County. In 2010, the Attorney General objected to a Mississippi law that imposed majority-vote and runoff requirements for county boards of education, including the DeSoto County Board of Education.

140.   In 1966, a white gunman shot civil rights activist James Meredith in DeSoto County as he marched from Memphis to Jackson in support of Black voter registration.

141.   Overtly racist attacks to instill fear in the Black community are not confined to DeSoto County's distant past.

142.   At a poll worker training during the 2020 Coronavirus Pandemic, a Black poll worker in DeSoto County expressed her wish that DeSoto County have mail-in voting. Barry Chatham, the Election Commissioner, responded "over my dead body."

143.   After Barry Chatham's office was vacated in 2021, the DeSoto County Board of Supervisors appointed his wife, Barbara Chatham, over the objection of Black community members, who had requested that a well-known, more qualified Black woman be appointed to represent them and administer elections.

144.   During a 2021 special election, Barbara Chatham was criticized for failing to ensure that polling locations were adequately staffed, resulting in "lines out the door all day long," at times more than 200 people.

145.   Most polling locations in DeSoto County are churches. Black community organizations, reflecting concerns about voter intimidation, have repeatedly asked the Election Commission to utilize predominantly Black churches as polling locations in predominantly Black areas of DeSoto County. Today, only 2 of the 49 polling places in DeSoto County are located in a predominantly Black church.

146.   In 2018, a white DeSoto County voter arrived at a polling location wearing a t-shirt featuring a Confederate flag and an image of a noose. A photo of the voter showed that the t-shirt included the phrase "MISSISSIPPI JUSTICE" in large letters above and below the Confederate flag and noose. The man wearing the t-shirt was not removed from the polling location. When

asked if he understood why the t-shirt could be interpreted as voter intimidation or hate speech, the Election Commissioner responsible for that polling location, Barry Chatham, responded that the t-shirt did not violate any law and that election officials could take no action to respond to the situation. Mr. Chatham criticized the person taking the photo for bringing a camera into the polling location.

147.   Armed and uniformed police officers regularly stand outside DeSoto County polling places on election days despite the objection of Black candidates to this practice.

148.   In 2021 and 2022, flyers celebrating the Ku Klux Klan were found on the steps of a predominantly Black church and in the yards of dozens of Black families across DeSoto County.

149.   The flyers read, "The Old Glory Knight of the Ku Klux Klan is alive and growing in 14 states . . . Join your local Klavern today to preserve white Christian unity before multiculturalism destroys America for good."

150.   To this day, a water basin near Horn Lake is called "Dead Negro Slough."

### *Enhancing Practices Used Today*

151.   DeSoto County's electoral system maintains and has historically upheld voting procedures and practices that exacerbate the 2022 Plan's discriminatory effects.

152.   DeSoto County employs a majority-vote requirement with respect to primary elections, pursuant to state law. *See Gingles*, 478 U.S. at 39–40 (explaining that majority vote requirements in primaries can serve as a "practical impediment to the opportunity of [B]lack voting minorities to elect candidates of their choice").

153.   DeSoto County holds elections for several of the County Offices in odd-numbered years, suppressing turnout as compared to elections that coincide with federal elections.

154.   Elections for the Board of Supervisors, Justice Court Judges, and Constables coincide with gubernatorial elections, which are always held in the years immediately prior to presidential elections.

155.   Members of the Election Commission and Board of Education are elected on a staggered basis, which ensures that some county elections consistently occur in off years.

156.   Elections for at least some members of each of the County Offices occur in odd-numbered years.

157.   Voting in Mississippi is cumbersome and expensive for voters.

158.   Mississippi is ranked 49th on the Cost of Voting Index, which examines election laws and policies and calculates the relative burden imposed on voters in each state. Scot Schraufnagel et al., *Cost of Voting in the American States: 2022*, 21 Election L.J. 220 (2022).

159.   Mississippi does not permit same-day voter registration, polling place registration, online registration, automatic voter registration, in-person early voting, or no-excuse mail-in voting.

160.   Another obstacle to voting in Mississippi is the state's notarization requirement for both absentee ballot applications and ballots themselves. Mississippi is the only state that requires both absentee ballot applications and ballots to be notarized.

