IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

| | |
|---|---|
| HAROLD HARRIS; PASTOR ROBERT TIPTON, JR.; DELTA SIGMA THETA SORORITY, INC.; AND DESOTO COUNTY MS NAACP UNIT 5574 | PLAINTIFFS |
| VS. | CIVIL NO.: 3:24-CV-00289-GHD-RP |
| DESOTO COUNTY, MISSISSIPPI; DESOTO COUNTY BOARD OF SUPERVISORS; DESOTO COUNTY ELECTION COMMISSION; and DALE THOMPSON in her official capacity as DeSoto County Circuit Clerk | DEFENDANTS |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

Although the Complaint only advances a single claim for violation of Section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. §§ 10101 to 10702, multiple grounds exist for its dismissal. First, Plaintiffs lack standing to sue Defendant Dale Thompson, sued in her official capacity as Circuit Clerk for DeSoto County, so Thompson should be dismissed. Second, despite including 239 paragraphs of allegations, setting forth a lot of noise but very little substance, Plaintiffs have not and cannot allege facts sufficient to state a claim for violation of Section 2. Finally, Section 2 does not contain a private right of action, thus foreclosing the claim. For these reasons, the Complaint should be dismissed with prejudice.

**Relevant Background**

This action stems from Defendant DeSoto County, Mississippi's ("the County") 2022 redistricting plan (the "2022 Plan"), as approved by the Defendant DeSoto County Board of Supervisors ("the Board of Supervisors"). Following the 2020 U.S. Census, the Board of Supervisors began the redistricting process to redraw the County's five electoral districts. *See* Compl. [1] at ¶ 60. The Board of Supervisors, the Defendant DeSoto County Election Commission

("the Election Commission"),[1] the Board of Education, Constables, and Justice Court Judges are all elected from each of these five districts. *Id*. Members of the community and interest groups participated in the redistricting process and presented alternative redistricting plans. *Id*. at ¶ 64. On May 16, 2022, the Board of Supervisors provided notice for a public hearing on the redistricting process to be held on June 6, 2022. *Id*. at ¶ 69. Multiple redistricting plans were presented at the June 6 meeting, including plans purporting to consist of a "Black-opportunity district." *Id*. at ¶¶ 74, 77, 78. The Board of Supervisors ultimately approved the 2022 Plan. *Id*. at ¶ 80.

On September 12, 2024, Plaintiffs Harold Harris, Robert Tipton, Jr., Delta Sigma Theta Sorority, Inc., and the DeSoto County MS NAACP Unit 5574 ("Plaintiffs") filed a 239-paragraph Complaint against Defendants, challenging the 2022 Plan under Section 2 of the VRA for allegedly diluting Black votes. *See generally id*. Specifically, Plaintiffs allege that the 2022 Plan "cracks" the Black community—namely, the City of Horn Lake's Black population—between districts and dilutes Black voting power in the County, thereby denying Black voters the opportunity in any of the five districts to elect their preferred candidate to any of the County offices. *Id*. at ¶¶ 20, 81, 82.

Plaintiffs seek extraordinary relief from the Court, including a declaration that the 2022 Plan violates Section 2; a permanent injunction enjoining Defendants from holding any elections under the plan; an order directing Defendants "to take appropriate action to ensure uniform compliance" with this Court's orders; a "reasonable deadline" to be set for the County to adopt new district boundaries that provide Black voters the ability to elect candidates of their choice and Court-ordered remedial plans should the County fail to do so by the imposed deadline; and an order for Defendants to hold special elections should "adequate relief" be unavailable before the

---

[1] The County, the Board of Supervisors, the Election Commission, and Thompson often will be referred to collectively as "Defendants."

next regular election. *Id*. at 35–36. They further ask the Court to retain jurisdiction until Defendants have complied with all "necessary" orders. *Id*. at 36. Plaintiffs' claim should be dismissed.

## Legal Standards

The federal rules offer various avenues for challenging a complaint before filing an answer, including motions to dismiss under Rule 12(b)(1) and Rule 12(b)(6). A Rule 12(b)(1) motion contests subject matter jurisdiction while a Rule 12(b)(6) motion contests a complaint's factual and/or legal sufficiency. Defendants invoke both here.

