UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

HAROLD HARRIS; PASTOR ROBERT
TIPTON, JR.; DELTA SIGMA THETA
SORORITY, INC.; and DESOTO COUNTY
MS NAACP UNIT 5574                                    PLAINTIFFS

vs.                                           Civil No. 3:24-cv-00289-GHD-RP

DESOTO COUNTY, MISSISSIPPI; DESOTO
COUNTY BOARD OF SUPERVISORS;
DESOTO COUNTY ELECTION
COMMISSION; and DALE THOMPSON in her
official capacity as Desoto County Circuit Clerk      DEFENDANTS

**MEMORANDUM OPINION**

Presently before this Court is Defendants Desoto County, Mississippi; Desoto County

Board of Supervisors; Desoto County Election Commission; and Dale Thompson's (collectively

"Defendants") Motion to Dismiss [36]. This is in response to Plaintiffs Harold Harris; Pastor

Robert Tipton, Jr.; Delta Sigma Theta Sorority, Inc.; and Desoto County, Mississippi NAACP

Unit 5574's (collectively "Plaintiffs") Complaint [1] alleging Defendants' 2022 redistricting plan

violates Section 2 of the Voting Right Act ("VRA").[1] Plaintiffs have responded [44] to

Defendants' Motion to Dismiss [36], making the issue ripe for decision. As set forth below, the

Court finds Defendants' Motion to Dismiss [36] should be granted in part and denied in part.

**BACKGROUND**

As required after each decennial census, the DeSoto County Board of Supervisors began

its redistricting process in September 2021.[2] These district boundaries not only determine board

of supervisor elections but also the elections of County Justice Court judges, constables, and

---

[1] 52 U.S.C. § 10301.
[2] As required under Federal Rule of Civil Procedure 12(b)(6), all background information is drawn from Plaintiffs' Complaint [1].

members of both the board of education and election commission. In December 2021, the DeSoto County Board of Supervisors contracted with a firm "to prepare the County's redistricting plan." At the same time, black DeSoto County residents (including some of the plaintiffs in this case) created the Citizens' Redistricting Committee which "hosted public meetings, provided classes on redistricting," and more importantly, "drafted alternative redistricting plans." Another "citizen group, the DeSoto Community Redistricting Committee," also created an alternative redistricting plan.

In March 2022, the board of supervisors' hired firm presented draft redistricting maps to county officials. Then, on May 16, 2022, the board of supervisors scheduled a public hearing concerning the redistricting plans for Monday, June 6, 2022, at 8:00 a.m. The board of supervisors allegedly refused to change this meeting time despite community members requesting such for greater public involvement. The board also allegedly refused to allow alternative redistricting plans to be included in the meeting's agenda, but both maps were seemingly presented at the June 6 meeting along with the hired firm's four proposed maps. It is also alleged a representative of that firm "stated he was not able to draw a map with a Black-opportunity district based on feedback from holders of the County offices" at the meeting. Ultimately, the board of supervisors unanimously adopted the 2022 plan at issue here. This litigation followed.

## STANDARD OF REVIEW

When deciding a Rule 12(b)(6) motion to dismiss, the Court is limited to the allegations set forth in the complaint and any documents attached to the complaint. *Walker v. Webco Indus., Inc.*, 562 F. App'x 215, 216–17 (5th Cir. 2014) (per curiam) (citing *Kennedy v. Chase Manhattan Bank USA, NA*, 369 F.3d 833, 839 (5th Cir. 2004)). "[A plaintiff's] complaint therefore must

2

contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Phillips v. City of Dallas, Tex.*, 781 F.3d 772, 775–76 (5th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))). A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937 (citing *Twombly*, 550 U.S. at 556, 127 S. Ct. 1955).

In other words, "plaintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim." *Webb v. Morella*, 522 F. App'x 238, 241 (5th Cir. 2013) (per curiam) (quoting *City of Clinton, Ark. v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152–53 (5th Cir. 2010) (internal quotation marks omitted)). "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Id.* (quoting *Fernandez–Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993) (internal quotation marks omitted)). "Dismissal is appropriate when the plaintiff has not alleged 'enough facts to state a claim to relief that is plausible on its face' and has failed to 'raise a right to relief above the speculative level.'" *Emesowum v. Houston Police Dep't*, 561 F. App'x 372, 372 (5th Cir. 2014) (per curiam) (quoting *Twombly*, 550 U.S. at 555, 570, 127 S. Ct. 1955).

