IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

| | |
|---|---|
| **HAROLD HARRIS; PASTOR ROBERT TIPTON, JR.; DELTA SIGMA THETA SORORITY, INC.; and DESOTO COUNTY MS NAACP UNIT 5574**, | CIVIL NO.: 3:24-CV-00289-GHD-RP |
| Plaintiffs, | |
| v. | |
| **DESOTO COUNTY, MISSISSIPPI; DESOTO COUNTY BOARD OF SUPERVISORS; and DESOTO COUNTY ELECTION COMMISSION**, | |
| Defendants. | |

**EXPERT REPORT OF SEAN P. TRENDE, Ph.D.**

**Exhibit B**

# Table of Contents

1 Introduction and Executive Summary    1

2 Qualifications    1

    2.1 Career . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    2.2 Publications and Speaking Engagements . . . . . . . . . . . . . . . . 2

    2.3 Education . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    2.4 Prior Engagements . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

3 Overview of Compactness Metrics    5

    3.1 Reock Scores . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    3.2 Polsby-Popper Scores . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    3.3 Convex Hull Scores . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    3.4 IKIWISI Scores . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

4 A Brief Introduction to Census Geographies    11

5 Evaluation of Mr. Cooper's Plans    14

    5.1 All of Mr. Cooper's Demonstrative Districts Barely Cross the *Gingles I*
Population Threshold. . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    5.2 Mr. Cooper's criteria for evaluating maps are arbitrary. . . . . . . . . . 15

    5.3 Mr. Cooper's maps all appear to split precincts primarily on the basis of
race. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

       5.3.1 Map 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

       5.3.2 Map 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

       5.3.3 Map 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    5.4 Mr. Cooper's maps 2 and 3 feature districts that are substantially less
compact than those of the Enacted Map . . . . . . . . . . . . . . . . 30

    5.5 Mr. Cooper's maps have comparatively low core retention rates. . . . . . 36

5.6  Mr. Cooper's maps 2 and 3 are based upon non-compact minority populations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

5.7  Mr. Cooper likely did not rely on socio-economic data when drawing the map. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

5.8  Mr. Cooper's demographic comparisons are meaningless without an appropriate statistical test. . . . . . . . . . . . . . . . . . . . . . . . . . . .  50

**6  Exhibit 1 – Sean Trende C.V.**  **53**

# List of Figures

Figure 1:     Comparison of low Reock district (left) with high Reock district (right) . . . . . . . . . . . . . . . . . . . . . . . . . . .     6

Figure 2:     Comparison of low Polsby-Popper district (left) with high Polsby-Popper district (right) . . . . . . . . . . . . . . . . . . . . . . .     8

Figure 3:     Comparison of low Convex Hull district (left) with high Convex Hull district (right) . . . . . . . . . . . . . . . . . . . . . . . .     9

Figure 4:     Illustration of Census Tracts (Black Lines), Census Block Groups (Shaded, Dashed Lines), and Census Blocks (White Lines) in DeSoto County, Mississippi . . . . . . . . . . . . . . . . . . . . . .     12

Figure 5:     Southaven boundaries outlined in blue, with census tracts in the region outlined in black. Census tracts that Southaven splits are shaded grey . . . . . . . . . . . . . . . . . . . . . . . . . . .     13

Figure 6:     North Central DeSoto County. Block groups are outlined in black and shaded. VTDs are depicted with blue dashed lines. Instances where blue dashed lines depart from solid black lines are places where VTD and block group boundaries do not line up. . . . . . .     14

Figure 7:     Portion of DeSoto County. VTD lines are outlined in blue, enacted district boundary is outlined by black dashed line . . . . . . . . .     16

Figure 8:     Boundary of Illustrative Map 1, District 3 . . . . . . . . . . . . .     18

Figure 9:     Split of Southaven West Precinct . . . . . . . . . . . . . . . . . .     19

Figure 10:    Split of Southaven West Precinct, Map 1 . . . . . . . . . . . . . .     20

Figure 11:    Split of Northwest Community College Precinct, Map 1 . . . . . .     21

Figure 12:    Map 1, Choropleth by % BVAP . . . . . . . . . . . . . . . . . .     23

Figure 13:    Map 2, District 3 . . . . . . . . . . . . . . . . . . . . . . . . . .     24

Figure 14:    Map 2, Choropleth by % BVAP . . . . . . . . . . . . . . . . . .     25

Figure 15:    Split of Northwest Community College Precinct, Map 2 . . . . . .     26

Figure 16:   Split of Walls Precinct, Map 2 . . . . . . . . . . . . . . . . . . . . .   27

Figure 17:   Split of Lake Cormorant Precinct, Map 2 . . . . . . . . . . . . . .   28

Figure 18:   Map 3, Choropleth by % BVAP . . . . . . . . . . . . . . . . . . . .   29

Figure 19:   Split of Northwest Community College Precinct, Map 3 . . . . . .   30

Figure 20:   Individual Depictions of Districts, Various Maps . . . . . . . . . .   31

Figure 21:   Various Districts, Sorted By Reock Score . . . . . . . . . . . . . .   32

Figure 22:   Various Districts, Sorted By Polsby-Popper Score . . . . . . . . .   33

Figure 23:   Various Districts, Sorted By Convex Hull Score . . . . . . . . . .   34

Figure 24:   Various Districts, Sorted By IKIWISI Score . . . . . . . . . . . .   35

Figure 25:   Core Retention districts in the Benchmark Map in the Enacted
             Map (i.e., 97.4% of the population in Benchmark District 1 is kept
             together in some district in the Enacted Map, etc. . . . . . . . . .   37

Figure 26:   Core Retention districts in the Benchmark Map in Illustrative Map
             1 (i.e., 93.65% of the population in Benchmark District 1 is kept
             together in some district in Illustrative Map 1, etc. . . . . . . . .   37

Figure 27:   Core Retention districts in the Benchmark Map in Illustrative Map
             1 (i.e., 97.34% of the population in Benchmark District 1 is kept
             together in some district in Illustrative Map 2, etc. . . . . . . . .   38

Figure 28:   Core Retention districts in the Benchmark Map in Illustrative Map
             1 (i.e., 76.47% of the population in Benchmark District 1 is kept
             together in some district in Illustrative Map 3, etc. . . . . . . . .   38

Figure 29:   Dot Density map of Map 1, District 3. One black dot = 1 Black
             resident; 1 yellow dot = 1 non-Black resident. . . . . . . . . . . .   40

Figure 30:   Dot Density map of Map 2, District 3. One black dot = 1 Black
             resident; 1 yellow dot = 1 non-Black resident. . . . . . . . . . . .   41

Figure 31:   Dot Density map of Map 3, District 3. One black dot = 1 Black
             resident; 1 yellow dot = 1 non-Black resident. . . . . . . . . . . .   42

Figure 32:  15 highest BVAP precincts/parts of precincts, with Map 1 district

assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

Figure 33:  15 highest BVAP precincts/parts of precincts, with Map 2 district

assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

Figure 34:  15 highest BVAP precincts/parts of precincts, with Map 3 district

assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

Figure 35:  20 highest income block groups, with Map 1 district assignment .  47

Figure 36:  20 highest income block groups, with Map 2 district assignment .  48

Figure 37:  20 highest income block groups, with Map 3 district assignment .  49

# 1 Introduction and Executive Summary

My name is Sean P. Trende. I am over 18 years of age and I hold a Ph.D. in Political Science. I have been retained by the Phelps Dunbar law firm on behalf of their clients, DeSoto County, Mississippi, et al., in the above-captioned matter. In this part of my report, I am asked to evaluate the Expert Report of William S. Cooper, dated April 18, 2025 ("Cooper Report"). In particular, I have been asked to evaluate his Illustrative Maps 1, 2 and 3. I am being compensated at a rate of $500/hr for authoring this report. My compensation is in no way dependent upon the conclusions that I reach.

My major conclusions are as follows:

- Mr. Cooper's maps often subordinate his proposed traditional redistricting principles to racial goals.

- Mr. Cooper's individual districts are frequently less compact than any in the Enacted Map.

- Mr. Cooper's maps 2 and 3 are based upon non-compact minority populations.

- Mr. Cooper's maps have comparatively low core retention rates.

- Mr. Cooper's demographic comparisons are meaningless without a proper statistical test.

