# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF MISSISSIPPI OXFORD DIVISION

| | |
|---|---|
| HAROLD HARRIS et al., <br><br> Plaintiffs, <br><br> vs. <br><br> DESOTO COUNTY, MISSISSIPPI et al., <br><br> Defendants. | No. 3:24-cv-00289-GHD-RP |

# REPLY REPORT OF WILLIAM S. COOPER

# AUGUST 11, 2025

**Exhibit C**

**Introduction**

I filed a report on April 18, 2025 ("Cooper Report"). I submit this reply report in response to the July 11, 2025 rebuttal report filed by Dr. Sean Trende, an expert for the Defendants in this lawsuit. ("Trende Rebuttal"). My CV and details about my compensation in this case are included in my original report.

In my opinion, the five Illustrative Plans[1] that I have developed are clearly within the norm in terms of traditional redistricting principles, including population equality, compactness, contiguity, respect for political subdivision boundaries, respect for communities of interest, and the non-dilution of minority voting strength.[2]

**A. The 50%+1 Threshold and Compactness**

In my April 18, 2025 Report, I introduced three Illustrative Plans. All three Illustrative Plans demonstrate that the Black population in northern DeSoto County is sufficiently numerous and geographically compact to encompass a majority-Black voting age population (a "majority-BVAP district" or "majority-Black

---

[1] Three Illustrative Plans are included my initial report. This reply report adds two more – Illustrative Plan 4 and Illustrative Plan 5.
[2] I have drawn election plans in 45 states since my initial 1988 trial testimony in *Henderson v. Board of Supervisors of Richmond County, Virginia*. In addition to the list of redistricting projects referenced in my CV appended to my original report, I have drawn countless plans outside of a litigation context for governing bodies, non-governmental organizations and community groups since 1988.

2

district"), while adhering to traditional redistricting principles. (**Cooper Report, pp. 20-25**).

In each of these three plans, the majority-BVAP district is numbered District 3. Majority-Black District 3 is configured differently in each of the three Illustrative Pans, demonstrating that there are multiple ways to draw a *Gingles* 1 compliant district while adhering to traditional redistricting principles. In no uncertain terms, Dr. Trende concludes that District 3 under all three Illustrative Plans meets the *Gingles* 1 50%+1 majority-Black threshold:[3] "To be clear, my understanding is that Plaintiffs' burden is to reach the 50% + 1 threshold, and these three districts appear to do so based on my review." (**Trende Rebuttal, p. 15**).

I agree with Dr. Trende that a *Gingles* 1 district with a BVAP of 50%+1 satisfies the *Gingles* 1 criterion. There is no "narrowness" qualifier (**Trende Rebuttal, p. 15**) that would call into question numerosity if a *Gingles* 1 district is just barely over 50%. In other words, once that majority threshold is crossed, there is no need to further increase the BVAP of the district to satisfy *Gingles* 1.

I have reviewed many bare-majority-BVAP districts around the country that have been enacted or court-ordered. A current case in point can be found just a stone's throw away from DeSoto County in nearby Fayette County, Tennessee. In

---

[3] *Bartlett v. Strickland*, 556 U.S. 1 (2009).

3

February 2025, plaintiffs filed a Section 2 lawsuit alleging vote dilution in the 2021 county commission plan.[4] I served as a redistricting consultant to the plaintiffs. The Fayette County, Tennessee lawsuit was resolved on July 7, 2025 after the county adopted a 19-district plan with three majority-Black districts. One of the three remedial majority-Black districts (District 7) has a BVAP of 50.18%.[5] There are other cases where I have drawn, and courts have accepted, *Gingles* 1 districts that are just over the majority threshold. As another example, I drew a *Gingles* 1 district accepted by the court in Fayette County, Georgia that was 50.22% BVAP.[6]

Dr. Trende also concludes that majority-Black District 3 and all of the districts under Illustrative Plan 1 ("Map 1") are compact: "Map 1 does appear to have relatively compact districts across the scores." (**Trende Rebuttal, p. 35**). In fact, as revealed in Trende Figure 22 (Reock), Trende Figure 23 (Polsby-Popper), Trende Figure 24 (Convex Hull), and Trende Figure 25 (IKIWISI), majority-Black

---

[4] Case No. 2:25-cv-02223 (W.D. Tenn. 2025). Complaint available at: https://vhdshf2oms2wcnsvk7sdv3so.blob.core.windows.net/thearp-media/documents/TN_225-cv-2223_1.pdf.

