IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

HAROLD HARRIS; PASTOR ROBERT
TIPTON, JR.; DELTA SIGMA THETA
SORORITY, INC.; and DESOTO COUNTY
MS NAACP UNIT 5574           PLAINTIFFS

v.            Civil No. 3:24-cv-00289-GHD-RP

DESOTO COUNTY, MISSISSIPPI; DESOTO
COUNTY BOARD OF SUPERVISORS; and
DESOTO COUNTY ELECTION
COMMISSION           DEFENDANTS

## OPINION

Presently before the Court is Defendants DeSoto County Board of Supervisors; DeSoto County Election Commission; and DeSoto County, Mississippi's (collectively "Defendants") Motion for Summary Judgment [Doc. No. 297] seeking the dismissal of Plaintiffs Harrold Harris; Pastor Robert Tipton, Jr.; Delta Sigma Theta Sorority, Inc.; and DeSoto County, Mississippi, NAACP Unit 5574's (collectively "Plaintiffs") vote dilution claims under Section 2 of the Voting Rights Act ("VRA"). Based on the reasoning below, the Court finds Defendants' Motion [297] should be denied.

## BACKGROUND

The DeSoto County Board of Supervisors began its redistricting process in September 2021 in response to DeSoto County's growing population—evident from the 2020 census [298]. The DeSoto County Board of Supervisors hired Mr. Chris Watson to prepare redistricting map options for the board of supervisors' approval [298]. Simultaneously, "a group of interested citizens" organized the DeSoto County Redistricting Committee ("DCRC") to "[educate] themselves on redistricting" and monitor the board of supervisors' agendas [319]. This redistricting impacted not

only board of supervisor elections, but also County Justice Court judge, constable, board of education, and election commission elections: a total of twenty-five elected positions [*Id.*].

After selecting four alternative redistricting map options [298], the board of supervisors held a public hearing about the redistricting at 8:00 a.m. on June 6, 2022, noticing the public via newspaper publication [297-13]. Plaintiffs allege, however, the board of supervisors utilized repressive tactics to prevent community input in the redistricting process [319]. Unit 5574 did not participate in the redistricting process as an organization [297-8, pg. 26]; however, individuals from the DCRC and another organization, the Community Redistricting Committee ("CRC"), presented alternative maps to those drawn by Mr. Watson at the June 6, 2022, hearing [319]. After reviewing Watson's four alternate maps, hearing members of the public make statements, and reviewing the two maps presented by the organizations, a black Hernando alderman, Andrew Miller, requested Mr. Watson change the lines within his district on Alternate Map 1 to allow a precinct his constituents "traditionally voted at" remain in his district [298]. After doing so, the board of supervisors unanimously voted to adopt the revised Alternate Map 1 for the redistricting; that is, the 2022 plan at issue in this case [298].

This litigation followed. Defendants filed a motion to dismiss [36] which this Court granted in part and denied in part [98].[1] After extensive discovery, Defendants now file a Motion for Summary Judgment [297].

## STANDARD OF REVIEW

This Court grants summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex*

---

[1] Dale Thompson, sued in her official capacity as Circuit Clerk, was dismissed as a party to this litigation [98].

2

*Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008). The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

The party moving for summary judgment bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record it believes demonstrate the absence of a genuine dispute of material fact. *Id.* at 323. Under Rule 56(a), the burden then shifts to the nonmovant to "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324; *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001); *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995). When the parties dispute the facts, the Court must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal citations omitted). "However, a nonmovant may not overcome the summary judgment standard with conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *McClure v. Boles*, 490 F. App'x 666, 667 (5th Cir. 2012) (per curiam) (citing *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007)).

As for Rule 12(b)(1), motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the subject matter jurisdiction of the district court to hear a case. Fed. R. Civ. P. 12(b)(1). Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's

3

resolution of disputed facts. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *Barrera–Montenegro v. United States,* 74 F.3d 657, 659 (5th Cir. 1996). The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. *Ramming*, 281 F.3d at 161. Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist. *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507, 511 (5th Cir. 1980).

