IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

HAROLD HARRIS; PASTOR ROBERT
TIPTON, JR.; DELTA SIGMA THETA
SORORITY, INC.; and DESOTO COUNTY
MS NAACP UNIT 5574                                               PLAINTIFFS

v.                                                     Civil No. 3:24-cv-00289-GHD-RP

DESOTO COUNTY, MISSISSIPPI; DESOTO
COUNTY BOARD OF SUPERVISORS; and
DESOTO COUNTY ELECTION
COMMISSION                                                       DEFENDANTS

## OPINION

The Plaintiffs in this action filed suit against the Defendants on September 12, 2024, challenging DeSoto County, Mississippi's, 2021 redistricting map for county-wide elections. Plaintiffs allege this map dilutes Black DeSoto County residents' votes in violation of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301. After an extensive twelve-day bench trial in which over 300 exhibits were entered and thirty-six witnesses testified, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### I. Background

#### A. The Parties

Two organizations are plaintiffs in this suit: the DeSoto County, Mississippi, National Association for the Advancement of Colored People ("NAACP") Unit 5574 ("Unit 5574"), and the Delta Sigma Theta Sorority ("DST"). Unit 5574 is a "subordinate unit" of the NAACP representing DeSoto County's local Black community's interests through local members. PX-121, pp. 1-3. DST is a nationwide sorority with members located in DeSoto County, Mississippi,

seeking to foster "high ideals in moral, social, and intellectual life" including political awareness and involvement. PX-124, p. 1; PX-125.

Two individual NAACP members are also plaintiffs in this suit. The first is Plaintiff Harold Harris, a long-time, Black DeSoto County resident and registered voter who resides in District 3. *Trial Tr.* Vol. 1, 46:1-49:14 [Doc. 470]. The second is Plaintiff Robert Tipton, Jr., who has resided in DeSoto County "[o]ff and on" for approximately twenty-three years and is a registered voter in District 4 who identifies his race as Black but during trial identified himself as "American." Stip. 380-1, ¶ 4; *Trial Tr.* Vol. 2, 370:11-25; 373:1-22 [Doc. 471].

This lawsuit names three defendants. Defendant DeSoto County, Mississippi, is a political subdivision of the state of Mississippi and is constitutionally divided into five districts. Miss. Const., Art. 6 § 170; *Stip.* 380-1, ¶ 11. Defendant DeSoto County Board of Supervisors is the five-member elected body charged with operating DeSoto County's local government pursuant to Miss. Code Ann. § 19-3-1 *et seq* including redistricting. *Stip.* Doc. 380-1, ¶¶ 11-12. Those currently serving as supervisors are Jesse Medlin (District 1), Mark Gardner (District 2), Ray Dennison (District 3), Lee Caldwell (District 4), and Robert Foster (District 5). *Id.* at ¶ 13. Each of these supervisors participated in the 2021 redistricting process with the exception of Robert Foster who replaced Michael Lee as District 5 supervisor. *Id.* at ¶ 15. All these individuals are White. *Answer and Affirmative Defenses* Doc. 99, ¶ 5. The third and final Defendant is the DeSoto County Election Commission which consists of five members charged with conducting elections, certifying election results, and maintaining voter rolls pursuant to Miss. Code Ann. § 23-15-213 *et seq. Stip.* 380-1, ¶¶ 14-15. All Election Commission members are also White. *Answer and Affirmative Defenses* Doc. 99, ¶ 5.

### B. The Redistricting Process

Every ten years the United States Census Bureau conducts a census and then releases the results the following year. 13 U.S.C. § 141. The 2020 census—the relevant census for this case—revealed DeSoto County's Black population accounted for 31.71 percent of the county's total population. PX-149, p. 10. This is a 9.5 percent increase from the 2010 census which showed the Black population comprised 22.56 percent of the county's population. *Id.* at 9. With this knowledge the DeSoto County Board of Supervisors began the county's redistricting process in September 2021 pursuant to Mississippi law. Miss. Code Ann. § 23-15-283. This redistricting impacted not only board of supervisor elections, but also elections for County Justice Court judges, constables, board of education members, and election commission members: a total of twenty-five elected positions. *Stip.* 380-1, ¶ 18.