### *Continuing Discrimination and Its Effects in Other Socioeconomic Areas*

161.   DeSoto County's Black population continues to feel the effects of discrimination.

162.   Racial disparities that exist statewide and in DeSoto County are the legacy of the State's and the County's intentional policy choices.

163.   Recently, a three-judge panel found that Black Mississippian suffer socioeconomic disparities that impair their ability to participate in the political process, and that these disparities

can be traced to Mississippi's history of discrimination. *See Miss. State Conf. NAACP*, 2024 WL 3275965, at *98.

164.  The court found the Black Mississippians are significantly worse off in areas of income, poverty, unemployment, educational attainment, internet access, vehicle ownership, and health-insurance coverage. *Id*.

165.  Likewise, racial disparities in a wide range of areas interact with DeSoto County's electoral system to make it harder for Black residents to participate fully in the democratic process and elect their preferred candidates.

166.  Black residents have been and continue to be subjected to state-sanctioned discrimination in education.

167.  Schools in DeSoto County were segregated until well after the Supreme Court's decision in *Brown v. Board of Education*, 347 U.S. 483 (1954). Between 1890 and 1963, the average per-pupil funding for Black students in DeSoto County was $51; it was $219 for white students.

168.  The vestiges of discrimination in education remained after *de jure* segregation was ended. For example, in 1997, parents and students at Hernando High School in DeSoto County drew attention to several racially discriminatory practices. The school was administered by one Black and one white principal. Certain student government positions were allocated to Black students only or to white students only. Each class at Hernando High School selected a Black and white student for homecoming court.

169.  Throughout DeSoto County's history, its Black residents have been subject to racial terror, sanctioned by white officials, to enforce *de jure* discrimination.

170.   In its report titled *Lynching in America* (2015), the Equal Justice Institute documented 12 lynchings in DeSoto County from 1877 to 1950. During the same period, more than 500 Black people were lynched in Mississippi, more than in any other state.

171.   There are significant economic disparities between Black and white DeSoto County residents.

172.   The U.S. Census Bureau's American Community Survey ("ACS") 1-year estimates for DeSoto County show the mean per capita income for white residents in 2022 was more than 1.4 times higher than that of Black residents. *See* U.S. Census Bureau, American Community Survey, 2022 1-Year Estimates (hereinafter "ACS"), Table S1902: Mean Income in the Past 12 Months (in 2022 Inflation-Adjusted Dollars).

173.   DeSoto County's Black population experiences poverty at nearly three times the rate the white population does. *See* ACS Table S1701, Poverty Status in the Past 12 Months.

174.   Income and economic security are correlated with political participation.

175.   Only 2% of white residents of DeSoto County are unemployed, while 7% of Black residents are unemployed. *See* ACS Table S2301, Employment Status.

176.   Black residents of the County are less likely than white residents to have health insurance. *See* ACS Table S2701, Selected Characteristics of Health Insurance Coverage in the United States.

177.   Black residents of DeSoto County are less likely to own their home and more likely to rent. *See* U.S. Census Bureau, 2020 Decennial Census (hereinafter "Census"), Table H10: Tenure by Race of Householder.

178.   In DeSoto County, 47.4% of renter-occupied housing units are occupied by Black residents, even though Black residents make up less than 33% of DeSoto's population. *See id.*

179.  White residents lived in more than 70% of owner-occupied homes in DeSoto County as of the 2020 Census, despite making up only 59% of the population. *See id*.

180.  Home ownership and housing stability are correlated with political participation.

181.  The legacy of decades of redlining policies and continued discrimination in lending disproportionately lock Black Mississippians out of home ownership.

182.  As of 2019, the mortgage denial rate for Black residents in Mississippi earning more than $150,000 was higher than the denial rate for white residents earning between $30,000 and $50,000. *See* Calandra Davis & Sara Miller, *A Dream Deferred: The Lasting Legacy of Racist Redlining in the Deep South*, Mississippi Free Press (Apr. 8, 2021).