Under Rule 12(b)(1), the central question is whether a court has constitutional or statutory authority to decide the case. *See, e.g., Griener v. United States*, 900 F.3d 700, 703 (5th Cir. 2018). This question is answered by considering the complaint, undisputed facts, and disputed facts that are capable of judicial resolution. *See, e.g., Lane v. Haliburton*, 529 F.3d 548, 557 (5th Cir. 2008). Put differently, a court may go beyond the pleadings to decide a Rule 12(b)(1) motion. *Id*. It is Plaintiffs' burden to establish that the Court possesses subject matter jurisdiction. *See Alfonso v. United States*, 752 F.3d 622, 625 (5th Cir. 2014).

Under Rule 12(b)(6), the central question is whether the complaint includes claims that provide a plausible basis for relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-63 (2007). This question is answered by comparing the legal claims that have been identified in the complaint with the factual allegations offered in support. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts may consider the complaint, documents attached to the complaint, documents central to the claims that are referenced in the complaint, and matters of public record, such as documents filed in state court. *See, e.g., Joseph v. Bach & Wasserman, LLC*, 487 Fed. App'x 173, 178 n.2 (5th Cir. 2012). Merely reciting the elements of a cause of action, or making conclusory factual or legal assertions, are insufficient to defeat a motion to dismiss. *See, e.g., Jordan v. Flexton*, 729 Fed. App'x 282, 284 (5th Cir. 2018).

**Arguments and Authorities**

I.  **Plaintiffs Lack Standing to Sue Defendant Thompson**

Plaintiffs lack standing to bring a Section 2 claim against Defendant Dale Thompson.[2] Plaintiffs have standing only if they can "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (citation omitted); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). In other words, standing for federal jurisdiction requires (1) an injury-in-fact to the plaintiff (2) that the defendant *caused* and (3) that a judicial decree can *redress*. *Lujan*, 504 U.S. at 560–61. At the pleading stage, the "plaintiff . . . bears the burden of" clearly alleging "facts demonstrating each element" of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quotations and citations omitted). Here, Plaintiffs fail to allege facts satisfying causality and redressability as to Thompson.

Plaintiffs' alleged injury is that they are "being subject to racial vote dilution in violation of Section 2 of the VRA." Compl. [1] at ¶ 239. Injury, of course, informs the causal element of standing analysis, which is lacking here. *See Lujan*, 504 U.S. at 560. Plaintiffs allege the racial vote dilution occurred as a result of the "redistricting scheme" adopted by "DeSoto County's electoral districts." Compl. [1] at ¶¶ 232, 237. To redress that harm allegedly caused by the redistricting scheme, Plaintiffs ask that "a remedial map [be] adopted." Compl. [1] at ¶ 239.

Plaintiffs have not alleged how Thompson played any part in *causing* the alleged Section 2 violation or how she could help *redress* it. Nor could they have done so, since Thompson has no role in DeSoto County's redistricting process. The Complaint, in fact, only mentions Thompson once, describing her role as "the Circuit Clerk of DeSoto County," through which she is

---

[2] *Moore v. Bryant*, 853 F.3d 245, 248 n.2 (5th Cir. 2017) ("Dismissals for lack of Constitutional standing are granted pursuant to Rule 12(b)(1).").

4

"responsible for supporting the DeSoto County Election Commission, administering and supervising voter registration, preparing and holding elections, archiving election results, and performing other election functions." Compl. [1] at ¶ 54.

Nothing in Thompson's role, therefore, has anything to do with either adopting or drafting district maps—the causal element here. *Lujan*, 504 U.S. at 560 (to prove causality, "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court" (cleaned up)). To be clear, Plaintiffs have not pointed to anything in Thompson's job description that would allow her to play a role in redressing the alleged violation by adopting a remedial map. *Id.* at 561; *see also Simon v. DeWine*, 2024 WL 3253267, at *5 (N.D. Ohio July 1, 2024) (finding lack of redressability because "[t]he relief plaintiffs seek is beyond the defendants' ability to provide," and so the court "cannot issue an order that would redress the plaintiffs' alleged harm"). Accordingly, Plaintiffs do not have standing to sue Thompson, and the Complaint against her should be dismissed pursuant to Rule 12(b)(1). *Moore*, 853 F.3d at 248 n.2.