As for Rule 12(b)(1), motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the subject matter jurisdiction of the district court to hear a case. Fed. R. Civ. P. 12(b)(1). Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001);

3

*Barrera–Montenegro v. United States,* 74 F.3d 657, 659 (5th Cir. 1996). The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. *Ramming*, 281 F.3d at 161. Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist. *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507, 511 (5th Cir. 1980). As the Fifth Circuit directs, "When a 12(b)(1) motion is filed with other Rule 12 motions, [this Court] first considers its jurisdiction." *McLin v. Twenty-First Jud. Dist.*, 79 F.4th 411, 415 (5th Cir. 2023) (citing *Ramming*, 281 F.3d at 161).

## DISCUSSION AND ANALYSIS

As the Fifth Circuit directs, the Court takes up the 12(b)(1) question of standing to sue Defendant Dale Thompson first and then analyzes Plaintiffs' VRA claim under 12(b)(6).

### I.    *Standing in relation to Defendant Dale Thompson*

The United States Supreme Court established a clear three-part test for standing in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) which requires "the party invoking federal jurisdiction" establish:

> *First*, . . . an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized . . .; and (b) actual or imminent, not conjectural or hypothetical. . . . *Second*, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court. . . . *Third*, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61 (citations omitted) (cleaned up) (emphasis added); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006); *OCA-Greater Houston v. Texas*, 864 F.3d 604, 609-10 (5th Cir. 2017). Thus, the Court must first determine whether Plaintiffs pled "an injury in fact." *Id*. The parties seemingly agree Plaintiffs alleged an injury in fact because Defendants' standing analysis covers only the second and third

4

prongs of the test. Therefore, the Court will assume Plaintiffs properly alleged an injury in fact.

The Court turns now to the second prong, which requires the showing of a "causal connection between the injury and the conduct complained of" that is "fairly . . . traceable to the challenged action of the defendant." *Id.* (internal quotation marks omitted). Plaintiffs cannot plausibly show this. As circuit clerk, Defendant Thompson is charged with *implementing* boundary line changes the board of supervisors adopts—she plays no role in its *development*. Miss. Code Ann. § 23-15-283(3). Plaintiff alleges nothing more than Defendant Thompson's position as Desoto County's circuit clerk and her responsibilities "for supporting the DeSoto County Election Commission, administering and supervising voter registration, preparing and holding elections, archiving election results, and performing other election functions" [1]. None of these allegations maintain a "causal connection" between Defendant Thompson's actions as circuit clerk and Plaintiffs' injury; therefore, Plaintiffs have no standing to sue Defendant Thompson, requiring her dismissal from this case.

## II. *Voting Rights Act Claim*

Plaintiffs claim the remaining Defendants violated Section 2 of the Voting Rights Act, specifically 52 U.S.C. § 10301 which states:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).
>
> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation

by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

The Fifth Circuit has clearly held a private right of action does exist under Section 2 of the VRA. *Robinson v. Ardoin*, 86 F.4th 574, 587-88 (5th Cir. 2023) (citing *OCA-Greater Houston*, 867 F.3d at 614). Returning to the more substantive part of this analysis, the United States Supreme Court developed a test in *Thornburg v. Gingles*, 487 U.S. 30, 50 (1986), to guide courts in their analysis of Section 2 claims. To prove a Section 2 violation under *Gingles*, a plaintiff must satisfy three preconditions: (1) "the minority group must be sufficiently large and geographically compact;" (2) "the minority group must be politically cohesive;" and (3) "the white majority must be shown to vote sufficiently as a bloc to usually defeat the minority-preferred candidate." *Robinson*, 86 F.4th at 589 (citing *Allen v. Milligan*, 599 U.S. 1, 18 (2023)) (internal quotation marks omitted). If these preconditions are met, "a plaintiff then must 'show, under the totality of the circumstances, that the political process is not equally open to minority votes.'" *Id.*

## A. The First *Gingles* Precondition

"First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district," *Gingles*, 478 U.S. at 50. Stated differently, the focus is "on geographical compactness and numerosity." *Robinson*, 86 F.4th at 589 (citing *Milligan*, 599 U.S. at 18). To satisfy the numerosity component, "[t]he party asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent." *Robinson*, 86 F.4th at 589-90 (citing *Bartlett v. Strickland*, 556 U.S. 1, 19-20 (2009)) (internal quotation marks omitted).