# 2 Qualifications

## 2.1 Career

I serve as Senior Elections Analyst for Real Clear Politics. I joined Real Clear Politics in January of 2009 and assumed a fulltime position in March of 2010. Real Clear Politics is a company of approximately 50 employees, with its main offices in Washington D.C. It produces one of the most heavily trafficked political websites in the world, which serves as a one-stop shop for political analysis from all sides of the political spectrum and is recognized as a pioneer in the field of poll aggregation. Real Clear Politics produces

original content, including both data analysis and traditional reporting.

My main responsibilities with Real Clear Politics consist of tracking, analyzing, and writing about elections. I collaborate in rating the competitiveness of Presidential, Senate, House, and gubernatorial races. As a part of carrying out these responsibilities, I have studied and written extensively about demographic trends in the country, exit poll data at the state and federal level, public opinion polling, and voter turnout and voting behavior. In particular, understanding the way that districts are drawn and how geography and demographics interact is crucial to predicting United States House of Representatives races, so much of my time is dedicated to that task. I am currently a Visiting Scholar at the American Enterprise Institute, where my publications focus on the demographic and coalitional aspects of American Politics.

I am also a Lecturer at The Ohio State University. My courseload is detailed below.

## 2.2 Publications and Speaking Engagements

I am the author of the 2012 book *The Lost Majority: Why the Future of Government is up For Grabs and Who Will Take It.* In this book, I explore realignment theory. It argues that realignments are a poor concept that should be abandoned. As part of this analysis, I conducted a thorough analysis of demographic and political trends beginning in the 1920s and continuing through modern times, noting the fluidity and fragility of the coalitions built by the major political parties and their candidates.

I also co-authored the 2014 *Almanac of American Politics.* The Almanac is considered the foundational text for understanding congressional districts and the representatives of those districts, as well as the dynamics in play behind the elections. My focus was researching the history of and writing descriptions for many of the 2012 districts, including tracing the history of how and why they were drawn the way that they were drawn. Because the 2014 Almanac covers the 2012 elections, analyzing how redistricting was done was crucial to my work. I have also authored a chapter in Dr. Larry Sabato's

post-election compendium after every election dating back to 2012.

I have spoken on these subjects before audiences from across the political spectrum, including at the Heritage Foundation, the American Enterprise Institute, the CATO Institute, the Bipartisan Policy Center, and the Brookings Institution. In 2012, I was invited to Brussels to speak about American elections to the European External Action Service, which is the European Union's diplomatic corps. I was selected by the United States Embassy in Sweden to discuss the 2016 elections to a series of audiences there and was selected by the United States Embassy in Spain to fulfill a similar mission in 2018. I was invited to present by the United States Embassy in Italy, but was unable to do so because of my teaching schedule.

## 2.3   Education

I received my Ph.D. in political science at The Ohio State University in 2023. I passed comprehensive examinations in both Methodology and American Politics. The first chapter of my dissertation involves voting patterns on the Supreme Court from 1900 to 1945; the second chapter involves the application of integrated nested LaPlace approximations to enable the incorporation of spatial statistical analysis in the study of United States elections. The third chapter of the dissertation involves the use of communities of interest in redistricting simulations. In pursuit of this degree, I also earned a Master's Degree in Applied Statistics. My coursework for my Ph.D. and M.A.S. included, among other things, classes on G.I.S. systems, spatial statistics, issues in contemporary redistricting, machine learning, non-parametric hypothesis tests and probability theory. I also earned a B.A. from Yale University in history and political science in 1995, a Juris Doctor from Duke University in 2001, and a Master's Degree in political science from Duke University in 2001.

In the winter of 2018, I taught American Politics and the Mass Media at Ohio Wesleyan University. I taught Introduction to American Politics at The Ohio State University for three semesters from Fall of 2018 to Fall of 2019, and again in Fall of 2021.

In the Spring semesters of 2020, 2021, 2022 and 2023, I taught Political Participation and Voting Behavior at The Ohio State University. This course spent several weeks covering all facets of redistricting: how maps are drawn, debates over what constitutes a fair map, measures of redistricting quality, and similar topics. It also covers the Voting Rights Act and racial gerrymandering claims. I also taught survey methodology in Fall of 2022 and Spring of 2024. In Spring 2025 I taught Introduction to the Policy Process.

## 2.4   Prior Engagements

A full copy of all cases in which I have testified or been deposed is included on my C.V., attached as Exhibit 1. In 2021, I served as one of two special masters appointed by the Supreme Court of Virginia to redraw the districts that will elect the Commonwealth's representatives to the House of Delegates, state Senate, and U.S. Congress in the following decade. The Supreme Court of Virginia accepted those maps, which were praised by observers from across the political spectrum. *See, e.g.*, *New Voting Maps, and a New Day, for Virginia*, The Washington Post (Jan. 2, 2022), *available at* `https://www.washingtonpost.com/opinions/2022/01/02/virginia-redistricting-voting-maps-gerrymander`; Henry Olsen, *Maryland Shows How to do Redistricting Wrong. Virginia Shows How to Do it Right*, The Washington Post (Dec. 9, 2021), *available at* `https://www.washingtonpost.com/opinions/2021/12/09/maryland-virginia-redistricting`; Richard Pildes, *Has VA Created a New Model for a Reasonably Non-Partisan Redistricting Process*, Election Law Blog (Dec. 9, 2021), *available at* `https://electionlawblog.org/?p=126216`.

In 2019, I was appointed as the court's expert by the Supreme Court of Belize. In that case I was asked to identify international standards of democracy as they relate to malapportionment claims, to determine whether Belize's electoral divisions (similar to our congressional districts) conformed with those standards, and to draw alternative maps that would remedy any existing malapportionment.

I served as a Voting Rights Act expert to counsel for the Arizona Independent

Redistricting Commission in 2021 and 2022.

# 3 Overview of Compactness Metrics

I employ three commonly used compactness measures in this report: Reock, Polsby-Popper, and Convex Hull, as well as a newer score (IKIWISI). The former three are probably the most commonly used compactness measures. They are but a sample of dozens of metrics that have been proposed over the years. *See, e.g.*, `https://alarm-redist.org/redistmetrics/articles/compactness.html` (listing various measures). Mr. Cooper employs the first two of these. I add the Convex Hull and IKIWISI scores because, as described below, they pick up on features that the Reock score does not.

While this Court may have a background in these scores, it may still be useful to give some basic analysis of what these measures really describe, and to offer some insight as to their pros and cons.

## 3.1 Reock Scores

The first measure is the Reock score. It is the first measure discussed here, but it was also among the first numeric measures of compactness developed. In lay terms, we might imagine the smallest circle that wholly encloses the district without cutting it, called the "minimum bounding circle." The Reock score is the percentage of that circle that the district would fill, expressed as a decimal. Were a district perfectly circular, it would fill 100% of that minimum bounding circle, and the Reock score would be 1. Were a district somehow a line segment, it would fill 0% of that district, and the Reock score would be 0.

In practical terms, Reock scores measure how distended a district is. Elongated districts tend to have low Reock scores, while districts with high Reock scores tend to be, for lack of a better word, "stocky." To help illustrate this, compare the least compact district according to Reock among the various proposed districts in this case (Enacted

Map District 3) as well as the most compact (Map 1 District 5).

Figure 1: Comparison of low Reock district (left) with high Reock district (right)





(a) Enacted Map District 3, with min-
imum bounding circle

(b) Illustrative Map 1 District 5, with
minimum bounding circle

The district on the left has a Reock score of 0.265, which means that it fills 26.5%
of the circle that surrounds it. The district on the right has a Reock score of 0.51, meaning
that it fills 51% of the circle that surrounds it. One can readily see that the district on
the right "fills" a higher percentage of its minimum bounding circle than the district on
the left. This is what a Reock score measures; an opinion that relies upon a Reock score
is relying upon the percentage of a particular circle that a district would fill.

## 3.2   Polsby-Popper Scores

Reock scores do have real limitations for redistricting purposes. One can imagine a
circular district, which would have a Reock score of 1. Now imagine a map maker carves
out a narrow, serpentine channel running into the center of the district. The district
would still fill a large portion of the Minimum Bounding Circle, and thus would score
well on the compactness score. Likewise, a district covered with small protrusions, like
potato eyes, could nevertheless score well on Reock scores, even though such inlets and

protrusions might signify a gerrymander or be identified by laypeople as not compact.

Polsby-Popper scores help to address this. In lay terms, imagine taking a district and then "unfolding" it without breaking it, until it is shaped into a circle. That circle would have the same perimeter as the district since we've only "unfolded" it. The Polsby-Popper score is the percentage of such a circle (i.e. a circle with the same perimeter as the district) that such a district would fill.