[5] Available at: https://fayettetn.us/wp-content/uploads/2025/05/District-14-Orange-B-Map-Packet.pdf

[6] *Georgia State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs,* 950 F. Supp. 2d 1294, 1303 (N.D. Ga. 2013), aff'd in part, vacated in part, rev'd in part, 775 F.3d 1336 (11th Cir. 2015). The remedial plan in that case included a district that was 50.13% BVAP. *Georgia State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 996 F. Supp. 2d 1353, 1360 (N.D. Ga. 2014)

District 3 under Illustrative Plan 1 takes third place in compactness measures across all 25 districts (**Trende Rebuttal, pp. 32-35).**

It is my understanding that there is no bright line rule on what constitutes a compact election district. And, it is not necessary for a *Gingles* 1-compliant district to win a blue ribbon (or even take third place) for compactness scores.[7] At the outset, Dr. Trende concludes that majority-Black District 3 in Illustrative Plan 1 is compact and meets the *Gingles* 1 50%+1 threshold. That should be the end of the story. But, alas, "due to the narrowness with which it crosses that threshold," Dr. Trende contends that the district was drawn by "purely racial decision-making." (**Trende Rebuttal, p. 15**).

Dr. Trende's "narrowness" race-based claim is demonstrably false. I constantly balance traditional redistricting plans as I draw an illustrative plan. To be sure, I am aware of racial demographics within a geographic context as I draw a plan but race does not unilaterally drive my decision-making. In particular, with respect to Illustrative Plan 1, I sought to draw a very compact District 3 while splitting fewer VTDs and municipalities than the Enacted Plan. In drafting Illustrative Plans 2 and 3, I prioritized protecting incumbents while maintaining compact majority-Black districts.

---

[7] *Allen v. Milligan,* 599 U.S. 1, 21 (2023); *Georgia State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1308 (N.D. Ga. 2013), aff'd in part, vacated in part, rev'd in part, 775 F.3d 1336 (11th Cir. 2015).

Unlike Dr. Trende, I do not employ racial shading when developing an election plan. The detailed district-by-district analysis (**Trende Rebuttal, pp. 19-30**) that Dr. Trende conducts with color-coded maps, breaking out racial demographics in five percentage point increments at the block level, is not something I use when drafting a plan.

When I develop an election plan, I am looking at a map that places green dots over 30%+ Black precincts and sometimes 30%+ census blocks, with overlays depicting municipal lines, current election districts, and (if available) incumbent address points in focus. There is no color-coding except for five random colors to demarcate the area and geographic extent of the districts as I develop each one. This has been my methodology since 1988 when I was drawing plans using paper census maps and a macro-driven *Lotus 1-2-3* spreadsheet.

## B. <u>Illustrative Plan 4</u>

I developed Illustrative Plan 4 to negate Dr. Trende's "narrowness" claim that seems to suggest I had to make race-based decisions to squeak across the 50%+1 threshold. In fact, it is possible to draw a plan with much higher BVAP, and the districts in my initial three plans reflect a different balancing of criteria.

Illustrative Plan 4 in **Figure 1** demonstrates that I can balance traditional redistricting principles and draw a reasonably compact majority-Black District 3 that is well above the 50%+1 threshold (52.79% BVAP).

6

**Figure 1: Illustrative Plan 4**



Majority-Black District 3 extends west from Horn Lake to the municipal limits of Lakeview and Lynchburg. The Town of Walls is divided in a straight path east to west along Church Road. **Figure 2** breaks out the population summary for the five districts in Illustrative Plan 4.