## ANALYSIS AND DISCUSSION

### *I.    Standing*

The Court begins with Defendants' standing arguments due to their obvious impact on the summary judgment analysis. The United States Supreme Court reaffirmed a clear three-part test for Article III standing in *Gill v. Whitford*, 585 U.S. 48, 65 (2018), requiring plaintiffs establish they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Indeed, "each element must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Defendants argue "Plaintiffs lack standing . . . because [they] have not suffered a legally cognizable injury in fact[,] and the harm for which they complain is speculative and cannot be redressed by the requested relief." [298]. The Court begins with the individual plaintiffs' standing and then discusses the organizations' standing.

### A. Individuals' Standing

Plaintiffs argue the individual plaintiffs, Harrold Harris and Robert Tipton, Jr., have standing to pursue this claim because each live in a majority-white district under the 2022 Plan while *they would live* in a majority-black district under "at least one of Plaintiffs' illustrative plans" [319]. Plaintiffs cite *Nairne v. Landry*, 151 F.4th 666 (5th Cir. 2025), to support this argument.

4

There, the Fifth Circuit found the defendant conceded the individual plaintiffs "each have standing to challenge vote dilution in the legislative districts where they reside" with each being "a Black registered voter residing in a district that is either cracked or packed." *Id.* at 682, n.8. Indeed, the Fifth Circuit found "[t]hat, on its own, is sufficient to confer standing to pursue a § 2 claim." *Id.* (citing *Harding v. County of Dallas*, 948 F.3d 302, 307 (5th Cir. 2020)). This Court, however, agrees with Defendants. The Fifth Circuit withheld its mandate in *Nairne*; therefore, this Court cannot rely on that case's findings until such mandate is handed down. *Nairne v. Landry*, No. 24-30115, at Doc. No. 313 (5th Cir. Aug. 14, 2025); *Spikes v. Wheat*, 141 F.4th 662, 668 n.1 (5th Cir. 2025).

Even so, the *Nairne* court cites *Harding v. County of Dallas*, 948 F.3d at 307, and this Court can rely on that case to support Plaintiff's argument. It is still unpersuasive for the premise proposed above because the *Harding* court acknowledges the defendants there "conceded that each voter resides in a district where their vote has been cracked or packed," and no such concession exists in the case *sub judice*. *Id.* With these clarifications in place, the Court addresses the central argument of the individual plaintiffs' standing below.

Beginning with the first element, Plaintiffs argue Harris and Tipton "are harmed because their vote is diluted" [319]. "In voting dilution cases, the 'harm arises from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight than it would carry in another hypothetical district." *Harding*, 948 F.3d at 307 (quoting *Gill*, 585 U.S. at 67). This is the exact argument Plaintiffs make here in support of their individual standing. "An injury in fact is 'an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical.'" *La Union Del Pueblo Entero v. Abbott*, 151 F.4th 273, 285 (5th Cir. 2025) (quoting *Lujan*, 504 U.S.

5

at 560)). Plaintiffs accurately show this regarding an injury in fact for the individual plaintiffs. The two individual plaintiffs have shown for purposes of this motion they are black registered voters residing in different districts in DeSoto County, each asserting a "legally cognizable injury—the dilution of their votes," and the black population is cracked (specifically the city of Horn Lake) between Districts 3 and 4, resulting in the dilution of black votes [319]. *Harding*, 948 F.3d at 307.