The DeSoto County Board of Supervisors hired Mr. Chris Watson from Bridge & Watson, Inc. to prepare redistricting map options for the board of supervisors' approval. *Stip.* 380-1, ¶ 16. Simultaneously, a group of "[p]redominantly Black" DeSoto County citizens organized the DeSoto County Redistricting Committee ("DCRC") to "educate [them]selves on the [redistricting] process" and monitor the board of supervisors' agendas. *Trial Tr.* Vol. 5, 944:1-12 [Doc. 464]. After preliminary meetings with board members, Mr. Watson prepared a proposed redistricting plan, dated March 21, 2022, for the board of supervisors. He then met with members of the DCRC directly where he explained the redistricting process, showed them DeSoto County's population changes, and explained the goals of redistricting while also taking questions. PX-008; *Trial Tr.* Vol. 8, 1566-68 [Doc. 467]; Vol. 5, 959:24-961:22 [Doc. 464].

After selecting four alternative redistricting map options, D-2; D-3; D-4; D-5; D-6; D-7; D-8; D-388, the board of supervisors held a public hearing about the County's redistricting on June

3

6, 2022. *Trial Tr.* Vol. 8, 1576:17-1577:10 [Doc. 467]. These maps were also on display in the DeSoto County administration building in Hernando, Mississippi, for public viewing prior to the hearing. *Trial Tr.* Vol. 5, 967:5-968:9 [Doc. 464]. Plaintiffs allege, however, the board of supervisors utilized repressive tactics to prevent community input in the redistricting process [479, pp. 8-9]. Unit 5574 did not participate in the redistricting process as an organization, *Trial Tr.* Vol. 2, 378:21-379:5 [Doc. 471]; however, individuals from the DCRC and another organization, the Community Redistricting Committee ("CRC"), presented alternative maps at the June 6, 2022, hearing to those drawn by Mr. Watson. *Trial Tr.* Vol. 5, 975:19-976:7 [Doc. 464]. After reviewing Mr. Watson's four alternate maps, hearing members of the public make statements, and reviewing the two maps presented by the organizations, a Black Hernando alderman, Andrew Miller, requested Mr. Watson change the lines within his district on Alternate Map 1 to retain a certain precinct for his constituents. *Trial Tr.* Vol. 5, 971:13-976:10 [Doc. 464]; PX-21, pp. 9-16. After doing so, the Board of Supervisors unanimously voted to adopt the revised Alternate Map 1 for the redistricting; that is, the 2022 plan at issue in this case. PX-21, p. 16. This litigation followed.

### C. The Litigation

Plaintiffs filed the Complaint [1] in this action on September 12, 2024, alleging Defendants' redistricting of DeSoto County, Mississippi, diluted the county's Black residents' votes in violation of Section 2 of the Voting Rights Act of 1964. Defendants then filed their Motion to Dismiss [36] requesting this Court dismiss all claims against Defendants. This Court granted that motion in part, dismissing Dale Thompson as a party to this lawsuit, but otherwise denied it [98]. Defendants again tried to have this case dismissed by filing a Motion for Summary Judgment [297]. The Court denied that motion [358].

4

Amid the more substantive briefing, however, the parties filed many motions to move the trial date. Plaintiffs began this sequence of events on March 6, 2025, by requesting the Court expedite the trial date in this matter that special elections might be held in the event they win the case on its merits [74]. This Court granted that motion and moved the trial date from the original April 27, 2026, date up to January 26, 2026 [90]. Several months later, Defendants requested this Court either stay the proceedings or continue the trial date until the United State Supreme Court decided *Louisiana v. Callais*, 146 S. Ct. 1131 (2026) [199]. That motion [199] as well as a Motion to Reconsider [367] were denied by this Court [301; 379]. When Defendants found these motions unavailing, they sought a higher power, filing a Writ of Mandamus [62-60020] with the Fifth Circuit Court of Appeals. The Fifth Circuit denied their writ, and this case proceeded to trial according to this Court's scheduled date [397]. Despite all of this, the trial was again rescheduled for February 17, 2026, due to an ice storm's effects on Oxford, Mississippi [403].

Trial of this matter did indeed commence on February 17, 2026, in Oxford, Mississippi. Over the course of the twelve-day bench trial the Court heard testimony from twenty-seven live witnesses and nine more witnesses solely by deposition. Then, on April 26, 2026, the United States Supreme Court decided *Louisiana v. Callais*, 146 S. Ct. 1131 (2026), which had a significant impact on standing Section 2 jurisprudence. Plaintiffs requested this Court move forward on the matter with the established record [474], and the parties briefed the Court on *Callais*'s impact [479; 480; 481]. After reviewing the parties' post-trial briefing on the matter, the Court now conducts its Section 2 analysis with *Callais*'s new standards in mind.