183.  These housing disparities are the result of discrimination. In 2016, the U.S. Department of Justice entered into a consent decree with BancorpSouth—a regional depository institution headquartered in DeSoto County. BancorpSouth had violated the Equal Credit Opportunity Act and Fair Housing Act by redlining majority-minority neighborhoods and illegally discriminating against Black applicants in the underwriting of mortgage loans and in the pricing of mortgage loans. *See* Consent Order, *United States and CFPB v. BancorpSouth Bank*, No. 1:16-CV-00118 (N.D. Miss. July 25, 2016).

184.  A similar consent decree was reached in 2021 with Trustmark National Bank, another lender operating in DeSoto County. See Consent Order, *United States v. Trustmark Nat'l Bank*, No. 2:21-CV-02716 (W.D. Tenn. Oct. 22, 2021).

185.  Racial disparities exist in educational attainment in DeSoto County. *See* ACS, Table S1501, Educational Attainment. A smaller proportion of Black residents compared to white residents have a bachelor's degree or higher. *Id.* Education is highly correlated with political participation.

186. Racial disparities and discrimination in education further restrict Black Mississippians' engagement with the political process.

187. In 2015, DeSoto County Parents & Students for Justice, a group of parents and students, filed a federal Title VI complaint with the U.S. Department of Education showing a pattern across the DeSoto County school district of Black students—especially those with disabilities—being punished more harshly, and for less severe offenses, than white students.

188. In 2016, the Department of Education opened an investigation into the school district.

189. In response to this investigation, the County Board of Education revised the district's student code of discipline.

190. As of 2021, a total of 33,990 students attend the 38 schools of the DeSoto County School District. Of those students, 46.3% are white, 39.0% are Black, 3.7% are two or more races, 9% are Hispanic/Latino, 1.8% are Asian or Asian/Pacific Islander, and the remainder are American Indian, Alaska Native, Native Hawaiian or other Pacific Islander. *DeSoto Cnty. Sch. Dist.*, U.S. Dept. of Educ., C.R. Data Collection Off. for C.R. (2020).

191. Black students constitute 39% of the school district, but Black students without disabilities constitute 80% of the students subjected to multiple out-of-school suspensions, 62.5% of students given one out-of-school suspension, 61.1% of the students subjected to corporal punishment, and 100% of the students expelled without educational services by the Board of Education. *Id*. Black students also constitute 75% of the students whom the Board of Education refers to law enforcement. *Id*. Yet, Black students are only 19.5% of students enrolled in the Gifted and Talented program in the lower grades and only 23.7% of the students in Advanced Placement high school courses. *Id*.

192. Across other forms of discipline—corporal punishment, expulsion, referral to law enforcement—significant disparities for Black students persist. *Id.*

193. DeSoto County students are sent to "alternative schools" after they are expelled.

194. These alternative schools contain a disproportionate number of Black students and frequently subject students to jail-like conditions, including by prohibiting students from exchanging personal information.

195. Expelled students are often kept in alternative schools for three to four years. These schools have repeatedly failed to create individualized instructional plans for their students despite state law requiring them to do so.

196. As a result, students who are expelled in DeSoto County fall further behind.

197. Black students in DeSoto County are also more likely to be referred to law enforcement by school administrations than white students. *Id.*

198. Law enforcement referrals can have extreme consequences for students.

199. In 2009, six Black students were arrested at Southaven High School in DeSoto after an argument broke out between a white student and a Black student.

200. A lawsuit filed alleged that the officers responded to the fight by arresting a half-dozen Black students, choking and tackling the Black student involved in the argument. *See D.P. v. City of Southaven*, No. 3:09-CV-00134 (N.D. Miss. Apr. 9, 2009).

201. The Board of Education settled additional lawsuits brought by Black students alleging that the Board violated their constitutional and civil rights. *See, e.g.*, *J.W. v. DeSoto Cnty. Sch. Dist.*, No. 2:09-cv-00155 (N.D. Miss. Sept. 9, 2009); *D.G. v. DeSoto Cnty. Sch. Dist.*, (N.D. Miss. Oct. 19, 2009).

202. Black residents of DeSoto County are disproportionately incarcerated and disenfranchised.

203. In 2015, despite making up less than 30% of the County's population (compared to white residents who made up 71% at the time), far more Black people than white people were imprisoned in DeSoto County.