## II.   Plaintiffs Fail to Plausibly Plead a Section 2 Vote Dilution Claim

Section 2 of the VRA prohibits any "voting qualification or prerequisite to voting or standard, practice, or procedure" from being "imposed or applied . . . in a manner which results in a denial or abridgment of the right . . . to vote on account of race or color[.]" 52 U.S.C. § 10301(a). To establish a violation of Section 2, a plaintiff must show, "based on the totality of circumstances, . . . that the political processes leading to nomination or election . . . are not equally open to participation by members of a class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id*. § 10301(b). Although courts may consider "[t]he extent to which members of a protected class have been elected to office in the State or political subdivision[,]" Section 2 does

5

not "establish[ ] a right to have members of a protected class elected in numbers equal to their proportion in the population." *Id*.

The two-step framework that applies to a discriminatory effects, vote dilution claim comes from *Thornburg v. Gingles* and its progeny. 478 U.S. 30 (1986); *see also Allen v. Milligan*, 599 U.S. 1, 38 (2023) (reaffirming that the *Gingles* preconditions apply to claims challenging single-member districts).

To succeed on the claim, a plaintiff must first sufficiently plead, as a threshold matter, the three *Gingles* preconditions: (1) the minority group must be sufficiently large and compact to constitute a majority in a single-member district; (2) the minority group must be politically cohesive; and (3) the majority group must vote sufficiently as a bloc to enable it to usually defeat the minority group's preferred candidate. 478 U.S. at 79. "Failure to establish any one of these threshold requirements is fatal." *Harding v. Cnty. of Dallas, Tex.*, 948 F.3d 302, 308 (5th Cir. 2020); *see also Overton v. City of Austin*, 871 F.2d 529, 538 (5th Cir. 1989). And "[i]f a plaintiff fails to establish any one of these three preconditions, a court need not consider the other two, leaving the plaintiff with no remedy." *Robinson v. Ardoin*, 86 F.4th 574, 590 (5th Cir. 2023) (citing *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425 (2006)). Put simply, satisfaction of the three *Gingles* preconditions is necessary but not sufficient to prevail on a Section 2 claim. *See Fusilier v. Landry*, 963 F.3d 447, 456 (5th Cir. 2020) (citing *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 868 (5th Cir. 1993)).

If the three preconditions are satisfied, a plaintiff then must show that, based on the "totality of circumstances," they have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). The totality of circumstances inquiry entails a "functional analysis" that is "peculiarly dependent upon the facts of each case . . . and requires an intensely local appraisal of the design and impact of the

6

contested electoral mechanism." *Gingles*, 478 U.S. at 79–80 (citations omitted); *see also Harding*, 948 F.3d at 308. And critically, each of the *Gingles* preconditions must be shown on a district-by-district basis. *See Abbott*, 604 F. Supp. 3d at 496 (citing *Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398, 405 (2022) (per curiam) (a "generalized conclusion" cannot adequately answer "'the relevant local question' whether the preconditions would be satisfied as to each district.")).

Against the *Gingles* framework, Plaintiffs' Section 2 vote dilution claim fails at the threshold as the factual allegations are insufficient to satisfy any of the three preconditions. Each are addressed in turn.

        A.      <u>Plaintiffs do not adequately allege the first *Gingles* precondition</u>

Plaintiffs attempt to satisfy the first *Gingles* precondition by asserting bald, conclusory allegations that "DeSoto County's Black *population* is sufficiently numerous and geographically compact to constitute a majority of the voting-age population in one of the five DeSoto County election districts." Compl. [1] at ¶ 90 (emphasis added). These allegations are insufficient.

To satisfy the first *Gingles* precondition, a plaintiff must establish that "the minority group is sufficiently large and geographically compact to constitute a majority in a single member district." *Gingles*, 478 U.S. at 50. Thus, the focus is on geographical compactness and numerosity. *Robinson*, 86 F.4th at 590 (citing *Milligan*, 599 U.S. at 18). This precondition is "needed to establish that the minority has the potential to elect a representative of its own choice." *Miss. State Conf. of the NAACP v. State Bd. of Election Comm'rs*, --- F. Supp. 3d --- , 3:22-CV-734-DPJ-HSO-LHS, 2024 WL 3275965 at *12 (S.D. Miss. July 2, 2024). To do so, a plaintiff must show that "the minority population in the potential election district is greater than 50 percent." *Robinson*, 86 F.4th at 590 (quoting *Bartlett v. Strickland*, 556 U.S. 1, 19–20 (2009)). "This percentage is analyzed in terms of the black voting-age population ("BVAP") because only eligible voters can affect the *Gingles* analysis." *Id*.