6

"This percentage is analyzed in terms of the black voting-age population ("BVAP") because only eligible voters can affect the *Gingles* analysis." *Id.* at 590. Plaintiffs make valid allegations regarding numerosity; specifically, the Complaint [1] states, "A majority-Black district would include large portions of the Black community in Horn Lake and the surrounding areas, including portions of Walls and Nesbit." Further, the Complaint [1] describes "Walls [as] a majority-Black town" and alleges "the Black population of Horn Lake increased from approximately 12% of the City's population in the 2000 U.S. Census to nearly 52% in the 2020 U.S. Census." At this juncture, these allegations are enough to satisfy the numerosity requirement for purposes of 12(b)(6).

The compactness inquiry "should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries" while focusing "on the compactness of the minority population, not [] the compactness of the contested district." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) (citing *Bush v. Vera*, 517 U.S. 952, 997 (1996)) (internal quotation marks omitted). "A district is sufficiently compact if it allows for effective representation. A district would not be sufficiently compact . . . if its members and its representatives could not easily tell who lived in the district." *Rodriguez v. Harris Cnty.*, Tex., 964 F.Supp.2d 686, 737-38 (S.D. Tex. 2013) (citing *Clark v. Calhoun Cnty., Miss.*, 21 F.3d 92, 96 (5th Cir. 1994) (*Clark I*); *Dillard v. Baldwin Cnty.*, 686 F.Supp. 1459, 1466 (M.D. Ala. 1988)). At this juncture, Plaintiffs properly allege compactness in their Complaint [1]: "Black communities in Horn Lake and the surrounding area, including the nearby Town of Walls and the nearby unincorporated community of Nesbit, share a community of interest with important socioeconomic and cultural ties." Those allegations are supported throughout the Complaint [1] with comparisons between the communities' median household incomes and

7

property values as well as shared public services and spaces (*e.g.*, doctors, stores, parks, and schools). Therefore, Plaintiffs have plausibly alleged factual material to satisfy the first *Gingles* precondition for 12(b)(6) purposes.

## B. The Second *Gingles* Precondition

The next precondition requires "the minority group . . . show that it is politically cohesive." *Gingles*, 478 U.S. at 51. That is, "the plaintiff must show that a significant number of minority group members usually vote for the same candidate." *Rodriguez*, 964 F.Supp.2d at 754 (citing *Gingles*, 478 U.S. at 57 ("the political cohesiveness inquiry asks whether 'voters of the same race tend to vote alike.'")). Plaintiffs validly allege this in their Complaint using examples like "the 2020 U.S. Senate race, [where] nearly 100% of Black *voters in DeSoto County* supported Mike Espy, while nearly 90% of white voters *in the county* supported his opponent, Cindy Hyde-Smith." [1 (emphasis added)]. This fact, taken as true, nudges this precondition past the speculative level; therefore, Plaintiffs have alleged enough at this juncture to establish the second precondition.

## C. The Third *Gingles* Precondition

The third and final precondition requires "the minority group . . . demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as a minority candidate running unopposed . . . —usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51. "This precondition requires proof that white bloc voting, 'can generally minimize or cancel black voters' ability to elect' their preferred candidate." *Robinson*, 86 F.4th at 595 (quoting *Gingles*, 478 U.S. at 56). "Racial bloc voting 'exists where there is consistent relationship between the race of the voter and the way in which the voter votes." *Rodriguez*, 964 F.Supp.2d at 756-57 (citing *Gingles*, 478 U.S. at 53 n. 21). The necessary