Practically speaking, a "smoother" district will have a higher Polsby-Popper score, while a district with many "arms and inlets" will have lower Polsby-Popper scores. Once again, a perfectly circular district would have no arms and inlets and its area would be the same as that of a circle with the same perimeter; it would fill 100% of the circle and would receive a Polsby-Popper score of one. As more and more "bends" are added to the district, the district's perimeter will increase, and it will fill less and less of the circle with the same perimeter as the district.

To help illustrate this, compare the least compact contiguous district using Polsby-Popper among the various districts here (Map 3, District 4, below left) with the most compact (Map 2, District 1, below right). Map 3, District 4 has a Polsby-Popper score of 0.128. Map 2, District 1 has a Polsby-Popper score of 0.522. Thus, Map 3, District 4 fills 12.8% of the circle with the same perimeter; this makes sense because it is fairly irregular. Map 2, District 1, on the other hand, fills 52.2%.

Figure 2: Comparison of low Polsby-Popper district (left) with high Polsby-Popper district (right)





(a) Illustrative Map 3, District 4, with circle of same perimeter

(b) Illustrative Map 2, District 1, with circle of same perimeter

Again, the basic intuition of what would be the more compact district holds here, with the district on the right looking considerably more compact than the district on the left. What makes the district on the left score so poorly on this test, though, are the many folds that inflate its perimeter, creating a larger circle that it is less able to fill.

Thus, we can see that the Polsby-Popper score measures the "arms and inlets" in a district. Also of interest here: As we will see below, the two districts have almost identical Reock scores, because although Map 3, District 4 has irregular boundaries, it is quite "stocky," while Map 2 District 1 is elongated, but has regular boundaries. This illustrates the danger in relying on one particular score.

This approach has limitations as well. Polsby-Popper scores can be sensitive to features that mapmakers are directed to follow. For example, river boundaries tend to meander, which can increase the perimeter of a district if they are followed. At the same time, mapmakers are often instructed to follow natural features, such as river boundaries. Thus, a mapmaker who forms a district boundary out of precincts drawn by straight lines and who avoids precincts that follow river boundaries would be rewarded with a higher

Polsby-Popper score.

Likewise, some states have very regular edges – think Colorado – while other states have irregular coastlines – think Maine. Districts that respect those shorelines will have more "arms and inlets" and therefore higher perimeters simply by virtue of state geography, and their Polsby-Popper scores will suffer.

## 3.3   Convex Hull Scores

Finally, a person may reasonably wonder "what is so great about circles?" Convex Hull scores seek to dispense with circles altogether and instead look at the area of a convex polygon that would enclose a district. A more straightforward way to think of this is to imagine a rubber band snapped around a district. The Convex Hull score would ask what percentage of that rubber band the district would fill.

We once again illustrate this by comparing the least compact district at issue here: District 5 from Cooper's Map 2, with a score of 0.588, with the most compact district according to Convex Hull scores: District 1 from Mr. Cooper's Map 2, with a Convex Hull score of 0.894.

Figure 3: Comparison of low Convex Hull district (left) with high Convex Hull district (right)





(a) Illustrative Map 2, District 5, with circle of same perimeter

(b) Illustrative Map 2, District 2, with circle of same perimeter

Once again we can see how the more compact district fills a much larger percentage of the shape "rubber-banded" around the district, when compared to the percentage of the less-compact district using Convex Hull.

As with all of these attempts to quantify the notion of "compactness," the Convex Hull score has its plusses and minuses. As a plus, it is likely impossible to ever draw a perfectly circular district (although circular cities do exist throughout the South), but square counties, townships and precincts do exist. It is therefore at least possible to draw a district with a Convex Hull score of 1 while adhering to traditional redistricting principles. At the same time, as is the case with Polsby-Popper scores, a badly distended district can score well on Convex Hull scores; imagine a largely rectangular district that spanned the entire Colorado/Wyoming border.

## 3.4   IKIWISI Scores

The final metric we examine is a newer one, developed by political scientists Aaron Kaufman, Gary King and Maya Komisarchik. Rather than directly developing a mathematical formula for measuring compactness, they instead interviewed judges, redistricting experts, public officials, lawyers and ordinary citizens by showing them various districts, in order to get a sense of what they would consider "valid." Kaufman, Aaron, et al., "How to Measure Legislative Compactness if You Only Know it When You See it," 65 *Am. Jrnl. Pol. Sci.* 533, 534 (2021). They find that the groups effectively define compactness in the same way, which they summarize as "squarish, with minimal arms, pockets, islands, or jagged edges." *Id.* at 544. They turn these into what they (unfortunately) call "I Know it When I See It" scores. These scores run from 1 to 100. Because they are whole numbers, there can be multiple districts with identical IKIWISI scores. We have already encountered the most compact district using the IKIWISI score (Map 2, District 1) and the least (Map 2, District 5).

# 4    A Brief Introduction to Census Geographies

As with compactness scores, it may be helpful to have a brief refresher on census geographies. The US Census Bureau reports data at multiple levels of data collection. The largest grouping is obviously at the national level, but the data are further broken down at the state level, and then to the county level.

Counties are then further broken down into census tracts. DeSoto County, MS has 41 census tracts with a mean population of around 4,520 residents. The largest tract contains 7,750 residents, while the smallest contains 1,590. Census tracts are then divided into block groups; there are 100 block groups in DeSoto County. The average block group in DeSoto County contained 1,853 residents. The largest had 3,122 residents, while the smallest contained 395. Finally, block groups are divided into census blocks, of which there are 2,418 in DeSoto County. On average, they contain 77 residents, although the largest contains 1,630. Around 20% of the census blocks in DeSoto County are unpopulated.

To help illustrate this better, the following map is of northern DeSoto County. The black lines on the map illustrate the census tracts in that area. Tract 705.23 is highlighted with a grey fill. It is divided into three block groups, which are denoted with dashed lines. Block Group 2 is comprised of 20 census blocks, which are highlighted with white boundaries.

Figure 4: Illustration of Census Tracts (Black Lines), Census Block Groups (Shaded, Dashed Lines), and Census Blocks (White Lines) in DeSoto County, Mississippi



Blocks are something of the "quarks" of the census world. They will usually line up with the boundaries of cities, towns, and the census version of precincts: Voting Tabulation Districts, or VTDs.[1] They will often line up with state generated precinct lines as well.

Census block *groups* and census tracts, however, are a different story. The boundaries of cities, VTDs and precincts, do *not* always line up with the boundaries of these geographies. In other words, census block groups and tracts will often traverse the boundaries of cities and VTDs in a way that census blocks typically will not. For example, the following map, zoomed in to North DeSoto County, layers the boundaries for Southaven over the tracts in the area in blue. The tracts that are split by the Southaven boundary are highlighted in grey.[2]

---

[1] Note that although VTD and precinct lines aren't identical, they are often used interchangeably. I do so here.

[2] The mapping software automatically creates a boundary when you zoom in on a region, so the rectangles created by the dark lines and the dashed lines should be viewed more as a frame than as additional boundaries.

Figure 5: Southaven boundaries outlined in blue, with census tracts in the region outlined in black. Census tracts that Southaven splits are shaded grey



VTDs and block groups do not line up. The following map shows the block groups in the area with thick, solid black lines, colored by block group number (because of the way block group names are created, the colors will tend to cluster with census tracts in the area). The VTDs are depicted with blue dashed lines. As you can see, there are numerous places where the VTD lines depart from the block group lines.

Figure 6: North Central DeSoto County. Block groups are outlined in black and shaded. VTDs are depicted with blue dashed lines. Instances where blue dashed lines depart from solid black lines are places where VTD and block group boundaries do not line up.



What all of this means is that when data are made available at the *block* level, they can typically be aggregated to give accurate data for just about any census geography: block groups, tracts, counties, VTDs, zip codes, and so forth, because they are nested within those geographies. However, block groups and tracts are not always nested within precincts or city boundaries, which means that data that are only available at the block group or tract level cannot consistently be aggregated to those levels. This is important, as most redistricting is done at the precinct level.

## 5   Evaluation of Mr. Cooper's Plans

### 5.1   All of Mr. Cooper's Demonstrative Districts Barely Cross the *Gingles I* Population Threshold.

As an initial matter, the variations of District 3 in Mr. Cooper's illustrative maps barely cross the minimum population threshold needed to create a 50% + 1 district.

Map 1, District 3, has a Voting Age population of 26,549. This means that to demonstrate that it is possible to create a district where the Black Voting Age Population is a majority of the Voting Age Population, his district must include at least 13,275 Black residents of voting age. It includes 13,291 Black residents of voting age, or 16 residents past the threshold.