**Figure 2: Illustrative Supervisor Plan 4 – 2020 Census**

| District | Population | Deviation | % Deviation | 18+ Pop | % 18+ AP Black | % 18+ Latino | % 18+ NH White |
|---|---|---|---|---|---|---|---|
| 1 | 36,733 | -330 | -0.89% | 27,235 | 32.09% | 4.41% | 59.37% |
| 2 | 37,987 | 924 | 2.49% | 29,180 | 30.67% | 4.48% | 60.48% |
| 3 | 36,373 | -690 | -1.86% | 26,159 | 52.79% | 6.30% | 37.69% |
| 4 | 37,659 | 596 | 1.61% | 28,541 | 21.22% | 4.87% | 69.47% |
| 5 | 36,562 | -501 | -1.35% | 26,899 | 12.25% | 2.97% | 79.80% |

7

A higher resolution map of Illustrative Plan 4 is in **Exhibit A-1**, with detailed population summary statistics in **Exhibit A-2**. **Exhibit A-3** identifies municipal splits. **Exhibit A-4** reports compactness scores. **Exhibit A-5** identifies VTD[8] splits. Illustrative Plan 4 can be viewed online in detail on the Dave's Redistricting Application (DRA) website via the link below:

https://davesredistricting.org/join/b15e39bf-be68-480f-b1c5-44a1eb68bc28

**Figure 3** compares Illustrative Plan 4 against the Enacted Plan. On balance, Illustrative Plan 4 metrics are in the same range as the Enacted Plan.

**Figure 3: Redistricting Metrics –Enacted vs Illustrative Plan 4**

| Metric | Enacted 2022 Plan | Illustrative Plan 4 |
|---|---|---|
| Populated VTD Splits* | 15 | 4 |
| Municipal Splits* | 15 | 13 |
| Population Deviation** | 7.83% | 4.35% |
| Compactness – Reock*** | .37 | .39 |
| Compactness – Polsby*** | .32 | .27 |
| Incumbent Conflicts (out of 25) | 0 | 14 |
| Highest BVAP district | 39.11% | 52.79% |

\* Excluding unpopulated splits – lower is better
\*\* Deviation – lower is better
\*\*\* Mean score – higher is better

---

[8] VTDs (Voting Tabulation Districts) are synonymous with precincts as defined by the Census Bureau in the 2020 Census.

### D. <u>Illustrative Plan 5</u>

Dr. Trende greatly overstates the negative impact on incumbents in Illustrative Plan 1. (**Trende Rebuttal, p. 35**). While it is true that 15 incumbents (60%) are paired, 7 of the 15 could potentially be reelected in head-to-head contests—resulting in negative outcomes (election loss or retirement) for 32% of the incumbents (8 of 25). I also developed Illustrative Plan 2 and Illustrative Plan 3 (**Cooper Report pp. 24-29**) to demonstrate that reasonably compact *Gingles* 1-compliant districts can be drawn while avoiding incumbent conflicts altogether.

Nonetheless, it makes sense to consider Illustrative Plan 5, which locks in District 3 as drawn in Illustrative Plan 1 but with fewer plan-wide incumbent conflicts. As noted *supra*, Dr. Trende agrees that District 3 is compact. Illustrative Plan 5 thus uses the District 3 Dr. Trende agrees is compact while also lessening the incumbent pairings that he highlights in his report.

As depicted in **Figure 4**, Illustrative Plan 5 would pair six incumbents—resulting in negative outcomes (election loss or retirement) for as few as 12% of the incumbents (3 of 25). By comparison, in a typical *Gingles* lawsuit involving five single-member districts (i.e., five incumbents), at least 20% of the incumbents would potentially be negatively impacted (1 of 5).

9

Figure 4: Illustrative Plan 5



**Figure 5** breaks out the population summary for the five districts in Illustrative Plan 5.

Figure 5: Illustrative Supervisor Plan 5 – 2020 Census

| District | Population | Deviation | % Deviation | 18+ Pop | % 18+ AP Black | % 18+ Latino | % 18+ NH White |
|---|---|---|---|---|---|---|---|
| 1 | 38,231 | 1168 | 3.15% | 28,261 | 31.30% | 4.33% | 60.3% |
| 2 | 37,868 | 805 | 2.17% | 28,903 | 28.07% | 4.63% | 62.3% |
| 3 | 36,730 | -333 | -0.90% | 26,549 | 50.06% | 6.86% | 39.8% |
| 4 | 36,047 | -1016 | -2.74% | 27,284 | 19.46% | 4.28% | 72.3% |
| 5 | 36,438 | -625 | -1.69% | 27,017 | 19.58% | 2.94% | 72.7% |

10

A higher resolution map of Illustrative Plan 5 is in **Exhibit B-1**, with detailed population summary statistics in **Exhibit B-2**. **Exhibit B-3** identifies municipal splits. **Exhibit B-4** reports compactness scores. **Exhibit B-5** identifies VTD splits.