The other two elements are quite obviously met here as well because it is the Defendants' redistricting which allegedly "dilutes" the individual plaintiffs' votes, and this can be addressed by a favorable judicial decision as has been done in a multitude of other cases. See, *e.g.*, *Thornburg v. Gingles*, 487 U.S. 30 (1986); *White v. State Bd. of Election Comm'rs*, 795 F.Supp.3d 794 (N.D. Miss. 2025); *Miss. State Conf. of NAACP v. State Bd. of Election Comm'rs*, 739 F.Supp.3d 383 (S.D. Miss. 2024). What is more troubling, however, is the Supreme Court's limitation on plaintiffs who allege "racial gerrymandering;" that is, such plaintiffs have "standing to assert only that [their] own district has been so gerrymandered." *Gill*, 585 U.S. at 66. Harris lives in District 3 and Tipton lives in District 4; therefore, they only have standing to bring claims as they relate to their individual districts. *Id.* The Court analyzes the organization plaintiffs' standing before drawing standing conclusions upon each district.

### B. Organizations' Standing

"An organization may have standing either by showing it can sue on behalf of its members (associational standing) or sue in its own right (organizational standing)." *La Union*, 151 F.4th at 285 (quoting *Tex. State LULAC v. Elfant*, 52 F.4th 248, 253 (5th Cir. 2022)) (internal quotation marks omitted). The organization plaintiffs, Delta Sigma Theta and Unit 5574, argue they have associational standing [319].

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests

6

it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); see also, *Students for Fair Admissions, Inc. v. Presidents and Fellows of Harvard College*, 600 U.S. 181, 199 (2023) (reaffirming the *Hunt* standard for associational standing). To satisfy the first element, the organization plaintiffs must each "make specific allegations establishing that at least one identified member had suffered or would suffer" the alleged harm. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).

The Court begins with Defendant DeSoto County MS NAACP Unit 5574 ("Unit 5574"). To support the contention they "identified members [of Unit 5574] who would have standing in their own right," Plaintiffs cite to their responses to interrogatories [318-31] which state, "Plaintiff DeSoto County MS NAACP Unit 5574 has Black members, including Plaintiffs Harold Harris and Pastor Robert Tipton, Jr., who are eligible and registered to vote at their residences, which are included in these aforementioned districts." The same document [318-31] also discusses Unit 5574 members Dr. Leslie-Burl McLemore and Khadija Sheard stating they live "within one or more of the Black-opportunity districts included in the illustrative maps" [*Id.*]. As for Defendant Delta Sigma Theta Sorority, Inc. ("DST"), Plaintiffs put forth Dr. Bacardi Harris, Ms. Merrilyn Ellis, and Ms. Gabrielle Larkin as DST members who are black voters living "within one or more of the Black-opportunity districts included in the illustrative maps" [318-32]. More specifically, Plaintiffs note Ellis and Larkin "reside at locations within Horn Lake" [*Id.*]. As previously discussed, Plaintiffs allege an injury in fact by stating these associated individuals reside in an area "where Section 2 of the VRA requires the drawing of a new district in which Black voters can elect a candidate of choice" [318-31; 318-32]. The first standing element has been successfully established.

7

Turning now to the second element concerning the organization plaintiffs' purposes, Plaintiffs argue "[v]oting rights are germane to both organizational [p]laintiffs' purpose" [319]. Plaintiffs successfully show this regarding DST through testimonial evidence [318-35], DST's website [318-34], and flyers and emails proving DST's community involvement in political education [318-33]. Regarding Unit 5574, Plaintiffs point to that organization's bylaws [318-36, p. 3] as support, and this evidence satisfies the second element.

The third and final element asks whether the requested relief "requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. "While an association's action for damages running solely to its members would be barred for want of the association's standing to sue, where the association seeks declaratory or injunctive relief, the third prong is usually satisfied." *Tex. Top Cop Shop, Inc. v. Garland*, 758 F.Supp.3d 607, 631 (E.D. Tex. 2024) (quoting *Assoc. of Am. Physicians & Surgeons, Inc. v. Tex. Med. Board*, 627 F.3d 547, 551 (5th Cir. 2010)) (other citations and internal quotation marks omitted). Because both organizations seek only declaratory and injunctive relief, it is not necessary for its individual members to participate; therefore, the third element is satisfied. The organization plaintiffs have satisfied their Article III standing, allowing this Court to continue to address this lawsuit on its merits. Because associational standing is derivative of the organization's members, the organization plaintiffs, here, only have standing to challenge Districts 3 and 4, the same as the individual plaintiffs. *League of United Latin American Citizens v. Abbott*, 604 F.Supp.3d 463, 483 (W.D. Tex. 2022) (citing *NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) and *Summers*, 555 U.S. at 499); see also, *LULAC*, 604 F.Supp.3d at 485, n.7.