## II.      *Standard for Section 2 of Voting Rights Act Claim*

Plaintiffs claim Defendants violated Section 2 of the Voting Rights Act, specifically 52 U.S.C. § 10301 which states:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

The Fifth Circuit has clearly held a private right of action exists under Section 2 of the VRA. *Robinson v. Ardoin*, 86 F.4th 574, 587-88 (5th Cir. 2023) (citing *OCA-Greater Houston*, 867 F.3d at 614). Defendants, to retain the issue for appeal, argue it does not. Because they have made no substantive arguments on the issue before this Court, no further discussion regarding it will follow.

The primary question before this Court is deceivingly simple; that is, whether "the evidence supports a strong inference that the [County] intentionally drew its districts to afford minority voters less opportunity because of their race." *Callais*, 146 S. Ct. at 1157. To guide courts in their Section 2 analyses, the Supreme Court developed a test in *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). The Supreme Court then gave that test an "update" in its recent *Callais* decision. 146 S. Ct. at 1157 (holding, "We need only update the framework"). "The first *Gingles* precondition is that a community of minority voters must be sufficiently numerous and compact to constitute a majority in a reasonably configured district." *Id.* at 1159. To prove this first precondition, Plaintiffs must provide the Court with illustrative maps that satisfy two sub-conditions: (1) "plaintiffs cannot use race as a districting criterion" when drawing the illustrative maps; and (2) the "illustrative

maps must meet all the [County's] legitimate districting objectives, including traditional districting criteria and the [County's] specified political goals." *Id.* "To satisfy the second and third preconditions—politically cohesive voting by the minority and racial-bloc voting by the majority—the plaintiffs must provide an analysis that controls for party affiliation." *Id.* If these preconditions are met, Plaintiffs must present the Court evidence of the totality of circumstances focusing "on evidence that has more than a remote bearing on what the Fifteenth Amendment prohibits: present-day intentional racial discrimination." *Id.* at 1160.

### III. *Analysis and Discussion*

### A. First *Gingles* Precondition

Under the first *Gingles* precondition, Plaintiffs must show through illustrative maps "that a community of minority voters [is] . . . sufficiently numerous and compact to constitute a majority in a reasonably configured district." *Callais*, 146 S. Ct. at 1159. The creation of these maps must satisfy two sub-conditions: (1) "plaintiffs cannot use race as a districting criterion" when drawing the maps; and (2) the "illustrative maps must meet all the [County's] legitimate districting objectives, including traditional districting criteria and the [County's] specified political goals." *Id.*

### 1. *Use of Race as Districting Criterion*

The parties disagree on the first sub-condition's meaning. Plaintiffs argue *Callais* merely clarified, in adducing illustrative maps, they cannot subordinate "'race-neutral districting criteria . . . to racial considerations'" [479 (quoting *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 7 (2024))]. Defendants take the position *Callais* prohibits *any* use of race as a districting criterion [480]. The Court agrees with Defendant's interpretation based on the plain reading of *Callais*. While Plaintiffs correctly note the Supreme Court did not specifically overrule *Allen v. Milligan*,

599 U.S. 1 (2023), the Court nonetheless updated the *Gingles* analysis, prohibiting the use of race as a "districting criterion" when drawing the illustrative maps to prove a Section 2 claim. *Callais*, 146 S. Ct. at 1159, 1162-63.

The record is clear on this point, Plaintiffs used race in, at minimum, a background sense to develop their illustrative maps. Plaintiffs hired Mr. William S. Cooper to draw their illustrative maps, and this Court accepted him as an expert in his field. *Trial Tr.* Vol. 1, 117:5-17 [Doc. 470]. Mr. Cooper's expert report sought "to determine whether the Black population in DeSoto County is 'sufficiently large and geographically compact' to allow for one majority-Black district in a five-district plan." PX-149, p. 5. To accomplish this, Mr. Cooper used the *Maptitude for Redistricting* software program, into which he input U.S. Census Bureau population data and geographic shapefiles as well as DeSoto County's geographic information system (GIS) office's geographic shapefiles and PDF maps. *Id.* at 6. From this, Mr. Cooper put "green dots over the 30 percent plus voting districts. Occasionally, the 30 percent plus census blocks and develop a plan just looking at the 30 percent plus Black district—Black geographies." *Trial Tr.* Vol. 1, 157:8-11 [Doc. 470]. Mr. Cooper characterizes this dot method as "consistent" with the way he normally draws maps and claims it allows him to see "where there's a concentration or a cluster of green dots, that's generally . . . an area that one might want to include in a majority-Black district." *Trial Tr.* Vol. 1, 159:2-9 [Doc. 470]. This, Mr. Cooper claims, is his utilization of race "in the background." *Trial Tr.* Vol. 1, 159:13-16 [Doc. 470].