204. Black people are also jailed in DeSoto County at a far higher rate than white people.

205. These criminal justice disparities have a direct effect on Black voters' opportunity to elect candidates of their choice due to Mississippi's felony disenfranchisement laws. *See Miss. State Conf. NAACP*, 2024 WL 3275965 at *79 (finding that, because a higher proportion of Black Mississippians are incarcerated, Black Mississippians are disproportionately impacted by lifetime felony disenfranchisement).

### *Non-responsiveness*

206. DeSoto County government is often non-responsive to the needs of Black residents.

207. On issues of particular concern to the Black community, the County frequently declines to act, or acts against the preferences of Black residents.

208. Residents have repeatedly voiced concerns—including during the redistricting process—about the fact that almost all polling locations are placed in white churches with very few in Black churches.

209. Black residents have explained to the Election Commissioners and Board of Supervisors that locating most polling places in white churches suppresses Black participation in elections.

210. The County has not acted on these concerns.

211. In 2013, James Irby Jr.—a fifty-five-year-old Black man with prostate cancer and gout—disappeared after an interaction with a white police officer in DeSoto County.

31

212. Mr. Irby was pulled over while driving to a funeral. A video appears to show the officer using a taser on him, prompting Mr. Irby to run away.

213. The officer claimed Mr. Irby ran into a field and escaped.

214. Mr. Irby's family insist his health problems rendered him unable to outrun the young police officer.

215. His family have further emphasized that it would be completely out-of-character for Mr. Irby to cut off contact with his family, with whom he was very close.

216. The officer was placed on administrative leave for an unrelated incident later in 2013.

217. In 2021, DeSoto County Sheriff Bill Rasco admitted he helped the white eighteen-year-old son of a sheriff's department employee avoid jail and prosecution for drunk driving by covering up the incident. The DeSoto NAACP called for an investigation into disparities in how Black and white residents are treated by the sheriff, but the DeSoto NAACP's demands were ignored.

218. In 2023, in a highly publicized "swatting" incident, the Southaven Police Department arrested a Black 17-year-old boy at his home and jailed him for three days.

219. The Police Department relied on an anonymous tip that the 17-year-old, who was diagnosed with autism, had threatened to carry out a school shooting and commit suicide.

220. The DeSoto County Juvenile Court declined to advance the case against him.

221. The 2022 Plan further contributes to the County's lack of responsiveness to the needs and interests of Black residents by ensuring that Black voters are not represented in County government.

*Overt and Subtle Racial Appeals*

222. Candidates in Mississippi, and in DeSoto County specifically, continue to make racial appeals in elections.

32

223.  In 2015, former Mayor of Walls and then-State Representative for DeSoto County Gene Alday stated that he opposed increasing funding for education because he comes "from a town where all the [B]lacks are getting food stamps and what I call 'welfare crazy checks.' They don't work."

224.  Mr. Alday also stated he went to the emergency room and nearly died because "[B]lacks" were "in there being treated for gunshots."

225.  In DeSoto County in 2019, Black employees of Kendall Prewitt—a candidate for county supervisor—revealed that Mr. Prewitt had subjected them to repeated racial harassment over the years, including calling Black employees "monkey" and the n-word.

226.  Also in 2019, after Hester Jackson-McCray became the first Black woman elected to the Mississippi House of Representatives from her district, which includes DeSoto County, her white opponent publicly contested the election results and asked the State House to overturn the election.

227.  A campaign advisor to Representative Jackson-McCray stated that she was "worried that this is all about race. The [B]lack woman beat the white woman. And we can't have that. So we've got to overturn the election and give it to the white girl. I don't see her having any argument for why she should be declared the winner."

228.  A special House Election Committee was appointed to review the challenge. After hearing arguments from both sides, the committee recommended that Representative Jackson-McCray be seated. This recommendation was based on the committee's finding that there were no substantial irregularities affecting the election outcome. The full House ultimately seated Representative Jackson-McCray.

229. At the swearing-in ceremony for County officials in December 2019, the Senior Chancery Court Judge who administered the oath said "We don't care to see DeSoto County become a haven for criminals and the killing fields that Memphis and Jackson have become . . . . Those who want to come here and live outside the law, I issue this warning: do not come to DeSoto County. Our justice will be swift and it will be harsh. We don't believe in rehabilitation without some sort of punishment." Memphis and Jackson have large Black populations.