7

Distilled down, the first precondition "relies on an objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?" *Strickland*, 556 U.S. at 13, 18; *see also Johnson v. De Grandy*, 512 U.S. 997, 1016 (1994). But even "[i]f the BVAP is greater than 50 percent, it must also be sufficiently compact such that a reasonably configured majority-minority district can be drawn." *Miss. State Conf. of the NAACP*, 2024 WL 3275965 at *12; *see also Abbott*, 604 F. Supp. 3d at 495 (recognizing that "the minority group must be able to constitute a majority by CVAP") (citing cases holding the same).

Plaintiffs attempt to satisfy the first *Gingles* precondition by asserting that "Black *citizens*" make up approximately 31.7% of the total population of DeSoto County and alleging that the "Black *community*" in Horn Lake and the surrounding areas is large enough to form a majority-Black district. *See* Compl. [1] at ¶¶ 3, 91 (emphasis added). These generalized assertions, *see* Compl. [1] at ¶¶ 3, 90, 91, lack sufficient details, let alone explain any of the "relevant geographic area" where Black *voters* constitute a majority of the citizen voting-age population. To satisfy the first precondition, Plaintiffs must show that the BVAP exceeds 50% within the proposed district because only eligible voters can participate in the political process and thus only can satisfy the *Gingles* analysis. *See Robinson*, 86 F.4th at 590. The Complaint, however, does not provide any quantitative demographic data or geographic information of where *Black voters* reside within DeSoto County.

Plaintiffs similarly have not plausibly alleged any facts from which it can be found that the BVAP is sufficiently compact (it's not). Without this, there is no basis to support Plaintiffs' proposition that Black voters could form a majority in any single member district in the County. To be sure, the Fifth Circuit has long recognized that "[t]he need for voting age population data, as opposed to total population data, in making the [*Gingles*] analysis should be obvious…. Unless minority voters possess the *potential to elect* representatives in the absence of the challenged

8

structure or practice, they cannot claim to have been injured by that practice." *Brewer v. Ham*, 876 F.2d 448, 452 (5th Cir. 1989); *see also Harding*, 948 F.3d at 308–09. On this point alone, Plaintiffs claim fails as a matter of law and should be dismissed.

> B.  Plaintiffs also do not sufficiently allege the second and third *Gingles* preconditions

As with Plaintiffs' deficient allegations for the first precondition, Plaintiffs fall far short on the second and third *Gingles* preconditions. While the second and third preconditions are often discussed together, they remain distinct inquiries evaluated on a district-by-district basis. *See Abbott*, 604 F. Supp. 3d at 496 (citing *Wis. Legislature*, 595 U.S. at 405).

The second precondition concerns the voting behavior of Black voters. *See Gingles*, 478 U.S. at 51, 56. To satisfy the second *Gingles* precondition, Plaintiffs must sufficiently plead that the minority group is "politically cohesive." The relevant inquiry is whether a "significant number of minority group members usually vote for the same candidate[,]" such that "they would elect their representative of choice in a majority-minority district." *Abbott*, 604 F. Supp. 3d at 496 (citing *Gingles*, 478 U.S. at 51); *Miss. State Conf. of NAACP*, 2024 WL 3275965 at *25.

The third precondition focuses on the electoral outcomes resulting from racially polarized voting and "requires establishing the plausibility that the challenged legislative districting thwarts minority voting on account of race." *Robinson*, 86 F.4th at 596 (citing *Milligan*, 599 U.S. at 19). In other words, to sufficiently plead the third precondition, a plaintiff must show that "whites vote sufficiently as a bloc usually to defeat the minority's preferred candidate." *Miss. State Conf. of NAACP*, 2024 WL 3275965 at *25 (citing *Gingles*, 478 U.S. at 56). The relevant inquiry is not whether white bloc voting is present but whether such bloc voting in a given district amounts to legally significant racially polarized voting. *Robinson*, 86 F.4th at 596; *see also Clements*, 999 F.2d at 850. In contrast to the second precondition, the third precondition must be established for the *challenged* districting. *Abbott*, 604 F. Supp. 3d at 496 (citing cases recognizing this point).