8

question under precondition three is whether the white majority "bloc voting is legally significant." *Id.* at 757 (citing *LULAC IV*, 999 F.2d 831, 850 (5th Cir. 1993); *LULAC III*, 986 F.2d 728, 745 (5th Cir. 1993)). "[G]enerally, a white bloc vote that normally will defeat the combined strength of minority support plus white crossover votes rises to the level of legally significant white bloc voting." *Id.* (citing *Gingles*, 478 U.S. at 56; accord *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425 (2006); *Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994); *LULAC IV*, 999 F.2d at 850)) (internal quotation marks omitted). Yet, "it is the usual predictability of the majority's success which distinguishes structural dilution from the mere loss of an occasional election." *Id.* (citing *Gingles*, 478 U.S. at 51) (internal quotation marks omitted).

Plaintiffs allege just such a scenario in their Complaint [1]. Specifically, "Since 2018, at least twelve Black candidates have run against white candidates for the County Offices. In each of these elections, Black voters voted cohesively for the Black candidate, who was decisively defeated by the white candidate preferred by white people voting as a bloc" [1]. They go further in alleging the same is true in DeSoto County for "Black congressional and statewide candidates" [1]. At this early stage in litigation, these allegations are enough to satisfy the third *Gingles* precondition for 12(b)(6).

## D. Totality of the Circumstances Test

"Finally, a plaintiff who demonstrates the three preconditions must also show, under the 'totality of the circumstances,' that the political process is not 'equally open' to minority voters." *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (citing *Gingles*, 487 U.S. at 45-46). Courts use the *Gingles* or Senate factors[3] for this analysis, of which there are ten, but "no one factor has determinative weight." *Veasey v. Abbott*, 830 F.3d 216, 246 (5th Cir. 2016) (citing *Gingles*, 478

---

[3] They are also sometimes referred to as the *Zimmer* factors. *Robinson*, 86 F.4th at 589 (citing *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 849 (5th Cir. 1993)).

U.S. at 45). The Court reiterates here it must "accept all well-pleaded facts as true, drawing all reasonable inferences in the nonmoving party's favor," and it addresses each factor below with that in mind. *Edmiston v. Borrego*, 75 F.4th 551, 557 (5th Cir. 2023) (citing *Benfield v. Magee*, 945 F.3d 333, 336 (5th Cir. 2019)).

The first factor looks to "the history of voting-related discrimination in the state or political subdivision." *Rodriguez*, 964 F.Supp.2d at 778 (citing *Gingles*, 478 U.S. at 36-37). Plaintiffs devote almost six pages of their Complaint [1, pp. 19-24] to allege Mississippi and DeSoto County's histories of voting-related discrimination. More specifically, they point to specific violent episodes and particular legislative action, along with other more generalized examples. Plaintiffs also allege more recent racial activities in DeSoto County including allegations of discriminatory polling places and voter intimidation [1, pp. 23-24]. This satisfies the first factor for 12(b)(6) purposes.

The second factor looks to "the extent to which voting in the state or subdivision is racially polarized." *Rodriguez*, 964 F.Supp.2d at 778 (citing *Gingles*, 478 U.S. at 36-37). Plaintiffs satisfy this factor for 12(b)(6) purposes with the allegations previously discussed; that is, "In the 2020 U.S. Senate race, nearly 100% of Black *voters in DeSoto County* supported Mike Espy, while nearly 90% of white voters *in the county* supported his opponent, Cindy Hyde-Smith" [1, p. 17 (emphasis added)]. They further alleged "the same voting pattern existed in the 2019 statewide races for Treasurer and Attorney General, both of which were biracial" [*Id.*]. These facts, taken as true, specifically refer to voters in DeSoto County and are enough to satisfy the second factor for 12(b)(6) purposes.

The third factor looks to "the extent to which the state or subdivision has used voting practices or procedures that tend to enhance opportunities for discrimination against the minority

group." *Rodriguez*, 964 F.Supp.2d at 778 (citing *Gingles*, 478 U.S. at 36-37). To support their claim under this factor, Plaintiffs allege "DeSoto County employs a majority-vote requirement with respect to primary elections, pursuant to state law" [1, p. 24]. They also allege the county holds some county office elections in odd-numbered years which suppresses "turnout as compared to elections that coincide with federal elections" [*Id.*]. More generally, Plaintiffs allege "[v]oting in Mississippi is cumbersome and expensive for voters, . . . Mississippi does not permit same-day voter registration, in-person early voting, or no-excuse mail-in voting," and claims the "state's notarization requirement for both absentee ballot applications and ballots themselves" is "another obstacle for voting" [1, p. 25]. At this juncture, these allegations are enough to satisfy the third factor.