Map 2, District 3, has a Voting Age population of 26,451. This means that to demonstrate that it is possible to create a district where the Black Voting Age Population is a majority of the Voting Age Population, his district must include at least 13,226 Black residents of voting age. It includes 13,239 Black residents of voting age, or 13 residents past the threshold.

Map 3, District 3, has a Voting Age population of 26,365. This means that to demonstrate that it is possible to create a district where the Black Voting Age Population is a majority of the Voting Age Population, his district must include at least 13,183 Black residents of voting age. It includes 13,228 Black residents of voting age, or 46 residents past the threshold.

To be clear, my understanding is that Plaintiffs' burden is to reach the 50% + 1 threshold, and these three districts appear to do so based on my review. In my opinion, the narrowness with which they cross the threshold is relevant context when viewed in conjunction with other factors described below, when determining the extent to which decisions were driven by purely racial decisionmaking.

## 5.2   Mr. Cooper's criteria for evaluating maps are arbitrary.

Mr. Cooper evaluates the reasonableness of the configuration of the districts primarily on the basis of a handful of criteria: the number of populated VTD splits; the number of municipal splits; minimizing population deviations; compactness on the Reock and Polsby-Popper scores; incumbent conflicts; and the highest BVAP district. *See, e.g.*, Cooper Report at 23. It is unclear exactly where this list comes from. Mr. Cooper doesn't cite to any source, and I'm unaware of any peer-reviewed literature that compares

districts in this manner. It's unclear why he selects the two compactness measures that he selects out of the dozens of measures out there. Nor does it seem to line up with his list of goals explored earlier in his report. *See, e.g.*, Cooper Report at 20-21 (listing communities of interest as a goal and defining them as "groups of individuals who have similar legislative concerns"). Moreover, it is unclear whether this reflects goals that the County Board of Supervisors pursued, or pursued to the extent that Mr. Cooper does. Consider the following map, which shows a portion of DeSoto County with the precincts outlined in blue and the Enacted Map boundary delineated with a black dashed line.

Figure 7: Portion of DeSoto County. VTD lines are outlined in blue, enacted district boundary is outlined by black dashed line



The precinct boundaries (again, depicted in blue) here create a stairstep pattern that runs toward the southwest to the border with Tunica County. In so doing, they often follow minor roads or in some instances no roads at all. For example, the VTD boundary between Nail Rd. and Church Road in the northern portion of the map (highlighted with an oval here) follows no road or other natural boundary at all. The same is true of the portion of the VTD boundary between Austin Rd. and Baldwin Rd. (highlighted with a square) and the VTD boundary in the southwestern portion of our region (the triangle).

The dashed line shows that the map drawer, on the other hand, simply follows Horn Lake Rd. south to Star Landing Rd. W, before turning south on State Highway 301. He then turns south along Baldwin road before heading west on Green River Rd. In so doing, he splits numerous VTDs, but it seems to be in pursuit of other goals. The map drawer may even have been indifferent to VTD/precinct boundaries. It isn't clear why this would be a valid metric for comparing maps.

In short these criteria are no criteria at all; they are largely in the eye of the beholder, or the individual map drawer.[3]

## 5.3 Mr. Cooper's maps all appear to split precincts primarily on the basis of race.

Mr. Cooper's maps do succeed in splitting fewer VTDs than the Enacted Map. But a careful examination of the instances where he does split VTDs suggests that he often does so primarily on the basis of race.

### 5.3.1 Map 1

Map 1 does have very few populated precinct splits, likely reflecting Mr. Cooper's conscious decision to try to include fewer precinct splits than the person who drew the

---

[3] One potential other way of looking at this is that if the illustrative maps are at least as good as the Enacted Map on certain criteria then the maps are "reasonably configured." This is an odd way of going about things. First, it is a core contention of plaintiffs that the Enacted Maps are illegal; if that is so, it is unclear why the same maps would form a good basis for defining "reasonableness" for purposes of federal law. Second, this only works if the Illustrative Maps are using the same criteria as the Enacted Map.

Enacted Map. All of them except one, however, occur in his Illustrative District 3. An image of Map 1, District 3 is provided below.

Figure 8: Boundary of Illustrative Map 1, District 3



Moreover, when we examine these splits, we see the role race played in making them. We also see that it explains some of the irregular features of this map. Consider his split of Southaven West Precinct. The following map is a choropleth map, or heatmap of that precinct. In it, the small shapes reflect census blocks, shaded by their BVAPs. The heavy black lines denote the district boundaries, with another black line providing a frame for the map. Empty blocks are shaded White. The portion of the VTD in District 3 is on the western side of the image.

Figure 9: Split of Southaven West Precinct



As you can see, the district boundary nicely carves out the heavily Black areas of this precinct. The western portion has 3,033 residents and 2,243 residents of voting age, 64.2% of whom are Black. The eastern portion has 2,302 residents and 1,738 residents of voting age, 21.3% of whom are Black. The three heavily White blocks included in the district have small populations: 32 residents of voting age in the small rectangle near the middle of the map, 16 in the one to the east, and 4 in the one near the district line.

His split of Colonial Hills Precinct is much the same.

Figure 10: Split of Southaven West Precinct, Map 1



© OpenStreetMap contributors

Here, District 3 covers the blocks to the south, which again separate Black residents from White residents. The northern portion has a population of 1,624 and a voting age population of 1,208, 18% of whom are Black. The southern portion has a voting age population of 614, 38.1% of whom are Black. None of the blocks outside of District 3 has a BVAP in excess of 38.1%.

Combined, this explains the strange jagged edge to the north of District 3, which

could be smoothed out considerably (improving compactness) by following the precinct lines. The split in Colonial Hills precinct could have been eliminated while adhering to one-person-one-vote requirements without otherwise changing the district.[4]

His split of Northwest Community College (into three districts) is of a piece with this.

Figure 11: Split of Northwest Community College Precinct, Map 1



© OpenStreetMap contributors

---

[4]All calcuations to this effect are with respect to the district itself; additional changes would sometimes have to be made from districts other than district 3.

The southern tip of the VTD is unpopulated; eliminating it seemingly serves to improve the compactness of the district by reducing the perimeter and the size of the minimum bounding circle.[5] The split of the populated portion of the precinct (on the eastern edge of the VTD) largely adheres to the racial contours of the VTD. The three heavily White blocks on the southern edge of the bulge have a combined VAP of less than 100 residents. The portion in District 3 has 6,433 residents, 4,767 of whom are of voting age, 44.4% of whom are Black. The portion in District 2 has a total population of 1,164 and a VAP of 956, 18.5% of whom are Black. The split could be reconciled without exceeding one-person-one-vote requirements, considerably smoothing out the boundary of the district. Mr. Cooper's split here also divides the Stone Creek neighborhood down Steffani Dr., with voters on the east side of the street residing in District 2, while their neighbors across the street reside in District 3.

Taken together, the split precincts in the map explain two obvious geographic oddities in the map: the jagged inlet at the top and the "stairstep with a bulge" in the southeast. If one were truly interested in adhering to traditional redistricting principles, rather than adhering to these principles only to the extent tolerable to hit a racial target, one could readily make the northern two precincts whole, and split Northwest Community College precinct along I-55/69. The resulting district would improve the Reock score to .4739 and the Polsby-Popper to 0.4692. It would not, however, be majority BVAP. We can see this more clearly by examining a heatmap of the area, where we can see the degree to which the district takes its shape from the racial contours of the area.

---

[5]Eliminating the additional split would drop the Reock score for the district from 0.4589 to 0.4061, and the Polsby-Popper from 0.4059 to 0.3732. There's nothing inherently wrong with it, but it does illustrate the problem with defining "reasonable" with a comparison to the Enacted Map, particularly if the drawer was not drawing with similar considerations. Had he been, he might have tried to eliminate empty blocks to further these goals.

Figure 12: Map 1, Choropleth by % BVAP



### 5.3.2  Map 2

District 3 in Map 2 is shown below. In this map, Mr. Cooper opts to consider a factor that constrained the map maker, but did not constrain him when drawing Map 1: avoiding the pairing of incumbents, or in more colloquial terms, avoiding "double bunking" of incumbents. This further illustrates the difficulty in comparing Map 1 to the Enacted Map. When Mr. Cooper attempts to draw under the same constraints as the mapmaker, the number of split precincts increases substantially, and the compactness of the districts fall, both in a quantitative sense (as detailed below) and from a simple "eyeball test" of the map.