**Figure 6** compares Illustrative Plan 5 against the Enacted Plan. On balance, Illustrative Plan 5 metrics are in the same range as the Enacted Plan.

**Figure 6: Redistricting Metrics –Enacted vs Illustrative Plan 5**

| Metric | Enacted 2022 Plan | Illustrative Plan 5 |
|---|---|---|
| Populated VTD Splits* | 15 | 13 |
| Municipal Splits* | 15 | 11 |
| Population Deviation** | 7.83% | 5.89% |
| Compactness – Reock*** | .37 | .40 |
| Compactness – Polsby*** | .32 | .31 |
| Incumbent Conflicts (out of 25) | 0 | 6 |
| Highest BVAP district | 39.11% | 50.06% |

\* Excluding unpopulated splits – lower is better
\*\* Deviation – lower is better
\*\*\* Mean score – higher is better

Illustrative Plan 5 can be viewed online in detail on the Dave's Redistricting Application (DRA) website via the link below:

https://davesredistricting.org/join/935f9ee0-dca3-4d19-9222-01db80136ec8

### E. Compactness of the Minority Population

Dr. Trende writes: "Mr. Cooper's maps 2 and 3 are based upon non-compact minority populations" (**Trende Rebuttal, p. 38**). By singling out Illustrative Plans

11

2 and 3 and omitting Illustrative Plan 1, Dr. Trende is admitting the obvious: The Black population in District 3 under Illustrative Plan 1 is compact. Therefore, by extension, the Black population in District 3 under Illustrative Plan 5 is also compact given that majority-Black District 3 is identical in Illustrative Plans 1 and 5.

Furthermore Dr. Trende's claim is counter-intuitive in saying Black populations in District 3 under Illustrative Plans 2 and 3 are somehow non-compact even though they are in compact districts. I am not aware of any requirement that the minority population within an otherwise reasonably compact district must be even more compact than the district itself—just as there is no requirement that the White population must be in an even more compact area of a reasonably compact district.

A *Gingles* 1 illustrative plan must show that the minority group is "sufficiently large and geographically compact to constitute a majority *in a single-member district.*"[9] (emphasis added.) The compactness of the district is proof of the sufficient compactness of the minority community. In other words, if the community can be drawn into a reasonably configured district, it is sufficiently

---

[9] *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986).

compact. As the compactness scores show, each of the majority-BVAP districts in my illustrative plans are reasonably configured and compact.

Moreover, Dr. Trende is equivocating on a non-issue regarding the compactness of the minority population in DeSoto County. As shown in **Figure 7**, majority-Black District 3 under Illustrative Plans 1 and 5 is smaller (23.4 square miles or 11.4% of DeSoto County's 495.78 square miles) than all five districts in the Enacted Plan. And District 3 ranks second in area under Illustrative Plans 2, 3, and 4.

**Figure 7: Area in Square Miles by District by Plan**

| District | Enacted | Illus 1 | Illus 2 | Illus 3 | Illus 4 | Illus 5 |
| --- | --- | --- | --- | --- | --- | --- |
| 1 | 87.36 | 56.66 | 87.36 | 40.18 | 56.66 | 86.32 |
| 2 | 35.13 | 27.17 | 28.36 | 25.26 | 25.59 | 28.9 |
| 3 | 109.67 | **23.41** | **43.39** | **31.99** | **29.77** | **23.41** |
| 4 | 108.33 | 258.91 | 189.43 | 264.82 | 252.12 | 210.88 |
| 5 | 155.29 | 129.64 | 147.24 | 133.53 | 131.64 | 146.28 |

## F. Additional Comments

Dr. Trende peppers his rebuttal with an array of other unsubstantiated claims. *First*, he implies that my choice of redistricting metrics is "arbitrary". (**Trende Rebuttal p.15**). The metrics I have reported are basically the same set that I have reported and testified about in most redistricting lawsuits since the early 2010s.