The Court notes, however, "the question of standing is quite separate from the question of remedy," and "it may be necessary to redraw every other district in the [county]." *Id.* at 486. "Such

a remedy is entirely within the judicial power, to the extent that it is limited to the inadequacy that produced the injury in fact that the plaintiff has established. But absent such injury-in-fact, this Court cannot grant *any* relief." *Id.* (quoting *Gill*, 585 U.S. at 67-68) (internal quotation marks omitted) (emphasis in original). The Court turns now to the merits of the claim at hand.

## II.    Summary Judgment

Plaintiffs claim Defendants violated Section 2 of the Voting Rights Act, specifically 52 U.S.C. § 10301 which states:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).
>
> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

The Fifth Circuit has clearly held a private right of action does exist under Section 2 of the VRA. *Robinson v. Ardoin*, 86 F.4th 574, 587-88 (5th Cir. 2023) (citing *OCA-Greater Houston*, 867 F.3d at 614).

To guide courts in their Section 2 analyses, the Supreme Court developed a test in *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986), requiring plaintiffs bringing such claims satisfy three preconditions: (1) "the minority group must be sufficiently large and geographically compact;" (2) "the minority group must be politically cohesive;" and (3) "the white majority must

9

be shown to vote sufficiently as a bloc to usually defeat the minority-preferred candidate." *Robinson*, 86 F.4th at 589 (citing *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (internal quotation marks omitted). If these preconditions are met, "a plaintiff then must 'show, under the totality of the circumstances, that the political process is not equally open to minority votes.'" *Id.* This is accomplished using ten Senate factors[2] of which "no one factor has determinative weight." *Veasey v. Abbott*, 830 F.3d 216, 246 (5th Cir. 2016) (citing *Gingles*, 478 U.S. at 45).

### A. First *Gingles* Precondition

"First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district," *Gingles*, 478 U.S. at 50. Stated differently, the focus is "on geographical compactness and numerosity." *Robinson*, 86 F.4th at 589 (citing *Milligan*, 599 U.S. at 18). To satisfy the numerosity component, "[t]he party asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent." *Robinson*, 86 F.4th at 589-90 (citing *Bartlett v. Strickland*, 556 U.S. 1, 19-20 (2009)) (internal quotation marks omitted). "This percentage is analyzed in terms of the black voting-age population ("BVAP") because only eligible voters can affect the *Gingles* analysis." *Id.* at 590; see, *e.g.*, *Cooper v. Harris*, 581 U.S. 285 (2017); *Fusilier v. Landry*, 963 F.3d 447, 456-57 (5th Cir. 2020). Plaintiffs put forth three potential redistricting maps, Illustrative Plans 1, 2, and 3 [205-1]. Plan 1's BVAP is 50.06%, Plan 2's is 50.05%, and Plan 3's is 50.17% [*Id.*]. This satisfies the numerosity requirement at this stage in the litigation process.

The compactness inquiry "should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries" while focusing "on the

---

[2] They are also sometimes referred to as the *Zimmer* factors. *Robinson*, 86 F.4th at 589 (citing *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 849 (5th Cir. 1993)).

compactness of the minority population, not . . . the compactness of the contested district." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) (citing *Bush v. Vera*, 517 U.S. 952, 997 (1996)) (internal quotation marks omitted). Indeed, "The first *Gingles* precondition does not require some aesthetic ideal of compactness, but simply that the black population be sufficiently compact to constitute a majority in a single-member district." *Sensley v. Albritton*, 385 F.3d 591, 596 (5th Cir. 2004) (quoting *Houston v. Lafayette Cnty., Miss.*, 56 F.3d 606, 611 (5th Cir. 1995)). It asks "whether [a proposed map] demonstrated that a geographically compact district *could be drawn*." *Id.* (emphasis in original).