As an added measure, Dr. Sean Trende also walks through several instances in Mr. Cooper's Illustrative Maps 1, 2, and 3 where Dr. Trende claims Mr. Cooper subordinated traditional redistricting criteria to racial concerns.[1] D-4918, pp. 17-30. The use of race in the development of

---

[1] While this is traditionally considered under the totality of the circumstances portion of the *Gingles* analysis, the Court notes Mr. Cooper's illustrative maps demonstrates his subordination of traditional districting criteria—like

these maps is now prohibited under *Callais*'s updated standard. Plaintiffs used race to develop their illustrative maps; therefore, Plaintiffs fail on the first *Gingles* factor's first sub-condition.

### 2. *Maps Meeting Legitimate Districting Objectives*

The Court now turns to the first *Gingles* factor's second sub-condition. To reiterate, Plaintiffs' "illustrative maps must meet all the [County's] legitimate districting objectives, including traditional districting criteria and the [County's] specified political goals." *Callais*, 146 S. Ct. at 1159. Defendants claim Plaintiffs' illustrative maps must meet or do better than the County's standing map or the Enacted Plan, PX-83, in: "compactness, trying to keep incumbents in their respective districts, avoiding splitting neighborhoods, avoiding removing areas of strong constituency, and trying to use visible boundaries" [480, p. 11 (citing PX-322, p. 2; *Trial Tr.* Vol. 8, 1548:5-24 [Doc. 467])]. Defendants also seek to add an additional criterion: "Defendants kept all incumbents' home addresses in the districts where they had previously been located in the 2011 Enacted Plan" in the 2022 Enacted Plan [480, p. 11]. To be sure, each of these interests is constitutionally permissible. *Callais*, 146 S. Ct. at 1156 (quoting *Bush v. Vera*, 517 U.S. 952, 964 (1996); *Miller v. Johnson*, 515 U.S. 900, 906, 916 (1995)).

Plaintiffs argue they were under no obligation to consider any goals or criteria other than ensuring "the [C]ounty's twenty-five elected officials were protected, and no two incumbents for the same office were paired together in any district" because "the County itself did not advance any" other districting criteria [479, p. 4]. Plaintiffs' Illustrative Maps 1 and 3 clearly fail under sub-section two because they do not "protect all the incumbents that the [County] sought to shield." *Callais*, 146 S. Ct. at 1161. Therefore, the only map left for consideration is Illustrative Map 2.

---

the equal distribution of road mileage between supervisors—to race. PX-154; PX-155; PX-156; *Trial Tr.* Vol. 10, 1934:8-16 [Doc. 468]; *Trial Tr.* Vol. 11, 2161:22-2169:19 [Doc. 469]. One need only look at the size of District 4 in each illustrative map to understand just how disproportionate that distribution truly is for each supervisor.

Plaintiffs claim Illustrative Map 2 satisfies the second sub-condition because it avoids incumbent contests, has compactness measures within the same range as the Enacted Plan [479, p. 4 (citing PX-149 at 26; *Trial Tr.* Vol. 1, 170:14-172:6 [Doc. 470])], and is either "comparable" or "outperforms" the Enacted Plan, PX-83, on other traditional districting criteria [479, p. 4 (citing PX-149 at 26)].