230. In recent years, Black candidates running for office in DeSoto County have also described acts of intimidation during campaigns themselves, such as having their campaign materials torn up. The three-judge district court credited testimony from a Black candidate who had "the police called" on her and her party while campaigning in predominantly white areas of DeSoto County. *See Miss. State Conf. NAACP*, 2024 WL 3275965, at *108.

## CLAIM FOR RELIEF

### COUNT 1: VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT (52 U.S.C. § 10301, AS ENFORCABLE UNDER 42 U.S.C. § 1983)

231. Plaintiffs repeat and reallege paragraphs 1–230 above as if fully set forth herein.

232. DeSoto County's electoral districts do not afford Black Mississippians, including Plaintiffs, an equal opportunity to participate in the political process and elect their candidates of choice as county Supervisors, Constables, Justice Court Judges, Election Commissioners, and members of the Board of Education.

233. Each of the three threshold *Gingles* questions is satisfied in DeSoto County.

    a. The Black population is sufficiently large and geographically compact to constitute the majority of a reasonably configured single-member district.

    b. The Black community is politically cohesive, generally tending to prefer the same candidates.

34

     c.   DeSoto County's white majority votes as a bloc to usually defeat Black voters' preferred candidate. *Gingles*, 478 U.S. at 50–51; *see also Milligan*, 599 U.S. at 6.

234. Further, the "totality of circumstances" demonstrates that "the political processes leading to nomination or election" are "not equally open to participation" by DeSoto County's Black community "in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

235. Here, the totality of circumstances establishes a violation of the VRA.

236. Additionally, the proportionality analysis of *Johnson v. DeGrandy*, 512 U.S. 997 (1994), shows a violation of the VRA. Black residents form nearly a third of DeSoto County's population, yet have no representation in any of the county bodies elected under the 2022 Plan.

237. Thus, the challenged redistricting scheme results in the denial or abridgement of Plaintiffs' right to vote on account of their race and color in violation of 52 U.S.C. § 10301.

238. Plaintiffs are entitled to relief from this violation of their federal rights.

239. Plaintiffs will be irreparably harmed by being subject to racial vote dilution in violation of Section 2 of the VRA unless a remedial map is adopted.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and:

A. Declare that the district boundaries adopted by the DeSoto County Board of Supervisors and used to elect the Board of Supervisors, the Election Commission, the Board of

Education, Constables, and Justice Court judges deny or abridge the rights of Plaintiffs to vote in violation of Section 2 of the VRA, 52 U.S.C. § 10301;

B.   Permanently enjoin Defendants and their agents from holding any election for County Supervisor, member of the County Election Commission, member of the County Board of Education, Constable, or Judge of the County Justice Court under the existing district boundaries;

C.   Direct Defendants, their agents, and all persons acting in concert with Defendants to take appropriate action to ensure uniform compliance with this Court's Orders by authorities administering the County's electoral processes;

D.   Set a reasonable deadline for DeSoto County to adopt county election districts that do not abridge or dilute the ability of Black voters to elect candidates of their choice, and, should the County fail to adopt an appropriate plan by the deadline, order the adoption of remedial plans that do not abridge or dilute the ability of Black voters to elect candidates of their choice;

E.   Order Defendants to hold special elections to limit the harm to Plaintiffs should adequate relief be unavailable prior to the next regularly scheduled elections;

F.   Retain jurisdiction over this matter until Defendants have complied with all Orders this Court may deem necessary;

G.   Award Plaintiffs attorneys' fees and costs of their suit; and

H.   Grant such other relief as the Court deems just and proper.

Dated: September 12, 2024

Respectfully submitted,

*/s/ Joshua Tom*

*/s/ Amir Badat*

Joshua Tom (Miss. Bar No. 105392)
**ACLU OF MISSISSIPPI**
101 South Congress Street
Jackson, MS 39201
Telephone: (601) 354-3408
jtom@aclu-ms.org

Amir Badat (Miss. Bar No. 106599)
**NAACP LEGAL DEFENSE AND
    EDUCATIONAL FUND, INC.**
40 Rector Street, 5th Floor
New York, NY 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592
abadat@naacpldf.org

*Attorneys for Plaintiffs*