9

The Complaint alleges very little in support of the second or third *Gingles* preconditions. Instead of providing district-specific allegations regarding Black and White voting patterns and electoral results, Plaintiffs address both these distinct inquiries in combination. Even when considered together, Plaintiffs' allegations fail to sufficiently plead either precondition.

Plaintiffs broadly assert the second and third *Gingles* preconditions are satisfied "because voting in DeSoto County is racially polarized" and "Black voters in the County are cohesive in supporting their preferred candidates, but white voters consistently vote as a bloc to support other candidates." Compl. [1] at ¶¶ 96, 97. The first allegation is a legal conclusion while the second is a threadbare recital of claim elements. *See Iqbal*, 556 U.S. at 678; *see, e.g., Gingles*, 478 U.S. at (describing racially polarized voting as a "legal concept"). Similarly, Plaintiffs allege that, "[a]s a result, candidates preferred by white voters typically defeat the Black-preferred candidates in DeSoto County election." Compl. [1] at ¶ 98. This too is a legal conclusion without any factual basis or support purportedly showing that the third precondition is satisfied. *See Abbott*, 604 F. Supp. 3d at 499.

In an attempt to provide factual support for these conclusory statements, Plaintiffs generally assert that in "recent elections" at the local, countywide, statewide, and federal levels, "large majorities of Black voters supported the same candidates, who were defeated by candidates preferred by large majorities of white voters." Compl. [1] at ¶ 99; *see also id*. at ¶ 100. The Complaint references the 2020 U.S. Senate race where purportedly "100% of Black voters in DeSoto County supported Mike Epsy, while nearly 90% of white voters in the county supported his opponent, Cindy Hyde-Smith" and the 2019 statewide races. *See id*. at ¶¶ 102, 103. But these congressional and statewide electoral examples are not representative of the County's *local elections* governed by the 2022 Plan that Plaintiffs challenge. *See Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393, 1397 (5th Cir. 1996) (reiterating that "exogenous elections—those not involving the

10

particular office at issue—are less probative than elections involving the specific office that is the subject of the litigation."). While Plaintiffs make broad statements that Black candidates have been unsuccessful in County Office elections since 2018, *see* Compl. [1] at ¶ 100, they fail to allege how these losses were the result of White bloc voting or any other factual allegations to support this general proposition that White bloc voting usually defeats Black-preferred candidates in the County Offices at issue. In fact, the Complaint itself acknowledges that DeSoto County voters recently elected an African American Sheriff. Compl. [1] at ¶ 110. Plaintiffs however fail to mention or acknowledge that a broad swath of DeSoto County voters also recently elected a Republican African American State Representative, Rodney Hall, in Mississippi House of Representatives District 20, *see* Miss. Secretary of State, 2023 Statewide Recapitulation Sheet, *available at* https://www.sos.ms.gov/elections-voting/2023-general-election-results (last visited Nov. 22, 2024), a fact of which the Court may take judicial notice. *See* Fed. R. Evid. 201; *Palmer v. Jefferson*, No. 3:22-CV-508-DPJ-FKB, 2023 WL 1141844, at * 2 (S.D. Miss. Jan. 30, 2023) (taking judicial notice of date upon which sheriff was elected); *Perez v. Perry*, No. 11-CV-360, 2017 WL 962686, at *1 (W.D. Tex. Mar. 10, 2017) (taking "judicial notice of election returns available on the Texas Secretary of State's website").

Without specific, election-based allegations regarding political cohesion amongst Black voters and consistent White bloc voting in County elections, Plaintiffs have not sufficiently plead the requirements to satisfy the second and third *Gingles* preconditions. These deficiencies are fatal to their Section 2 vote dilution claim on the merits.

To survive a motion to dismiss, Plaintiff must plead more than "labels and conclusions" or a "formulaic recitation" of the elements of their claims. *Twombly*, 550 U.S. at 555; *see also Armstrong v. Ashley*, 60 F.4th 262, 270–71 (5th Cir. 2023) (affirming dismissal of all claims against municipality and several of its officers because the plaintiff's pleadings only contained

11

"labels and conclusions" and "a formulaic recitation of the elements of a cause of action" and "allegations [were] devoid of supporting factual detail that could render them plausible.") (citing *Iqbal*, 556 U.S. at 678); *Winder v. Gallardo*, 118 F.4th 638, 644 (5th Cir. 2024) (the Fifth Circuit "does not presume true a number of categories of statements, including legal conclusions, mere labels, threadbare recitals of the elements of a cause of action, conclusory statements, and naked assertions devoid of further factual enhancement.") (citing *Iqbal*, 556 U.S. at 678). Plaintiffs' Complaint relies on legal conclusions without providing sufficient factual support to satisfy any of the *Gingles* preconditions. Thus, their Section 2 vote dilution claim must be dismissed.