The fourth factor looks to "whether minority candidates have been denied access to any candidate-slating process." *Rodriguez*, 964 F.Supp.2d at 778 (citing *Gingles*, 478 U.S. at 36-37). The Fifth Circuit noted in *N.A.A.C.P. v. Fordice*, 252 F.3d 361, 372 (5th Cir. 2001), "Mississippi does not use a candidate slating process," and the Plaintiffs make no mention of that in their Complaint [1]; therefore, it will have no bearing on this analysis.

The fifth factor looks to "the extent to which minorities have borne the effects of past discrimination in relation to education, employment, and health." *Rodriguez*, 964 F.Supp.2d at 778 (citing *Gingles*, 478 U.S. at 36-37). Plaintiffs again use almost six pages of their Complaint [1, pp. 25-31] to support their claim under the fifth factor. Those allegations clearly satisfy the fifth factor of this analysis for purposes of 12(b)(6).

The sixth factor looks to "whether local political campaigns have used overt or subtle racial appeals." *Rodriguez*, 964 F.Supp.2d at 778 (citing *Gingles*, 478 U.S. at 36-37). Plaintiffs

11

sufficiently cite examples of both overt and more subtle racial appeals in their Complaint [1] to support this factor at this juncture.

The seventh factor looks to "the extent to which minority group members have been elected to public office in the jurisdiction." *Rodriguez*, 964 F.Supp.2d at 778 (citing *Gingles*, 478 U.S. at 36-37). Plaintiffs allege "[s]ince at least 2012, no Black . . . candidate has won election to any of the five County Offices that were elected under the County districting plan" [1, p. 18]. Therefore, Plaintiffs have made the proper allegations to support the seventh factor for 12(b)(6) purposes.

The eighth factor looks to "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of members of the minority group." *Rodriguez*, 964 F.Supp.2d at 778 (citing *Gingles*, 478 U.S. at 36-37). Plaintiffs sufficiently allege examples of DeSoto County's lack of responsiveness to its black community's concerns, both specifically regarding voting but also in a more general sense [1, pp. 31-32]. At this juncture in the proceedings, this is enough to satisfy the eighth factor.

The ninth factor looks to "whether the policy underlying the use of voting qualifications is tenuous." *Rodriguez*, 964 F.Supp.2d at 778 (citing *Gingles*, 478 U.S. at 36-37). Plaintiffs make no mention of this factor in their Complaint [1]; therefore, it plays no part in the Court's analysis.

Finally, "[t]he court must also consider whether the number of districts in which the minority group forms an effective majority is roughly proportional to the minority group's share of the population in the relevant area." *Rodriguez*, 964 F.Supp.2d at 778 (citing *Perry,* 548 U.S. at 425; *Fairley,* 584 F.3d at 673). "[P]roportionality is not dispositive in a challenge to single-member districting." *Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994). However, "it is a relevant fact in the totality of circumstances . . . when determining whether members of a

12

minority group have 'less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* (citing 52 U.S.C. § 10301). Plaintiffs provide very little support, if any, for this final factor. Yet, considering their support for the other factors, it is clear Plaintiffs have sufficiently stated their claim. Therefore, Plaintiffs have met their 12(b)(6) burden for the totality of circumstances test under *Gingles*.

**CONCLUSION**

For all the foregoing reasons, the Court finds Defendants DeSoto County, Mississippi; DeSoto County Board of Supervisors; DeSoto County Election Commission; and Dale Thompson's Motion to Dismiss [36] should be granted in part as to the claims against Dale Thompson, and otherwise denied. The Plaintiffs' claim for 52 U.S.C. § 10301 violations shall proceed at this juncture.

An order in accordance with this opinion shall issue this day.

THIS _28th_ day of April, 2025.

SENIOR U.S. DISTRICT JUDGE