Figure 13: Map 2, District 3



In particular, the district gains an odd appendage on its western end. It seems as though this was added to incorporate incumbents who live in Lake Cormorant and Walls. The boundaries at the southwestern end follow the boundaries of the town of Walls.

We can also see that the map clearly carves the Black population out of north-central DeSoto County.

Figure 14: Map 2, Choropleth by % BVAP



One precinct split we have seen before: The Southaven West precinct, which is split exactly as it is in Map 1 (described above). Another split, of Horn Lake High School precinct, does not appear to be an example of traditional redistricting criteria becoming subordinate to racial concerns. Instead, it helps to keep from double bunking incumbents.

The three-way split of Northwest Community College precinct, on the other hand, involves creating an odd epiglottis-shaped appendage on the southern end of the district that encloses an area of highly concentrated Black residents. Taken together, the area contains 936 residents, 623 of whom are of voting age, and 89.4% of whom are Black. The four blocks included contain the three highest BVAP census blocks in the precinct (of 68 blocks); the fourth block has just 12 residents of voting age (8 of whom are Black).

Figure 15: Split of Northwest Community College Precinct, Map 2



) OpenStreetMap contributors

Turning to the "arm," the split of Walls precinct leaves 4,190 residents of voting age in District 3, 38.5% of whom are Black, while leaving a 19.7% BVAP area in the southeast and a 15.4% BVAP area in the northwest out of the district. This split could easily be remedied: making the precinct whole would not double bunk any incumbents, nor would it cross municipal boundaries. It would not even require further changes to District 4, which would still be within 1-person-1-vote range. It would, however, drop the district's BVAP below the 50% level.

Figure 16: Split of Walls Precinct, Map 2



© OpenStreetMap contributors

The split of Lake Cormorant precinct likewise separates 289 residents of voting age residing in the town of Walls, 34.3% of whom are Black, from the rest of the precinct. The southwestern portion has 455 residents of voting age, 14.1% of whom are Black, while the eastern portion has 127 residents of voting age, 26.8% of whom are Black. Both this split and the split of Walls precinct could be eliminated, and the district would still be within one-person-one-vote limits (though District 4 would have to pick up population). No members would be double bunked, and the compactness of the district would improve. The district, however, would no longer be 50% + 1 BVAP.

Figure 17: Split of Lake Cormorant Precinct, Map 2



© OpenStreetMap contributors

### 5.3.3 Map 3

By Map 3, District 3 has become a snakelike configuration that winds through the region, rarely more than a single precinct wide, again carving out the heavily Black areas of the region.

Figure 18: Map 3, Choropleth by % BVAP



There are six split precincts in this version of District 3 (out of 11 total). One is the familiar split of Southaven West precinct seen in Map 1 and Map 2. The splits of Walls precinct does have heavy racial implications, but can likely be justified as an attempt to include two incumbents within the district boundaries. The splits of Horn Lake High School and Nesbit West can be justified as attempts to keep incumbents in the district, and do not appear to have substantial racial implications. The split of Northwest Community College, however, once again appears to be designed to pull out the highest BVAP areas of that precinct while providing a bridge to the incumbent in Nesbit West. Overall the district had a low population (36,380, with 37,063 being the ideal population size) so most of the precinct splits were avoidable, but for the impact that they would have on the district BVAP.

Figure 19: Split of Northwest Community College Precinct, Map 3



© OpenStreetMap contributors

## 5.4 Mr. Cooper's maps 2 and 3 feature districts that are substantially less compact than those of the Enacted Map

Mr. Cooper employs plan-wide averages when evaluating the compactness of his districts. There is nothing inherently wrong with examining averages. However, averages are inherently vulnerable to outliers, especially when small numbers of observations are involved. The Court may therefore also find it useful to examine the properties of individual districts.

The following chart shows the shape of every district in each map. This allows the

Court to conduct an eyeball test of the individual districts, if it so desires.

Figure 20: Individual Depictions of Districts, Various Maps



It is readily apparent here, even from an eyeball test, that Maps 2 and 3 contain particularly compact districts (Map 2, District 1, Map 3, District 1) that, in an average of scores, would inflate that average. This could cover the weak scores of some of the other districts that even an eyeball test reveals as particularly oddly shaped, such as Map 3, District 4 or Map 2, District 5.

To give context beyond an average, the individual scores of the districts are reported on the next few pages, using the four different compactness measures described above, sorted from weakest score to best score.

Figure 21: Various Districts, Sorted By Reock Score

| Map | District | Reock |
|---|---|---|
| Enacted | 3 | 0.265 |
| Map 1 | 2 | 0.267 |
| Map 2 | 3 | 0.269 |
| Map 3 | 1 | 0.276 |
| Enacted | 4 | 0.323 |
| Map 2 | 5 | 0.329 |
| Map 2 | 2 | 0.353 |
| Map 2 | 4 | 0.356 |
| Map 3 | 3 | 0.361 |
| Enacted | 5 | 0.370 |
| Map 3 | 2 | 0.397 |
| Enacted | 2 | 0.399 |
| Map 1 | 4 | 0.399 |
| Enacted | 1 | 0.402 |
| Map 3 | 5 | 0.403 |
| Map 3 | 4 | 0.404 |
| Map 2 | 1 | 0.410 |
| Map 1 | 3 | 0.459 |
| Map 1 | 1 | 0.486 |
| Map 1 | 5 | 0.510 |

Figure 22: Various Districts, Sorted By Polsby-Popper Score

| Map | District | Polsby-Popper |
|---|---|---|
| Map 3 | 4 | 0.128 |
| Map 2 | 5 | 0.150 |
| Map 2 | 4 | 0.160 |
| Map 3 | 3 | 0.184 |
| Enacted | 5 | 0.212 |
| Map 3 | 5 | 0.220 |
| Enacted | 4 | 0.220 |
| Map 2 | 3 | 0.226 |
| Map 1 | 4 | 0.226 |
| Map 2 | 2 | 0.240 |
| Map 3 | 2 | 0.240 |
| Enacted | 2 | 0.314 |
| Enacted | 3 | 0.318 |
| Map 3 | 1 | 0.330 |
| Map 1 | 2 | 0.356 |
| Map 1 | 5 | 0.382 |
| Map 1 | 1 | 0.383 |
| Map 1 | 3 | 0.406 |
| Enacted | 1 | 0.514 |
| Map 2 | 1 | 0.522 |

Figure 23: Various Districts, Sorted By Convex Hull Score

| Map | District | Convex Hull |
|---|---|---|
| Map 2 | 5 | 0.588 |
| Map 2 | 4 | 0.617 |
| Map 3 | 3 | 0.635 |
| Enacted | 4 | 0.672 |
| Map 2 | 2 | 0.674 |
| Enacted | 5 | 0.678 |
| Map 1 | 4 | 0.685 |
| Map 3 | 4 | 0.687 |
| Map 3 | 1 | 0.692 |
| Map 3 | 2 | 0.699 |
| Enacted | 2 | 0.708 |
| Map 3 | 5 | 0.730 |
| Map 2 | 3 | 0.734 |
| Enacted | 3 | 0.749 |
| Map 1 | 1 | 0.779 |
| Map 1 | 2 | 0.789 |
| Map 1 | 3 | 0.809 |
| Map 1 | 5 | 0.822 |
| Enacted | 1 | 0.893 |
| Map 2 | 1 | 0.894 |

Figure 24: Various Districts, Sorted By IKIWISI Score

| Map | District | IKIWISI |
|---|---|---|
| Map 2 | 5 | 18 |
| Map 2 | 4 | 24 |
| Map 3 | 3 | 28 |
| Map 3 | 4 | 29 |
| Enacted | 4 | 34 |
| Enacted | 5 | 34 |
| Map 1 | 4 | 38 |
| Map 2 | 2 | 39 |
| Map 2 | 3 | 40 |
| Map 3 | 2 | 41 |
| Map 3 | 5 | 43 |
| Map 3 | 1 | 49 |
| Enacted | 2 | 51 |
| Enacted | 3 | 55 |
| Map 1 | 2 | 62 |
| Map 1 | 1 | 63 |
| Map 1 | 5 | 70 |
| Map 1 | 3 | 71 |
| Enacted | 1 | 85 |
| Map 2 | 1 | 87 |

Map 1 does appear to have relatively compact districts across the scores. This, however, illustrates the difficulty with using the county's plan as a benchmark against Map 1. This map did not account for incumbency – indeed it pairs 60% of the county's incumbents in districts with other incumbents. When Mr. Cooper accounts for incumbency, as the mapmaker apparently did, his maps struggle and often produce less compact districts than any of those found in the Enacted Map.