13

These metrics are routinely reported by other experts in redistricting lawsuits. (See, for example, *Caster v. Allen*.[10])

*Second*, he implies that I might have drawn the illustrative plans based on "median income"[11] at the block group level. (**Trende Rebuttal pp. 42-51**). To be clear, I did not draw the illustrative plans based on block group median income. The block group median household income map (**Cooper Report pp. 13-14**) is solely for background demographic and socioeconomic information—complementing the charts and tables that document socioeconomic disparities by race at the county and municipal levels.[12] (**Cooper Report, pp. 30-31**). In fact, within the context of my plan drawing, Dr. Trende's entire ACS block group analysis shown in Trende Figures 35-37 (**Trende Rebuttal, pp. 46-49**) is "meaningless" (**Trende Rebuttal, pp. 50-51**). I am aware that there are margins of error associated with the *5-year American Community Survey*. Even so, the *5-year*

---

[10] 2025 WL 1643532 (N.D. Ala. May 8, 2025). Dr. Trende served as an expert for the State defendants in that lawsuit. I was an expert for plaintiffs.

[11] Dr. Trende fails to distinguish "median income" (i.e., at the individual level) and "median household income" (i.e., for one or more persons at the household dwelling unit level).

[12] I frequently include ACS socioeconomic charts and tables in my *Gingles* 1 reports for demographic background, as well as to help document Senate Factor 5.

14

*ACS* is the contemporary gold standard for reporting statistical point estimates across the range of socioeconomic indicators available at the block group level.[13]

*Lastly*, for general information, I have included core retention tables for the five Illustrative Plans vis-à-vis the Enacted Plan in **Exhibit C**.[14] The table in **Figure 8** summarizes those tables to show the percentage of the population (all ages) that is kept together in the transition from the districts in the Enacted Plan to districts in the Illustrative Plans.

Figure 8: **Core Retention -- Illustrative Plans vis-à-vis Enacted Plan**

| Plan | Core Retention |
|---|---|
| Illustrative 1 | 64.14% |
| Illustrative 2 | 68.23% |
| Illustrative 3 | 60.89% |
| Illustrative 4 | 63.88% |
| Illustrative 5 | 65.57% |

---

[13] See, for example, the nationwide block-group level maps (based on the *5-Year ACS*) that I produce on an annual basis for the Food Research and Action Center (since 2002). https://frac.org/research/resource-library/summer-food-mapper.
The block group maps show areas that are eligible or may be eligible for federal subsidies to support Summer Meal sites for children from low to moderate income households (185% poverty). On FRAC's Mississippi map, the lower income areas roughly line up with the median household income maps that I prepared in this matter.

[14] On the **Exhibit C** core retention tables, grey shading identifies the largest population subgroup kept together by district in the Illustrative Plans, irrespective of the district number or incumbent in the Enacted Plan. The sum of the shaded rows divided by the county population results in the Core Retention calculations in **Figure 8**.

Of course, it would be impossible not to have significant population shifts with respect to the Enacted Plan because that plan fragments and cracks the Black population in an area where the Mississippi State legislature drew new majority-Black House District 40 in 2022 and remedial majority Black Senate District 11 in 2025.[15]

**H. Address-searchable Map**

An address searchable map with boundaries for the Enacted Plan and Illustrative Plans 4 and 5 as separate clickable layers (accessible via the legend) can be viewed via Maptitude Online at the link below (Click off layers to display only the map for the plan of interest.):

https://online.caliper.com/mas-874-drp-290-ujr/maps/me1ipw59009x4qi34drz

A similar map depicting Illustrative Pans 1, 2, and 3 is available at the link below.

https://online.caliper.com/mas-874-drp-290-ujr/maps/m8pv1s4r00030ka13q93

# # #

---

[15] I served as the *Gingles* 1 expert for the plaintiffs and testified at trial in *Mississippi State Conference of the NAACP v. State Board of Election Commissioners*, No. 3:22-cv-734-DPJ-HSO-LHS (S.D. Miss.)

I reserve the right to continue to supplement my reports in light of additional facts, testimony, and/or materials that may come to light during the pendency of the above-captioned case.

Dated: August 11, 2025

*William S. Cooper*
_____
William S. Cooper