Plaintiffs rightly point out Defendants' expert witness, Dr. Sean Trende, conceded Plaintiffs' expert witness, Mr. William Cooper, created a compact minority district in Plan 1 [318-39]. Specifically, Dr. Trende was asked, "[Y]ou can't deny that the minority population in [Plan] 1, District 3 is a compact population, right," and Dr. Trende responded, "Right" [*Id.*].[3] Therefore, both experts agree Mr. Cooper's proposed Plan 1, District 3 contains a compact minority population. However, Dr. Trende still takes issue with Mr. Cooper's methodology used to arrive at his compactness calculations. Because both parties designated experts to testify, a battle of the experts exists, with each party free to question the opposing witness regarding methodology and conclusions at trial. *Horton v. Allstate Vehicle & Prop. Ins. Co.*, No. 22-20533, 2023 WL 7549507, at *2 (5th Cir. Nov. 13, 2023) (citing *Cox v. Provident Life & Accident Ins. Co.*, 878 F.3d 504, 507 (5th Cir. 2017)) ("this evidence creates a classic "battle of the experts," which presents a question for the [fact finder]"). This only emphasizes the existence of a dispute of material fact regarding compactness; therefore, the first *Gingles* precondition is satisfied for the purposes of this summary judgment motion.

---

[3] Dr. Trende stated more in support of this, but the Court does not repeat that conversation exhaustively here.

### B. Second *Gingles* Precondition

The next precondition requires "the minority group . . . show that it is politically cohesive." *Gingles*, 478 U.S. at 51. That is, "the plaintiff must show that a significant number of minority group members usually vote for the same candidate." *Rodriguez*, 964 F.Supp.2d at 754 (citing *Gingles*, 478 U.S. at 57 ("the political cohesiveness inquiry asks whether 'voters of the same race tend to vote alike.'")). Defendants argue, here, no genuine dispute of material fact exists on this precondition because the expert report—prepared by Dr. Jacob Grumbach—on which Plaintiffs rely, is "insufficient to establish" such a precondition [298]. Defendants take issue with Dr. Grumbach's "methodology, assumptions, and conclusions" [*Id.*]. For example, Defendants argue his failure to "consider any primary elections in conducting his analysis . . . undermines the usefulness of the data and analysis" of his report [*Id.*].

The Court instead finds Plaintiffs' arguments convincing. These topics are better suited for trial rather than summary judgment. Indeed, Defendants' attempted undermining of Dr. Grumbach's expert opinion seeks to have this Court weigh the credibility of his testimony: this is prohibited at the summary judgment stage. *Berry v. Armstrong Rubber Co.*, 989 F.2d 822, 824 (5th Cir. 1993) ("In granting a motion for summary judgment, the district court is not to weigh the evidence or make credibility choices."); see also, *Click-To-Call Tech. LP v. Ingenio, Inc.*, 1:25-cv-00465-DAE, 2025 WL 621437, at *4 (W.D. Tex. Feb. 26, 2025) ("[I]t is not for the court to weigh the expert's credibility at the summary judgment stage."). This attack on the expert again only emphasizes the existence of a material fact issue regarding the second *Gingles* precondition.