Defendants, for their part, argue Illustrative Map 2 does not satisfy the second sub-condition. They first claim Illustrative Map 2 ignores the County's traditional districting criteria by splitting neighborhoods, failing to maintain communities of interest, and failing to maintain traditional boundaries [480, p. 11 (citing *Trial Tr.* Vol. 11, 2157:22-2159:9 [Doc. 469])]. When discussing the 2022 Enacted Plan, PX-83, during trial, Supervisor Lee Caldwell testified the 2022 Enacted Plan *recombined* the Greenbrook, Tulane, Jordan Drive, and Nesbit communities.[2] *Trial Tr.* Vol. 11, 2157:22-2159:9 [Doc. 469]. Unlike the Enacted Plan, PX-83, Dr. Sean Trende's expert report walks through several precinct splits in Illustrative Map 2 [D-4918, pp. 23-28]. The only evidence Plaintiffs cite to counter this evidence is Mr. Cooper's report stating Illustrative Map 2 has one less Populated Voting Tabulation District ("VTD") Split and one less Municipal Split than the 2022 Enacted Plan. PX-149, p. 26. Mr. Cooper notes in his report, PX-149 at p. 18 n.17, "VTDs are synonymous with precincts as defined by the Census Bureau in the 2020 Census." Similarly, Dr. Trende refers to them as "the census version of precincts." D-4918, p. 14.

Based on the record before this Court, it is possible Illustrative Map 2 could split more neighborhoods and communities of interest if they do not fall within the definition of a VTD, but the Court does not have the record evidence to truly define the communities of interest in DeSoto County except for those discussed above by Supervisor Caldwell and Dr. Trende. This lack of

---

[2] Mississippi State Representative Rodney Hall testified Greenbrook is "a predominantly Black precinct" in his district. *Trial Tr.* Vol. 10, 1885:19-23 [Doc. 468].

clarity leans in Defendants' favor because it is Plaintiffs' burden to prove by a preponderance of the evidence their maps accomplish all the County's legitimate districting objectives.

In addition to these arguments, Defendants contend Plaintiffs' Illustrative Map 2 fails to "keep incumbents in their respective districts" and fails to avoid "removing areas of strong constituency" [480, p. 12]. Defendants take particular issue with Illustrative Map 2 moving "incumbent Justice Court Judge Billy Lantrip out of District 3 and into District 2 and incumbent Justice Court Judge Karen Carter out of District 5 and into District 4" [480, p. 12]. Plaintiffs call this a "newly discovered 'interest'" [481, p. 3], but the Court finds that statement rather far-fetched when Defendants are citing one of Plaintiffs' own exhibits [see 480, p. 12 (citing PX-322 at 2)]. Despite this, Plaintiffs counter keeping these particular incumbents in their districts should not matter because Justice Court judges "are not even required to reside in the district where they are running," [481, p. 3 n.2]. Defendants acknowledge Justice Court judges are not required to reside in their elected district, but the County chose to keep those Justice Court judges (and all other elected officials) in their respective district in the 2011 Enacted Plan, requiring Plaintiffs to do so in their illustrative maps [480, p. 12]. The Court agrees with Defendants here based on the standard set forth in *Callais*. This criterion was discussed in the Board of Supervisor's official meeting minutes. PX-322, p. 2. regarding redistricting, Plaintiffs knew about it, and their illustrative maps do not comport with the County's legitimate districting objective.

What is more, Defendants argue "Plaintiffs' illustrative maps shift a significant portion of incumbents' core constituencies with respect to the 2022 Enacted Plan" [480, p. 13]. Defendants substantiate this argument with core retention rates [480, p. 13 (citing PX-183)]. As Defendants' expert, Dr. Sean Trende, explained during trial, "[C]ore retention is a measure of how much of a previous district an enacted district keeps together—how much of the population, I should say."

*Trial Tr.* Vol. 9, 1818:5-7 [Doc. 438]. This, Dr. Trende reports, puts incumbents in front of new voters and opens them up to primary challenges [480, p. 13 (citing *Trial Tr.* Vol. 9, 1818:20-1819:8 [Doc. 438])]. The Supreme Court has formerly devalued core retention as a comparator metric between enacted plans and illustrative plans, explaining it "had never held that a State's adherence to a previously used districting plan can defeat a § 2 claim. If that were the rule, a State could immunize from challenge a new racially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan." *Allen v. Milligan*, 599 U.S. 1, 22 (2013). This, of course, was prior to *Callais*, and this Court finds core retention rates may be more useful under *Callais*'s new standard, at least in the case *sub judice.* If a government body charged with redistricting (*e.g.*, a state or county) seeks to prevent shifts in incumbents' constituencies for political purposes, core retention rates provide the Court with a comparator metric showing how an incumbent's constituency may shift under an altered map. The Court therefore credits Dr. Trende's core retention testimony and finds it persuasive.