### III.    Section 2 Does Not Contain a Private Right of Action

Finally, although the Fifth Circuit has found "that there is a right for [private] Plaintiffs to bring [Section 2] claims," *Robinson v. Ardoin*, 86 F.4th 574, 588 (5th Cir. 2023), the Fifth Circuit has never conducted an implied-right-of-action analysis in the context of Section 2. That analysis was conducted recently (post-*Robinson*) by the Eighth Circuit, which found no private right of action in Section 2 because it fails a straightforward implied-right-of-action analysis. *See Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1209 (8th Cir. 2023). Defendants address this issue to preserve it and highlight shortcomings in *Robinson's* reasoning.[3]

---

[3] In *Nairne v. Landry*, CA5 No. 24-30115, the Fifth Circuit will have its first opportunity after *Ark. State Conf. NAACP*, 86 F.4th 1204, to address whether there is a private right of action in Section 2 of the VRA. In *Nairne*, the Louisiana Solicitor General asked for initial en banc consideration of the threshold question of whether Section 2 provides for a private right of action. *See* CA5 No. 24-30115, Docket no. 125. On June 24, 2024, the Fifth Circuit en banc court denied this request by a split court—eight voting for consideration, eight voting against, and one) taking no part in the voting. Briefing to the panel in *Nairne* completed on September 18, 2024, and oral argument is set for January 6, 2025.

The United States Supreme Court has never considered the issue of whether anyone besides the Attorney General can bring a private suit under Section 2. In fact, in the Supreme Court's most recent Section 2 decision, two Justices went out of their way to make clear that such an argument was not before the Court. *Allen v. Milligan*, 599 U.S. 1, 90 n.22 (2023) (Thomas, J., dissenting) ("The Court does not address whether [Section] 2 contains a private right of action, an issue that was argued below but was not raised in this Court." (citing *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) (Gorsuch, J., concurring)).

Section 2 does not explicitly state that a private right of action is available. When a statute does not explicitly state that "a private right of action is available," Congress can imply such a right only if Congress "*both* created an individual right *and* [gave] private plaintiffs the ability to enforce it." *Id.* (citing *Alexander v. Sandoval*, 532 U.S. 275, 288–89 (2001)).

Section 2 fails the first element of the implied right of action analysis because Congress did not create an individual right. True, the text of Section 2 outlines a "general proscription of discriminatory conduct" (which suggests no individual right) and focuses on a class of individuals "subject to discrimination in voting" (which might imply, but does not actually create, a right). *Id.* at 1209–10. But the text of Section 2 certainly lacks "the sort of rights-creating language needed to imply a private right of action." *See Planned Parenthood of Greater Tex. Fam. Planning & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347, 374 (5th Cir. 2020) (Elrod, C.J., concurring) (emphasizing that "where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action" (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285–86 (2002))).

But any question as to whether Congress explicitly created a private right of action is foreclosed by the second element of the implied right of action analysis.

Section 2 fails the second element because it does not give private plaintiffs the ability to enforce it. *See Ark. State Conf. NAACP*, 86 F.4th at 1209 (citing *Sandoval*, 532 U.S. at 288–89). Mere violation of a statute will not support a claim where no private right of action exists. *See, e.g.*, *Yoder v. Wells Fargo Bank, N.A.*, 566 F. App'x 138, 142 (3d Cir. 2014) (reasoning that conclusory claim for violation of a statute that imposed criminal penalty instead of affording a private right of action should be dismissed). In Section 12, the VRA "lists only one plaintiff who can enforce [Section] 2: the Attorney General." *Id.* at 1208 (citing 52 U.S.C. § 10308(d)); *see also*

13

52 U.S.C. § 10308(d) ("Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section 10301 . . . of this title, . . . the Attorney General may institute for the United States, or in the name of the United States, an action for preventive relief . . . ."). Naturally, then, based on "the text and structure of [Section] 2 and [Section] 12[,] . . . Congress intended to place enforcement in the hands of the [Attorney General], rather than private parties." *Id.* (citation omitted). Congress thus did not create a private right of action in Section 2, implicitly or explicitly.