For example, using the Polsby-Popper score, four of the districts Mr. Cooper draws are less compact than anything drawn in the Enacted Map. This includes his

majority BVAP district for Map 3. Similarly, Maps 2 and 3 contain three of the worst scores on the Convex Hull scores; this includes the majority BVAP district for Map 3. Using the metric that is based upon viewer perception of the district, IKIWISI, four of the districts across maps 2 and 3 are less compact than anything in the Enacted Map, including the majority BVAP district for Map 3.

## 5.5 Mr. Cooper's maps have comparatively low core retention rates.

Core retention is the percentage of a district that is kept together in a succeeding map. That is to say, assume that District 1 has 100,000 people in a map. The map is redrawn, such that 80,000 people are placed in a district numbered 2, and 20,000 people are placed together in a district number 3. The core retention rate for District 1 in that map is 80%, since the largest "chunk" of people kept together in a single district is 80% of the total benchmark district population.[6]

The following tables show the core retention rates for the various districts relative to the Enacted Map and to the various illustrative maps. We can see that the Enacted District that retained the lowest core vis-à-vis the benchmark map (5) saw a higher amount of its core retained than all of the illustrative map districts, with the exception of District 1 in Maps 1 and 2.[7]

---

[6]There is another way to measure core retention: The percentage of people in each district in a given map who were together in a previous district. Calculating this way does not produce appreciably different results.

[7]The same is true if we use the Enacted Map as the benchmark for the various illustrative plans.

Figure 25: Core Retention districts in the Benchmark Map in the Enacted Map (i.e., 97.4% of the population in Benchmark District 1 is kept together in some district in the Enacted Map, etc.

| Benchmark | Core Retained |
|:---------:|:-------------:|
| 3 | 100.00% |
| 1 | 97.40% |
| 4 | 91.43% |
| 2 | 88.66% |
| 5 | 84.07% |

Figure 26: Core Retention districts in the Benchmark Map in Illustrative Map 1 (i.e., 93.65% of the population in Benchmark District 1 is kept together in some district in Illustrative Map 1, etc.

| Benchmark | Core Retained |
|:---------:|:-------------:|
| 1 | 93.65% |
| 5 | 66.71% |
| 4 | 66.57% |
| 2 | 66.14% |
| 3 | 45.77% |

Figure 27: Core Retention districts in the Benchmark Map in Illustrative Map 1 (i.e., 97.34% of the population in Benchmark District 1 is kept together in some district in Illustrative Map 2, etc.

| Benchmark | Core Retained |
|:---------:|:-------------:|
| 1 | 97.34% |
| 2 | 65.21% |
| 3 | 62.77% |
| 4 | 50.94% |
| 5 | 50.91% |

Figure 28: Core Retention districts in the Benchmark Map in Illustrative Map 1 (i.e., 76.47% of the population in Benchmark District 1 is kept together in some district in Illustrative Map 3, etc.

| Benchmark | Core Retained |
|:---------:|:-------------:|
| 1 | 76.47% |
| 4 | 63.05% |
| 2 | 62.75% |
| 5 | 61.18% |
| 3 | 48.43% |

## 5.6 Mr. Cooper's maps 2 and 3 are based upon non-compact minority populations

Instead of focusing on the population of the district itself, we might also inquire as to the compactness of the population of the individuals in the district. Some courts have

distinguished between the two for purposes of the Voting Rights Act. *E.g.*, *Robinson v. Ardoin*, 37 F.4th 208, 218 (5th Cir. 2022) (concluding that a district court erred – but did not commit clear error – by not focusing on district compactness, and also stating that "before explaining why, we should first relate the law governing *Gingles*'s compactness requirement. Importantly, that requirement relates to the compactness of the minority population in the proposed district, not the proposed district itself."). *But see id.* at n.4 (calling the district's compactness a "reasonable proxy" for the compactness of a minority group within the district but observing that this would be but one factor in the compactness inquiry). *Cf. Sensley v. Albritton*, 385 F.3d 591 (5th Cir. 2004) (concluding that a district court's finding that a map joining together distinct clusters of Black voters was not compact was not clearly erroneous).[8]

To discuss the distribution of population, it is much better to utilize dot density maps than choropleth maps. These place a single dot to reflect a person or collection of people. Here, I utilize one dot to represent every Black resident of voting age in a precinct and one dot to represent each non-Black resident of voting. This allows us to see what the overall population distribution is. You can see that with Map 1 District 3, the district is based primarily in a compact population based in Horn Lake, before traversing lightly populated areas to get to the population in southern Southaven.

---

[8] I cite these cases to explain why I view this distinction as something that might help the trier of fact.

Figure 29: Dot Density map of Map 1, District 3. One black dot = 1 Black resident; 1 yellow dot = 1 non-Black resident.



Map 2, however, is different. Here, you can see how the district is based in the Black population in Horn Lake, but then reaches out to grab isolated pockets of Black voters on its journey to Walls. Because the district barely crosses the 50% BVAP threshold, almost every one of these voters is important to the district.

Figure 30: Dot Density map of Map 2, District 3. One black dot = 1 Black resident; 1 yellow dot = 1 non-Black resident.



Likewise, Map 3 is based in that core of Black residents, but also stretches out to pick up pockets of Black residents distant from that core.

Figure 31: Dot Density map of Map 3, District 3. One black dot = 1 Black resident; 1 yellow dot = 1 non-Black resident.



## 5.7 Mr. Cooper likely did not rely on socio-economic data when drawing the map.

It is unclear from his discussion of income data whether Mr. Cooper is suggesting that this formed a basis for his maps. To the extent that he does suggest this, it is a problematic claim.

First, income data are derived from the American Community Survey, or ACS. This means that they are only made available down to the block group level. Because block group boundaries do not coincide neatly with VTD or precinct boundaries, any use of income data is imprecise. This stands in contrast with the VAP data, which is taken from the decennial census and made available at the block level. Block boundaries typically line up with VTD and precinct boundaries, so that racial data can easily – and precisely – be aggregated to the VTD or precinct level. Second, to the extent Mr. Cooper demonstrates socio-economic factors correlate with race, it would also follow that a map that pairs Black residents would also tend to pair less socio-economically well-off residents.

Third, to the extent that these socio-economic factors played a role in redistricting, they were subordinate to race. We first note the care with which Mr. Cooper's Map 1 selects the most heavily Black precincts in the county by showing the top 15 populated VTDs, or pieces of VTDs, their BVAPs and the district to which they are assigned, for Map 1:

Figure 32: 15 highest BVAP precincts/parts of precincts, with Map 1 district assignment

| VTD | Map 1 | BVAP % |
|-----|-------|--------|
| 19 | 3 | 64.24% |
| 25 | 3 | 61.34% |
| 24 | 3 | 53.88% |
| 26 | 3 | 51.87% |
| 20 | 3 | 46.01% |
| 12 | 2 | 45.93% |
| 9 | 1 | 45.46% |
| 21 | 3 | 45.20% |
| 28 | 3 | 44.41% |
| 31 | 3 | 44.16% |
| 4 | 1 | 41.23% |
| 17 | 4 | 38.80% |
| 18 | 3 | 38.11% |
| 11 | 2 | 38.07% |
| 22 | 4 | 37.62% |

We only need to display the top 15 VTDs by BVAP because Map 1 District 3 doesn't include any VTDs that fall outside the top 15 VTDs by BVAP. As you can see Map 1 includes every majority Black precinct in the county, along with all but four of the 13 highest BVAP VTDs (or parts of VTDs).

Map 2 District 3 is similar. It does include two VTDs (or parts of VTDs) that fall outside of the 15 highest BVAPs in the county. One of those is number 17, and one (discussed above) is a portion of a precinct added to the district to capture an incumbent. It also has more VTD pieces than Map 1 because there are more split precincts.