### C. Third *Gingles* Precondition

The third and final precondition requires "the minority group . . . demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as

12

a minority candidate running unopposed . . . —usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51. "This precondition requires proof that white bloc voting, 'can generally minimize or cancel black voters' ability to elect' their preferred candidate." *Robinson*, 86 F.4th at 595 (quoting *Gingles*, 478 U.S. at 56). "Racial bloc voting 'exists where there is a consistent relationship between the race of the voter and the way in which the voter votes." *Rodriguez*, 964 F.Supp.2d at 756-57 (citing *Gingles*, 478 U.S. at 53 n. 21). The necessary question under precondition three is whether the white majority "bloc voting is legally significant." *Id.* at 757 (citing *LULAC IV*, 999 F.2d 831, 850 (5th Cir. 1993); *LULAC III*, 986 F.2d 728, 745 (5th Cir. 1993)). "[G]enerally, a white bloc vote that normally will defeat the combined strength of minority support plus white crossover votes rises to the level of legally significant white bloc voting." *Id.* (citing *Gingles*, 478 U.S. at 56; accord *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425 (2006); *Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994); *LULAC IV*, 999 F.2d at 850)) (internal quotation marks omitted). Yet, "it is the usual predictability of the majority's success which distinguishes structural dilution from the mere loss of an occasional election." *Id.* (citing *Gingles*, 478 U.S. at 51) (internal quotation marks omitted).

Defendants again attack Dr. Grumbach's report's underlying methodology by arguing he makes "no distinction between defeats caused by bloc voting and defeats caused by population distribution, incumbency, turnout, or partisan reasons" [298]. They also take issue with Dr. Grumbach considering "only three school board elections of the fourteen total endogenous elections he analyzed" [338]. The Court reiterates these are topics more suited for trial because they ask this Court to weigh Dr. Grumbach's report's credibility, which is prohibited at this stage in litigation. *Berry*, 989 F.2d at 824; *Click-to-Call*, 2025 WL 621437, at *4. This is enough to find

a material fact dispute for this precondition, but the Court addresses a few more arguments for clarity's sake.

Defendants argue further Plaintiffs fail to present a material fact issue regarding racial bloc voting because "the evidence shows . . . partisan polarization, rather than race, explains 'divergent voting patterns'" [298]. They rely heavily on *LULAC v. Clements*, 999 F.2d 831 (5th Cir. 1993) (*LULAC IV*), to support this contention. As Plaintiffs point out in their response, however, "[t]he third precondition . . . establishes that the challenged districting thwarts a distinctive minority *at least plausibly on account of race.*" *Allen v. Milligan*, 599 U.S. 1, 19 (2023) (cleaned up) (emphasis added). What is more, Plaintiffs argue analyzing whether partisanship or race is more appropriately addressed under the totality of the circumstances test as opposed to the third *Gingles* precondition, and they point to several cases post-*LULAC IV* to support this. See *White v. State Bd. of Election Comm'rs*, 795 F.Supp.3d 794, 824 (N.D. Miss. 2025) (collecting cases). The Court agrees with Plaintiffs in this instance as to both arguments.

Regardless, Plaintiffs provide an expert report, claiming it shows "substantial evidence indicating that race, rather than party, drives polarization" [319]. Defendants take issue with fundamental aspects of this report. This is a clear dispute of material fact; therefore, the third *Gingles* precondition is satisfied at this juncture.

### D. Totality of the Circumstances Test

"Finally, a plaintiff who demonstrates the three preconditions must also show, under the 'totality of the circumstances,' that the political process is not 'equally open' to minority voters." *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (citing *Gingles*, 487 U.S. at 45-46). Courts use the *Gingles* or Senate factors for this analysis, of which there are ten, but "no one factor has determinative weight." *Veasey v. Abbott*, 830 F.3d 216, 246 (5th Cir. 2016) (citing *Gingles*, 478 U.S. at 45).