Based on the previous findings, the Court is of the opinion Plaintiffs failed to show "a community of minority voters [is] . . . sufficiently numerous and compact [in DeSoto County] to constitute a majority in reasonably configured district" because their illustrative maps use race as a districting criterion and fail to meet all the County's legitimate districting objectives. *Callais*, 146 S. Ct. at 1159. This is fatal to Plaintiffs' case and enough for this Court to rule in Defendants' favor; however, the Court proceeds with the other *Gingles* preconditions as a precautionary measure.

### B. Second and Third *Gingles* Preconditions

In *Callais*, the Supreme Court analyzed the second and third *Gingles* preconditions together, as is often the case,[3] and the new standard is clear:

> To satisfy the second and third [*Gingles*] preconditions—politically cohesive voting by the minority and racial-bloc voting by the majority—the plaintiffs must provide an analysis that controls for party affiliation. In other words, they must show that voters engage in racial bloc voting that cannot be explained by partisan affiliation.

*Callais*, 146 S. Ct. at 1159.

Plaintiffs claim they satisfied the second and third *Gingles* preconditions "through strong evidence of racially polarized voting in non-partisan and . . . intra-party elections" [479, p. 5]. They refer to their expert, Dr. Jacob Grumbach, whose report showed what Plaintiffs describe as "high levels of racial polarization" in non-partisan school board elections [479, p. 5]. PX-200, p. 6. Dr. Grumbach's expert report, PX-184, assesses "whether recent elections in DeSoto County, MS[,] are racially polarized," and his reply report, PX-193, then "respond[s] to the opinions contained in the reports from Dr. Alford and Dr. Bonneau." D-4916; D-4913; D-4913A; D-4913B.

At trial, Dr. Grumbach was tendered as an expert witness "on the statistical analysis of election data including the analysis of polarized voting in elections." *Trial Tr*. Vol. 4, 634:12-15 [Doc. 463]. After determining the voting age population ("VAP") of each of DeSoto County's electoral precincts, Dr. Grumbach utilized ecological regression and ecological inference to analyze that data in the context of endogenous and exogenous elections. PX-184, p. 5. Dr. Grumbach excluded unopposed elections from his analysis, two of which are the elections of Mississippi State Representative Rodney Hall and DeSoto County Sheriff Thomas Tuggle.[4] PX-

---

[3] See *e.g.*, *Growe v. Emison*, 507 U.S. 25, 40 (1993); *Allen v. Milligan*, 599 U.S. 1, 22 (2023).

[4] These particular elections are significant because Representative Hall and Sheriff Tuggle are Black officials elected in DeSoto County after running unopposed. *Trial Tr.* Vol. 10, 1886:11-19 [Doc. 468]; Vol. 11, 2228:8-24 [Doc. 469]. Indeed, both defeated White candidates in Republican primaries. *Trial Tr.* Vol. 8, 1715:23-1716:1 [Doc. 467]; Vol. 10, 1881:3-10 [Doc. 468]; Vol. 11, 2225:4-18 [Doc. 469].

13

184, p. 5 n.2. The results of these analyses, in Dr. Grumbach's opinion, "show substantial racial polarization between the Black and non-Black electorates." PX-184, p. 7-8. What is interesting for our current purposes, however, is Dr. Grumbach testified he "did not do an analysis that takes [an election's partisanship or nonpartisanship] into account in some way." *Trial Tr.* Vol. 4, 724:3-7 [Doc. 463]. Indeed, Dr. Grumbach testified it would be *inappropriate* to control for partisanship in his analysis [480, p. 14 (citing *Trial Tr.* Vol. 4, 681:5-13 [Doc. 463]; PX-193 at 8) (emphasis added)].