In *Robinson*, the Fifth Circuit did not engage with the Supreme Court's implied-right-of-action analysis. The panel there instead reasoned that a private right of action existed in Section 2 because *OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017) did "most of the work on this issue[,] holding that the [VRA] abrogated the state sovereign immunity anchored in the Eleventh Amendment." *Robinson*, 86 F.4th at 588. But as a judge on the Eleventh Circuit has observed, this line from *OCA-Greater Houston* was conclusory, unexplained, and incorrect. *Ala. State Conf. of NAACP v. Alabama*, 949 F.3d 647, 662 (11th Cir. 2020) (Branch, J., dissenting) (explaining, in the context of a later-vacated decision, that *OCA-Greater Houston* is profoundly wrong because "nothing" in the VRA's text "abrogates state sovereign immunity such that private individuals can sue the State in federal court"). Removing this mistaken premise causes *Robinson*'s holding to collapse.

*OCA-Greater Houston* also summarily concluded that the VRA "validly abrogated state sovereign immunity." 867 F.3d at 614. That conclusion cannot be true as to private actions, as here, because there was no requisite clear legislative statement allowing private suits to abrogate the State's quintessential power to regulate elections. *OCA-Greater Houston* ignored the longstanding requirement that "Congress' intent to abrogate the States' immunity from suit must be obvious from 'a clear legislative statement.'" *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44,

14

55 (1996). Other courts have even declined to follow *OCA-Greater Houston* because of the "conclusory nature" and "bare[ness]" of its analysis. *See, e.g.*, *Abbott v. Mexican Am. Legis. Caucus, Tex. House of Representatives*, 647 S.W.3d 681, 698 (Tex. 2022).

Nonetheless, based almost exclusively on *OCA-Greater Houston*, *Robinson* held that the plaintiffs there could bring a private right of action under Section 2 of the VRA because they were "aggrieved persons" under Section 3 of the VRA. *Robinson*, 86 F.4th at 588 (citing 52 U.S.C. § 10302). As the Eighth Circuit recognized, however, Section 3 refers to a "proceeding instituted by the Attorney General or an aggrieved person," though it originally referenced only the Attorney General. 52 U.S.C. § 10302(c); *Ark. State Conf. NAACP*, 86 F.4th at 1211. The "most logical deduction from" Congress adding in the reference to aggrieved persons "is that Congress meant to address those cases brought pursuant to the private right[s] of action that already existed or that would be created in the future"—not that Congress meant to create a new private right of action altogether. *Morse v. Republican Party of Va.*, 517 U.S. 186, 289 (1996) (Thomas, J., dissenting); *Ark. State Conf. NAACP*, 86 F.4th at 1211.

It would have indeed been strange for Congress to have intended Section 3 to create *new* rights of actions because Section 12 already gave the Attorney General the right to pursue actions under Section 2. "[A] second, duplicate authorization for the Attorney General to sue" would make no sense. *Ark. State Conf. NAACP*, 86 F.4th at 1211. The text, history, and structure of the VRA do not support *Robinson*'s summary conclusion that there is a private right of action to sue under Section 2. For these reasons, Plaintiffs' Complaint must be dismissed.

## **Conclusion**

For these reasons, Defendants request an order dismissing the Complaint with prejudice.

Dated: November 22, 2024.

           Respectfully submitted,

           PHELPS DUNBAR LLP

           */s/ D. Michael Hurst, Jr.*
           D. Michael Hurst, Jr. MB # 99990
           W. Thomas Siler, Jr. MB #6791
           Nicholas F. Morisani MB #104970
           1905 Community Bank Way, Suite 200
           Flowood, Mississippi 39232
           Telephone: 601-352-2300
           Facsimile: 601-360-9777
           mike.hurst@phelps.com
           silert@phelps.com
           nick.morisani@phelps.com

           ***ATTORNEYS FOR DEFENDANTS***

**CERTIFICATE OF SERVICE**

   I certify that on November 22, 2024, I electronically filed this document with the Clerk of the Court using the ECF system, which sent notification of such filing to all ECF counsel of record in this action.

                     /s/ D. Michael Hurst, Jr.
                      D. Michael Hurst, Jr.