Figure 33: 15 highest BVAP precincts/parts of precincts, with Map 2 district assignment

| VTD | Map 2 | BVAP % |
|-----|-------|--------|
| 28 | 3 | 89.41% |
| 19 | 3 | 64.24% |
| 25 | 3 | 61.34% |
| 24 | 3 | 53.88% |
| 26 | 3 | 51.87% |
| 20 | 3 | 46.01% |
| 12 | 2 | 45.93% |
| 9 | 1 | 45.46% |
| 21 | 3 | 45.20% |
| 31 | 3 | 44.16% |
| 4 | 1 | 41.23% |
| 6 | 1 | 38.64% |
| 22 | 3 | 38.52% |
| 11 | 5 | 38.07% |
| 28 | 4 | 37.43% |

Once again we see the care with which high BVAP VTDs, or parts of VTDs, are placed in District 3. Map 3 is of a piece with this. Although the number of precinct or precinct pieces has increased to 60, District 3 only includes two pieces of VTDs that fall outside the top 15 by BVAP:

Figure 34: 15 highest BVAP precincts/parts of precincts, with Map 3 district assignment

| VTD | Map C | BVAP % |
|-----|-------|--------|
| 8 | 5 | 67.62% |
| 19 | 3 | 64.24% |
| 25 | 3 | 61.34% |
| 24 | 3 | 53.88% |
| 22 | 3 | 53.67% |
| 26 | 3 | 51.87% |
| 10 | 1 | 46.86% |
| 20 | 3 | 46.01% |
| 12 | 2 | 45.93% |
| 31 | 3 | 45.53% |
| 9 | 1 | 45.46% |
| 21 | 3 | 45.20% |
| 28 | 3 | 45.11% |
| 34 | 5 | 44.94% |
| 31 | 4 | 42.07% |

Income is different. Here I've matched block groups to the district where the majority of their area is included. Map 1, District 3 contains the block group with the seventh-highest medium income in the county, along with the 39th and 45th-highest. If we look at the block groups with the 20 lowest incomes we can see that they are not as well-sorted as the racial VTDs. Moreover, when separating the block groups between districts, it is generally block groups with low BVAPs that get placed outside District 3.

Figure 35: 20 highest income block groups, with Map 1 district assignment

| Map 1 | Med. Inc. | BVAP % |
|-------|-----------|--------|
| 2 | 23,761 | 39.20% |
| 4 | 28,236 | 58.64% |
| 3 | 28,387 | 58.36% |
| 4 | 34,217 | 59.53% |
| 3 | 38,472 | 61.30% |
| 3 | 41,176 | 46.51% |
| 3 | 41,823 | 23.02% |
| 3 | 42,375 | 62.74% |
| 3 | 44,286 | 66.25% |
| 3 | 45,032 | 41.92% |
| 3 | 47,969 | 17.43% |
| 3 | 49,420 | 68.54% |
| 2 | 50,536 | 19.81% |
| 3 | 51,028 | 39.69% |
| 2 | 51,250 | 35.13% |
| 3 | 52,443 | 62.67% |
| 3 | 53,017 | 48.78% |
| 3 | 53,447 | 51.62% |
| 2 | 53,529 | 28.17% |
| 2 | 54,479 | 15.50% |
| 2 | 55,327 | 36.28% |
| 5 | 58,050 | 5.50% |
| 2 | 58,875 | 21.56% |
| 1 | 59,811 | 36.16% |
| 3 | 60,833 | 39.68% |

The same is true for Map 2, District 3, which contains 5 of the 50 wealthiest block groups in the county. We can see that when low income block groups are excluded from District 3, they tend to be low BVAP block groups.

Figure 36: 20 highest income block groups, with Map 2 district assignment

| Map 2 | Med. Inc. | BVAP % |
|-------|-----------|--------|
| 2 | 23,761 | 39.20% |
| 4 | 28,236 | 58.64% |
| 3 | 28,387 | 58.36% |
| 4 | 34,217 | 59.53% |
| 3 | 38,472 | 61.30% |
| 3 | 41,176 | 46.51% |
| 3 | 41,823 | 23.02% |
| 3 | 42,375 | 62.74% |
| 3 | 44,286 | 66.25% |
| 3 | 45,032 | 41.92% |
| 4 | 47,969 | 17.43% |
| 3 | 49,420 | 68.54% |
| 2 | 50,536 | 19.81% |
| 3 | 51,028 | 39.69% |
| 2 | 51,250 | 35.13% |
| 3 | 52,443 | 62.67% |
| 3 | 53,017 | 48.78% |
| 4 | 53,447 | 51.62% |
| 2 | 53,529 | 28.17% |
| 2 | 54,479 | 15.50% |
| 2 | 55,327 | 36.28% |
| 4 | 58,050 | 5.50% |
| 2 | 58,875 | 21.56% |
| 1 | 59,811 | 36.16% |
| 3 | 60,833 | 39.68% |

Finally, the same is true for Map 3.

Figure 37: 20 highest income block groups, with Map 3 district assignment

| Map 3 | Med. Inc. | BVAP % |
|-------|-----------|--------|
| 2 | 23,761 | 39.20% |
| 5 | 28,236 | 58.64% |
| 3 | 28,387 | 58.36% |
| 4 | 34,217 | 59.53% |
| 3 | 38,472 | 61.30% |
| 3 | 41,176 | 46.51% |
| 3 | 41,823 | 23.02% |
| 3 | 42,375 | 62.74% |
| 3 | 44,286 | 66.25% |
| 3 | 45,032 | 41.92% |
| 3 | 47,969 | 17.43% |
| 3 | 49,420 | 68.54% |
| 2 | 50,536 | 19.81% |
| 3 | 51,028 | 39.69% |
| 2 | 51,250 | 35.13% |
| 3 | 52,443 | 62.67% |
| 3 | 53,017 | 48.78% |
| 3 | 53,447 | 51.62% |
| 2 | 53,529 | 28.17% |
| 2 | 54,479 | 15.50% |
| 2 | 55,327 | 36.28% |
| 5 | 58,050 | 5.50% |
| 2 | 58,875 | 21.56% |
| 1 | 59,811 | 36.16% |
| 3 | 60,833 | 39.68% |

## 5.8 Mr. Cooper's demographic comparisons are meaningless without an appropriate statistical test.

The *ACS Handbook*, which explains how to use the census data upon which Mr. Cooper relies, is clear: "For any comparisons based on ACS data, it is important to take into account the sampling error associated with each estimate through the use of a statistical test for significance. This test shows whether the observed difference between estimates likely represents a true difference that exists within the full population (is statistically significant) or instead has occurred by chance because of sampling (is not statistically significant)." United States Census Bureau, *Understanding and Using American Community Survey Data: What all Data Users Need to Know* 55, *available at* https://www.census.gov/content/dam/Census/library/publications/2020/acs/ acs_general_handbook_2020_ch07.pdf (hereinafter "ACS Handbook").

This is because, as the census explains:

> The data in American Community Survey (ACS) products are estimates of the actual figures that would have been obtained if the entire population—rather than the chosen ACS sample—had been interviewed using the same methodology. All estimates produced from sample surveys have uncertainty associated with them as a result of being based on a sample of the population rather than the full population. This uncertainty—called sampling error—means that *estimates derived from the ACS will likely differ from the values that would have been obtained if the entire population had been included in the survey*, as well as from values that would have been obtained had a different set of sample units been selected for the survey.

*ACS Handbook* at 53 (emphasis added). The ACS is emphatic about this. On the first page of the *ACS Handbook*, it sets aside a special box that reads "TIP: In general, data users should be careful in drawing conclusions about small differences between two ACS estimates because they may not be statistically different." *ACS Handbook*, at 1.

On page 17, it clarifies that "ACS data users interested in making comparisons also need to pay attention to sampling error because differences between estimates may, or may not, be statistically significant." *Id.* at 17. This is to show "whether the observed difference between estimates likely represents a true difference that exists within the full population (is statistically significant) or instead has occurred by chance because of sampling (is not statistically significant)." *Id.* at 55.

Because he does not follow these instructions, his comparisons are meaningless.

I declare under penalty of perjury under the laws of the State of Ohio that the foregoing is true and correct to the best of my knowledge and belief. Executed on July 11, 2025 in Delaware, Ohio.

*Sean P Trende*

Sean P. Trende

# 6 Exhibit 1 – Sean Trende C.V.

# SEAN P. TRENDE

1146 Elderberry Loop

Delaware, OH 43015

strende@realclearpolitics.com

## EDUCATION

Ph.D., The Ohio State University, Political Science, 2023. Dissertation titled *Application of Spatial Analysis to Contemporary Problems in Political Science*, September 2023.

M.A.S. (Master of Applied Statistics), The Ohio State University, 2019.

J.D., Duke University School of Law, *cum laude*, 2001; Duke Law Journal, Research Editor.

M.A., Duke University, *cum laude*, Political Science, 2001. Thesis titled *The Making of an Ideological Court: Application of Non-parametric Scaling Techniques to Explain Supreme Court Voting Patterns from 1900-1941*, June 2001.