14

### 1. Senate Factor One

The first factor contemplates "the history of voting-related discrimination in the state or political subdivision." *Rodriguez v. Harris Cnty., Tex.*, 964 F.Supp.2d 686, 778 (S.D. Tex. 2013) (citing *Gingles*, 478 U.S. at 36-37). In support of this factor, Plaintiffs rely heavily on expert testimony from Dr. Marvin King. As is their pattern, Defendants attack Dr. King's methodology, and just like their other attacks, this argument fails for the same reasons listed above. *Berry*, 989 F.2d at 824; *Click-to-Call*, 2025 WL 621437, at *4. Surprisingly, however, Defendants recognize Dr. King's report provides at least some amount of support under Senate Factor One related to DeSoto County [338, p. 19]; specifically, they wrote, "[T]he portions of King's report cited [by Plaintiffs] either do not support it, or *include a lone complaint* that school desegregation was slow to start in DeSoto County." A dispute of material fact exists here.

### 2. Senate Factor Two

The second factor contemplates "the extent to which voting in the state or subdivision is racially polarized." *Rodriguez*, 964 F.Supp.2d at 778 (citing *Gingles*, 478 U.S. at 36-37). Both parties rely on their *Gingles* precondition analysis in support of Senate Factor Two. The Court addresses those argument above, and many of them are applicable here because Dr. Grumbach's expert report is utilized as evidence in support of both the precondition and the second factor. See *supra*, Part II.A, B. As such, a dispute of material fact exists concerning Senate Factor Two.

### 3. Senate Factor Three

The third factor contemplates "the extent to which the state or subdivision has used voting practices or procedures that tend to enhance opportunities for discrimination against the minority group." *Rodriguez*, 964 F.Supp.2d at 778 (citing *Gingles*, 478 U.S. at 36-37). Many disputes of material fact exist under Senate Factor Three, and just one example is the relevance and weight of

15

"voter fatigue" [318-6]. Defendants call this concept "tenuous" [338] while Plaintiffs (in reliance on Dr. King's expert report) utilize it to prove Senate Factor Three falls in their favor. This issue is one more suited for trial rather than summary judgment.

### 4. Senate Factor Four

The fourth factor contemplates "whether minority candidates have been denied access to any candidate-slating process." *Rodriguez*, 964 F.Supp.2d at 778 (citing *Gingles*, 478 U.S. at 36-37). The Fifth Circuit noted in *N.A.A.C.P. v. Fordice*, 252 F.3d 361, 372 (5th Cir. 2001), "Mississippi does not use a candidate slating process," and the parties seemingly agree on this; therefore, the Court will not analyze it here.

### 5. Senate Factor Five

The fifth factor contemplates "the extent to which minorities have borne the effects of past discrimination in relation to education, employment, and health." *Rodriguez*, 964 F.Supp.2d at 778 (citing *Gingles*, 478 U.S. at 36-37). To show this, "Plaintiffs must prove both depressed political activity and socioeconomic inequality, but they need not . . . prove any causal nexus between their disparate socioeconomic status and the depressed level of political participation." *Id.* at 785 (citing *LULAC III*, 986 F.2d at 750). For summary judgment purposes, Plaintiffs accomplish this with Dr. King's expert report. Dr. King presents statistics concerning the differences in education, employment, and health between DeSoto County's black and white populations, and he provides at least some information concerning voter turnout [297-21]. Defendants again attack his methodology and claim Plaintiffs "offered no evidence tending to show that past discrimination has affected their ability to participate in the political process" [298]. As stated before, however, no "causal nexus between their disparate socioeconomic status and the depressed level of political

16

participation" is necessary. *Rodriguez*, 964 F.Supp.2d at 785. This is enough to create a material fact issue under Senate Factor Five.

### 6. Senate Factor Six

The sixth factor contemplates "whether local political campaigns have used overt or subtle racial appeals." *Rodriguez*, 964 F.Supp.2d at 778 (citing *Gingles*, 478 U.S. at 36-37). To support this element, Plaintiffs again point to Dr. King's expert report and the "several incidents of 'dog-whistle' racial appeals" therein [319]. Defendants call these incidents "tenuous anecdotes," and singles out an "anecdote involving DeSoto County Chancery Court Judge Percy Lynchard" [338]. Whether or not that anecdote should be classified as "dog-whistle politics" is a fact issue better dealt with at trial, and the same can be said for other examples Plaintiffs provided. Therefore, fact issues abound, and summary judgment is inappropriate on this factor.