Regarding intra-party polarization, Plaintiffs refer to Dr. Christopher Bonneau's corrected expert report. D-4913A; D-4913B. Dr. Bonneau was accepted "as an expert in the field of politics, campaigns, and elections." *Trial Tr.* Vol. 8, 1692:4-11 [Doc. 467]. Plaintiffs argue Dr. Bonneau's analysis shows in one election "White voters were much more willing to vote for a White Democrat and that only a White Democrat made an election competitive is evidence that race drives polarization" [479, p. 6 (citing *Ala. State Conf. of the NAACP v. Allen*, 796 F. Supp. 3d 759, 861-65 (N.D. Ala. 2025)]. To be sure, "intra-party racial-bloc voting pattern[s] help[] to demonstrate that the minority plaintiffs have 'less opportunity' than their majority counterparts because of race, not just because of partisan affiliation." *Callais*, 146 S. Ct. at 1159. In their summation after trial, Plaintiffs noted Dr. Bonneau's corrected analysis showed "when a White Democrat ran for office, he did better than any Black Democrat. He also did better than any Black person who ran in a nonpartisan race. That includes a Black candidate who ran in a nonpartisan race in the same district in the same year." *Trial Tr.* Vol. 12, 2262:3-7 [Doc. 441]. The problem with Plaintiffs' case, however, is they provide nothing more than one example from Dr. Bonneau's analysis. What is more, the Court finds little value in Dr. Bonneau's testimony considering the numerous errors requiring correction during trial. *Trial Tr.* Vol. 8, 1693:17-1703:23 [Doc. 467]. Plaintiffs' evidence

is simply too little to carry the day on the second and third *Gingles* preconditions under the new *Callais* standard.

Defendants begin their response by attacking Dr. Grumbach's analysis, noting he "did not account for party affiliation." *Trial Tr.* Vol. 4, 723:24-724:7 [Doc. 463]. They argue this is essentially a concession on the Plaintiffs' part because *Callais* now requires the second and third *Gingles* preconditions be analyzed controlling for party affiliation, and Plaintiffs' failure to do so fails to "disentangle race from the [County's] race-neutral considerations, including politics." *Callais*, 146 S. Ct. at 1157, 1159. Defendants additionally point to their expert, Dr. John Alford, whose analysis does control for partisanship. D-4916. Dr. Alford was tendered during trial as an expert "in the area field of American elections and voting behavior, particularly, as it pertains to *Gingles* 2 and 3 and Senate Factor 2." *Trial Tr.* Vol. 8, 1631:19-1632:3 [Doc. 467]. It should be noted Dr. Alford clearly stated during trial, "To the extent that [Dr. Grumbach] concludes that Black voters and White voters vote differently in DeSoto County, we don't disagree." *Trial Tr.* Vol. 8, 1633:15-22 [Doc. 467]. However, he finds "within the pool of Democratic candidates [in DeSoto County's exogenous elections], about half of whom are Black and about half of whom are White," no difference exists "either in the level of support given by Black voters to the Democratic candidate based on the race of the candidate; or in the lack of support among White voters for the Democratic candidate," and this is "regardless of whether the Democratic candidate is Black or White." *Trial Tr.* Vol. 8, 1638:5-11 [Doc. 467]. The Court credits Dr. Alford's testimony and finds it relevant to, at minimum, show an analysis controlling for partisanship was possible in the case *sub judice.*

The Court is of the opinion Plaintiffs have failed to carry their burden under the second and third *Gingles* preconditions because they provide no analysis that controls for party affiliation as

15

instructed in *Callais*. 146 S. Ct. at 1159. The only evidence they do provide is one example election, and even that is called into question because of the many errors in the expert's analysis. Plaintiffs do not provide the requisite evidence to show DeSoto County "voters engage in racial bloc voting that cannot be explained by partisan affiliation." *Callais*, 146 S. Ct. at 1159. Therefore, the Court finds Plaintiffs have failed on all three *Gingles* preconditions.

## C. Totality of the Circumstances

Because the Plaintiffs fail to overcome their burden on any of the three *Gingles* preconditions, the Court need not continue with the totality of the circumstances analysis. The Court's inquiry stops with the Plaintiffs' failure on all three *Gingles* preconditions. *Callais*, 146 S. Ct. at 1146 (quoting *Allen v. Milligan*, 599 U.S. 1, 18 (2023)) ("[A] plaintiff *who demonstrates the three preconditions* must also show, under the 'totality of the circumstances,' that the political process is not 'equally open' to minority voters.")

## IV.    *Conclusion*

Failing to overcome the first, second, and third *Gingles* preconditions, the Court finds Plaintiffs did not present enough evidence to support "a strong inference that the [County] intentionally drew its districts to afford minority voters less opportunity because of their race." Callais, 146 S. Ct. at 1157. As a result, Plaintiffs cannot prove their claims for vote dilution pursuant to Section 2 of the Voting Rights Act, and judgment must be awarded to Defendants.

A judgment in accordance with this opinion shall issue this day.

THIS, the ___24th___ day of June, 2026.

_Glen H. Davidson_
SENIOR U.S. DISTRICT JUDGE

16