B.A., Yale University, with distinction, History and Political Science, 1995.

## PROFESSIONAL EXPERIENCE

Law Clerk, Hon. Deanell R. Tacha, U.S. Court of Appeals for the Tenth Circuit, 2001-02.

Associate, Kirkland & Ellis, LLP, Washington, DC, 2002-05.

Associate, Hunton & Williams, LLP, Richmond, Virginia, 2005-09.

Associate, David, Kamp & Frank, P.C., Newport News, Virginia, 2009-10.

Senior Elections Analyst, RealClearPolitics, 2010-present.

Columnist, Center for Politics Crystal Ball, 2014-17.

Visiting Scholar, American Enterprise Institute, 2018-present.

## BOOKS AND BOOK CHAPTERS

Larry J. Sabato, ed., *The Red Ripple*, Ch. 15 (2023).

Larry J. Sabato, ed., *A Return to Normalcy?: The 2020 Election that (Almost) Broke America* Ch. 13 (2021).

Larry J. Sabato, ed., *The Blue Wave*, Ch. 14 (2019).

Larry J. Sabato, ed., *Trumped: The 2016 Election that Broke all the Rules* (2017).

Larry J. Sabato, ed., *The Surge:2014's Big GOP Win and What It Means for the Next Presidential Election*, Ch. 12 (2015).

Larry J. Sabato, ed., *Barack Obama and the New America*, Ch. 12 (2013).

Barone, Kraushaar, McCutcheon & Trende, *The Almanac of American Politics* 2014 (2013).

*The Lost Majority: Why the Future of Government is up for Grabs – And Who Will Take It* (2012).

## PREVIOUS EXPERT TESTIMONY AND/OR DEPOSITIONS

*Dickson v. Rucho*, No. 11-CVS-16896 (N.C. Super. Ct., Wake County) (racial gerrymandering).

*Covington v. North Carolina*, No. 1:15-CV-00399 (M.D.N.C.) (racial gerrymandering).

*NAACP v. McCrory*, No. 1:13CV658 (M.D.N.C.) (early voting).

*NAACP v. Husted*, No. 2:14-cv-404 (S.D. Ohio) (early voting).

*Ohio Democratic Party v. Husted*, Case 15-cv-01802 (S.D. Ohio) (early voting).

*Lee v. Virginia Bd. of Elections*, No. 3:15-cv-357 (E.D. Va.) (early voting).

*Feldman v. Arizona*, No. CV-16-1065-PHX-DLR (D. Ariz.) (absentee voting).

*A. Philip Randolph Institute v. Smith*, No. 1:18-cv-00357-TSB (S.D. Ohio) (political gerrymandering).

*Whitford v. Nichol*, No. 15-cv-421-bbc (W.D. Wisc.) (political gerrymandering).

*Common Cause v. Rucho*, No. 1:16-CV-1026-WO-JEP (M.D.N.C.) (political gerrymandering).

*Mecinas v. Hobbs*, No. CV-19-05547-PHX-DJH (D. Ariz.) (ballot order effect).

*Fair Fight Action v. Raffensperger*, No. 1:18-cv-05391-SCJ (N.D. Ga.) (statistical analysis).

*Pascua Yaqui Tribe v. Rodriguez*, No. 4:20-CV-00432-TUC-JAS (D. Ariz.) (early voting).

*Ohio Organizing Collaborative, et al v. Ohio Redistricting Commission, et al*, No. 2021-1210 (Ohio) (political gerrymandering).

*NCLCV v. Hall*, No. 21-CVS-15426 (N.C. Sup. Ct.) (political gerrymandering).

*Szeliga v. Lamone*, Case No. C-02-CV-21-001816 (Md. Cir. Ct.) (political gerrymandering).

*In the Matter of 2022 Legislative Districting of the State* , Misc. No. 25 (Md. Ct. App.) (political gerrymandering)

*Montana Democratic Party v. Jacobsen*, DV-56-2021-451 (Mont. Dist. Ct.) (early voting; ballot collection).

*Carter v. Chapman*, No. 464 M.D. 2021 (Pa.) (map drawing; amicus).

*NAACP v. McMaster*, No. 3:21-cv-03302 (D.S.C.) (racial gerrymandering).

*Alexander v. NAACP*, Case No. 3:21-cv-03302-MBS-TJH-RMG (D.S.C.) (racial gerrymandering).

*Graham v. Adams*, No. 22-CI-00047 (Ky. Cir. Ct.) (political gerrymandering).

*Harkenrider v. Hochul*, No. E2022-0116CV (N.Y. Sup. Ct.) (political gerrymandering).

*LULAC v. Abbott*, Case No. 3:21-cv-00259 (W.D. Tex.) (racial/political gerrymandering/VRA).

*Moore et al., v. Lee, et al.*, (Tenn. 20th Dist.) (state constitutional compliance).

*Milligan v. Allen*, Case No. 2:21-cv-01530-AMM (N.D. Ala.) (VRA).

*Nairne v. Ardoin*, NO. 22-178-SDD-SDJ (M.D. La.) (VRA).

*Robinson v. Ardoin*, NO. 22-211-SDD-SDJ (M.D. La.) (VRA).

*Republican Party v. Oliver*, No. D-506-CV-2022-00041 (N.M. Cir. Ct. (Lea County)) (political gerrymandering).

*Palmer v. Hobbs*, Case No. 3:22-CV-5035-RSL (W.D. Wash) (VRA; remedial phase only).

*Clarke v. Evers*, No. 2023AP001399-OA (Wisc.) (Political gerrymandering; remedial phase only).

*Stone v. Allen*, No. 2:21-cv-1531-AMM (N.D. Ala.) (VRA).

*Milligan v. Allen*, No. 2:21-cv-01530-AMM (S.D. Ala.) (VRA).

*Agee et al. v. Benson, et al.*, (W.D. Mich.) (racial gerrymandering/VRA).

*Faatz, et al. v. Ashcroft, et al.*, (Cir. Ct. Mo.) (state constitutional compliance).

*Coca, et al. v. City of Dodge City, et al.*, Case No. 6:22-cv-01274-EFM-RES (D. Kan.) (VRA).

*Pierce v. NC State Board of Elections*, Case No. 4:23-cv-193 (E.D.N.C.) (VRA).

*Williams v. Hall*, Civil Action No. 23 CV 1057 (M.D.N.C.) (VRA, Racial Gerrymandering).

*Hodges v. Passidomo*, Case No. 8:24-cv-879-CEH-TPB-ALB (M.D. Fla.) (Racial Gerrymandering).

*Cubanos Pa'Lante v. Florida House of Representatives*, Case No. 24-cv-21983-JB (S.D. Fla.) (Racial Gerrymandering).

*Coads v. Nassau County*, Index No. 611872/2023 (N.Y. Sup. Ct., Nassau County) (political gerrymandering, racial gerrymandering, NYVRA).

## COURT APPOINTMENTS

Appointed as Voting Rights Act expert by Arizona Independent Redistricting Commission (2020)

Appointed Special Master by the Supreme Court of Virginia to redraw maps for the Virginia House of Delegates, the Senate of Virginia, and for Virginia's delegation to the United States Congress for the 2022 election cycle.

Appointed redistricting expert by the Supreme Court of Belize in Smith v. Perrera, No. 55 of 2019 (one-person-one-vote).

## INTERNATIONAL PRESENTATIONS AND EXPERIENCE

Panel Discussion, European External Action Service, Brussels, Belgium, Likely Outcomes of 2012 American Elections.

Selected by U.S. Embassies in Sweden, Spain, and Italy to discuss 2016 and 2018 elections to think tanks and universities in area (declined Italy due to teaching responsibilities).

Selected by EEAS to discuss 2018 elections in private session with European Ambassadors.

## TEACHING

Introduction to the Policy Process, Spring 2025.

American Democracy and Mass Media, Ohio Wesleyan University, Spring 2018.

Introduction to American Politics, The Ohio State University, Autumns 2018, 2019, 2020, Spring 2018.

Political Participation and Voting Behavior, Springs 2020, 2021, 2022, 2023.

Survey Methodology, Fall 2022, Spring 2024.

## PUBLICATIONS

James G. Gimpel, Andrew Reeves, & Sean Trende, "Reconsidering Bellwether Locations in U.S. Presidential Elections," Pres. Stud. Q. (2022) (forthcoming, available online at http://doi.org/10.1111/psq.12793).

## REAL CLEAR POLITICS COLUMNS

Full archives available at `http://www.realclearpolitics.com/authors/sean_trende/`