### 7. Senate Factor Seven

The seventh factor contemplates "the extent to which minority group members have been elected to public office in the jurisdiction." *Rodriguez*, 964 F.Supp.2d at 778 (citing *Gingles*, 478 U.S. at 36-37). "This factor . . . is one of the most important factors that the district court must consider in its totality of the circumstances analysis." *Id.* at 788 (citing *Gingles*, 478 U.S. at 48 n. 15; *LULAC III*, 986 F.2d at 750-51; *Westwego III*, 946 F.2d at 1120).

The parties are at odds here. Plaintiffs argue they satisfy this factor because "[n]one of the 25 officials elected under the challenged district lines is Black" [319]. Further, "DeSoto County is one of only 11 out of 82 counties without a Black supervisor . . . and an outlier among counties with similar size and growing Black population" [*Id.*]. Defendants, however, made no Senate Factor Seven analysis in their original Motion to Dismiss [298], but argue in their Reply brief [338] "two Black officials were elected to public office in DeSoto County in 2023." Specifically,

17

"Rodney Hall was elected State Representative for District 20 of the Mississippi House of Representatives, which district encompasses all of DeSoto County, and Sheriff Thomas Tuggle was elected DeSoto County Sheriff" [338]. With those arguments in mind, the Court finds Plaintiffs satisfies its summary judgment burden for Senate Factor Seven.

### 8. Senate Factor Eight

The eighth factor contemplates "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of members of the minority group." *Rodriguez*, 964 F.Supp.2d at 778 (citing *Gingles*, 478 U.S. at 36-37). Both parties cite significant witness testimony in support of their arguments on this factor. This testimony, of course, is conflicting; therefore, a dispute of material fact exists concerning Senate Factor Eight.

### 9. Senate Factor Nine

The ninth factor contemplates "whether the policy underlying the use of voting qualifications is tenuous." *Rodriguez*, 964 F.Supp.2d at 778 (citing *Gingles*, 478 U.S. at 36-37). Plaintiffs argue Defendants' policy underlying their redistricting maps was to maintain racial ratios, citing a supervisor's email request for such and a memo from the map drawer, Mr. Watson [319]. Defendants then summarily state, without legal citation, Plaintiffs' "argument fails to identify sufficient evidence to meet [their] burden on summary judgment" [338] after failing to even mention this factor in their original Motion to Dismiss [298]. They do recover slightly, however, in their reply memorandum [338] by providing what they claim is the "primary" underlying policy for their maps; that is, "to protect incumbents and avoid redrawing the maps in a way that would pit incumbents against incumbents" [338]. This only shows competing testimony, once again; therefore, material fact issues exist regarding Senate Factor Nine, as well.

### *10. Proportionality Factor*

Finally, "[t]he court must also consider whether the number of districts in which the minority group forms an effective majority is roughly proportional to the minority group's share of the population in the relevant area." *Rodriguez*, 964 F.Supp.2d at 778 (citing *Perry*, 548 U.S. at 425; *Fairley*, 584 F.3d at 673). "[P]roportionality is not dispositive in a challenge to single-member districting." *Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994). However, "it is a relevant fact in the totality of circumstances . . . when determining whether members of a minority group have 'less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* (citing 52 U.S.C. § 10301). The parties fail to argue this in their briefs. Defendants simply state it is not a dispositive issue, a point with which this Court agrees. However, since the parties fail to address it properly in their briefs, the Court simply retains the issue for trial.

### CONCLUSION

Because disputes of material fact exist in both the *Gingles* preconditions and the totality of the circumstances test, the Court finds Defendants' Motion for Summary Judgment [297] should be denied, allowing the action to proceed as scheduled.

An order in accordance with this opinion shall issue this day.

THIS, the _____ 18ᵗʰ _____ day of December, 2025.


_____
SENIOR U.S. DISTRICT JUDGE